1  BLOOD HURST & O'REARDON, LLP
   TIMOTHY G. BLOOD (149343)
2  THOMAS J. O'REARDON, II (247952)
   PAULA R. BROWN (254142)
3  701 B Street, Suite 1700
   San Diego, CA  92101
4  Tel: 619/338-1100
   619/338-1101 (fax)
5  tblood@bholaw.com
   toreardon@bholaw.com
6  pbrown@bholaw.com

7  BARNOW AND ASSOCIATES, P.C.
   BEN BARNOW (*pro hac vice*)
8  ERICH P. SCHORK (*pro hac vice*)
   1 North LaSalle Street, Suite 4600
9  Chicago, IL  60602
   Tel: 312/621-2000
10 312/641-5504 (fax)
   b.barnow@barnowlaw.com
11 e.schork@barnowlaw.com

12 [Additional Counsel Appear on Signature Page]

13 Attorneys for Plaintiffs and the putative Class

14 **UNITED STATES DISTRICT COURT**

15 **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

16 BRIAN WARNER, KENNETH               Case No. 2:15-cv-02171-FMO-(FFMx)
   MAC LEOD; MICHAEL MEADE,
17 MICHAEL WATSON, JAMES               **CLASS ACTION**
   FULLER, and DALE FRANQUET,
18 individually and on behalf of all    **SECOND AMENDED COMPLAINT**
   others similarly situated,
19
            Plaintiffs,                USDJ:   Fernando M. Olguin
20                                     Ctrm:   22, 5th Floor – Spring
      v.                               USMJ:   Frederick F. Mumm
21                                     Ctrm:   E, 9th Floor – Spring
   TOYOTA MOTOR SALES, U.S.A.,
22 INC., a California corporation,

23          Defendant.                 JURY TRIAL DEMANDED

24 _____    Complaint Filed: March 24, 2015

25

26

27

28

Plaintiffs Brian Warner, Ryan Burns, Kenneth MacLeod, Michael Watson, Michael Meade, James Fuller, James Good, and Dale Franquet ("Plaintiffs"), individually and on behalf of all others similarly situated, upon personal knowledge of the facts pertaining to themselves and on information and belief as to all other matters, by and through undersigned counsel, hereby bring this Class Action Complaint against Defendant Toyota Motor Sales, U.S.A., Inc. ("Toyota" or "Defendant"), and allege as follows:

## NATURE OF THE CASE

1.      The frames for certain model year Toyota vehicles are prone to excessive, premature rust corrosion because the frames were not properly prepared and treated against rust corrosion when they were manufactured. The model years at issue are: 2005 to 2010 Toyota Tacomas ("Tacoma Vehicles"), 2007 to 2008 Toyota Tundras ("Tundra Vehicles"), and 2005 to 2008 Toyota Sequoias ("Sequoia Vehicles") (collectively, the "Toyota Vehicles"). Excessively corroded frames pose a serious safety hazard to a vehicle's occupants because a vehicle's frame forms the basis of a vehicle's crashworthiness, including its ability to withstand or minimize damage to the occupant compartment in the event of an accident.

2.      Defendant has represented that its vehicles are crashworthy throughout the expected life of the vehicles and its customers expect vehicles to remain crashworthy throughout the vehicle's life. Contrary to this promise and expectation, the frames of the Toyota Vehicles were designed, manufactured, and sold with inadequate rust corrosion protection. As a result, the frames on every Toyota Vehicle are prone to excessive rust corrosion, which render the vehicles unstable and unsafe.

3.      This condition is unrelated to and separate from normal surface rust, which is commonly found on metallic surfaces after some years of usage and environmental exposure. A vehicle with a sufficiently corroded frame is

Case No. 2:15-cv-02171 FMO (FFMx)

SECOND AMENDED COMPLAINT

BLOOD HURST & O'REARDON, LLP

00110878

1    worthless unless the corroded frame is replaced.

2          4.    Toyota has long known the frames on the Toyota Vehicles are

3    defective because they lack adequate rust corrosion protection. Despite this

4    knowledge, Toyota failed to disclose the existence of this defect to Plaintiffs,

5    other Class members, and the public. Nor has it issued a recall to inspect and

6    repair the Toyota Vehicles, or offered to reimburse the Toyota Vehicle owners

7    for costs incurred to identify and repair this defect.

8          5.    Instead Toyota initiated non-publicized Limited Service Campaigns

9    that provided inadequate relief for only some of the affected models in limited

10   geographic areas. The Limited Service Campaigns continued to mislead Toyota

11   Vehicle owners because those vehicles not covered by the campaign were lead to

12   believe their vehicles were not affected, when they were.

13                      **JURISDICTION AND VENUE**

14         6.    The Court has jurisdiction over Plaintiffs' claims pursuant to

15   28 U.S.C. §1332(d), because: (a) this action is brought as a proposed class action

16   under Fed. R. Civ. P. 23; (b) the proposed Class includes more than 100

17   members; (c) many of the proposed Class members are citizens of states that are

18   diverse from Toyota's citizenship; and (d) the matter in controversy exceeds

19   $5,000,000, exclusive of interest and costs.

20         7.    Venue is proper in this judicial District under 28 U.S.C. §1391(a)

21   because a substantial part of the challenged conduct or omissions giving rise to

22   claims occurred and/or emanated from this District, Toyota is headquartered in

23   this District and Toyota has caused harm to Class members residing in this

24   District.

25                              **PARTIES**

26         8.    Plaintiff Brian Warner is in the military and resides in the State of

27   Texas. He is a citizen of the State of Ohio. In 2010, Warner purchased a used

28   2006 Toyota Tacoma in Ohio. The frame on Warner's Tacoma vehicle is

BLOOD HURST & O'REARDON, LLP

severely corroded. Toyota has refused to replace the frame or apply rust corrosion protection to the frame.

9.     Plaintiff Kenneth MacLeod resides in and is a citizen of the State of Maryland. In 2009, MacLeod purchased a new 2009 Toyota Tacoma. The frame on MacLeod's Tacoma has suffered significant rust corrosion requiring replacement at a cost of approximately $15,000. Toyota has refused to replace the frame on MacLeod's vehicle.

10.     Plaintiff Ryan Burns resides in and is a citizen of the State of Arkansas. Burns purchased a 2005 Toyota Tacoma from J. Pauley Toyota in Fort Smith, Arkansas on April 30, 2005. Burns' Tacoma has suffered significant rust corrosion to his vehicle's frame. Toyota has refused to replace the frame on Burns' vehicle.

11.     Plaintiff Michael Meade resides in and is a citizen of the State of Louisiana. In 2010, Meade purchased a certified-used 2006 Toyota Tacoma. The frame on Meade's Tacoma suffered significant rust corrosion, requiring replacement.

12.     Plaintiff Michael Watson resides in and is a citizen of the State of Florida. In September 2005, Watson purchased a new 2005 Toyota Tacoma from Stadium Toyota in Tampa Florida. The frame on Watson's Tacoma vehicle experienced significant rust corrosion, requiring replacement.

13.     Plaintiff Dale Franquet resides in and is a citizen of the State of Pennsylvania. In 2009, Franquet purchased a used 2005 Toyota Tacoma in New York. The frame on Franquet's Tacoma experienced significant rust corrosion, requiring replacement.

14.     Plaintiff James Fuller resides in and is a citizen of the State of South Carolina. In January 2014, Fuller purchased a used 2006 Toyota Tacoma. The frame on Fuller's Tacoma experienced significant rust corrosion, requiring replacement.

15. Plaintiff James Good resides in and is a citizen of the State of Maryland. In May 2006, Good purchased a new 2006 Toyota Sequoia. Good's Sequoia has suffered significant rust corrosion to the frame.

16. Defendant Toyota Motor Sales, U.S.A., Inc. ("Toyota"), is incorporated in the State of California and is headquartered in Torrance, California. Toyota sells, markets, distributes, and services Toyota vehicles in the United States, including the Toyota Vehicles. From its Torrance, California office, Toyota makes all decisions related to marketing the Toyota Vehicles in the United States and implementing its Limited Service Campaigns. All inquiries related to the Limited Service Campaigns and requests for reimbursement as alleged below, are directed to Toyota's Torrance, California headquarters.

## FACTUAL BACKGROUND

### *Excessive Rust Corrosion and Perforation*
### *Renders the Toyota Vehicles Unsafe*

17. A vehicle frame is the main supporting structure to which all other components are attached of a motor vehicle with a "body on frame" design. The function of frames include handling static and dynamic loads with unintended deflection and distortion, preventing undesirable forces and twisting from driving over uneven surfaces, engine torque, vehicle handling and accelerating and decelerating. Frames also are the primary component that guard against sudden impacts and collisions.

18. The Toyota Vehicles were manufactured with frames lacking adequate rust corrosion protection. As a result, the Toyota Vehicles' frames are prone to experiencing severe premature rust corrosion, which affects the structural integrity of the vehicles, rendering them unsafe to drive and a hazard on the roadways.

19. Rust corrosion has a significant deleterious effect on metal items. It makes them weaker by replacing the strong iron or steel with flaky powder,

1  ultimately leading to perforations. Rust corrosion is a progressive process. Once
2  corrosion begins, it will not stop until adequately repaired.

3  20.    The frames on the Toyota Vehicles are materially the same for
4  purposes of this lawsuit and suffer from the same defect. All of the frames were
5  manufactured by the same corporation (Dana Holding Corporation) pursuant to
6  the same defective process. Further, the Sequoia is based on the Tundra, sharing
7  the same frame and frame assembly.

8  21.    Because the damage is typically on the undercarriage of the Toyota
9  Vehicles it goes undetected unless purposefully inspected, for example, through
10  a mandatory state safety inspection or otherwise.

11  22.    Corrosion of the Toyota Vehicles is unrelated to and separate from
12  normal surface rust experienced after years of usage and/or exposure to
13  environmental conditions.

14  23.    The excessive rust corrosion on the Toyota Vehicles compromises
15  the vehicles' safety, stability, and crash-worthiness because important suspension
16  components, engine mounts, transmission mounts, and body mounts anchor to
17  the vehicles' frames. It has also affected the value of the vehicles.

18  24.    According to Popular Mechanics, "A rusted-through frame means
19  the structural and crash integrity of the car is questionable, and it should be
20  inspected    and    repaired    by    a    qualified    repair    facility."    *See*
21  http://www.popularmechanics.com/cars/how-to/repair/how-to-fight-rust-and-
22  win-14930616 (last visited October 5, 2016).

23  25.    As described on AutoGuide.com, "excessive rust often signals the
24  impending death of a vehicle. Its useful life [is] essentially over." Further:

25  Frame rust is a big concern, as it affects the integrity of the car. Bad
26  enough frame rust can cause parts to snap off or crack, which will
  really compromise the safety of you, your passengers and other
27  motorists. It may also significantly diminish the car's ability to
  protect you in a crash.
28

BLOOD HURST & O'REARDON, LLP

Case No. 2:15-cv-02171 FMO (FFMx)

00110878                              SECOND AMENDED COMPLAINT

Sami Haj-Assaad, *Should You Buy a Car with Rust?*, AutoGuide.com (Feb. 24, 2014), available at http://www.autoguide.com/auto-news/2014/02/buy-car-rust.html (last visited October 5, 2016).

26.   Excessive rust corrosion and perforation on the Toyota Vehicles also causes the vehicles to fail state safety inspections. Once a vehicle fails state safety inspection, consumers cannot use their vehicle unless and until they spend time and money to remediate the rust and perforation.

### Toyota Knew of the Defect and Failed to Protect Consumers

27.   Toyota represented and promised that it used the "most advanced technology available" to ensure the Toyota Vehicles were, at the least, equipped with reasonably corrosion-resistant parts. For example, Toyota made the following representation in the owner's manuals for the Toyota Vehicles:

> Toyota, through its diligent research, design and use of the most advanced technology available, helps prevent corrosion and provides you with the finest quality vehicle construction.

28.   Toyota has long been aware that frames on the Toyota Vehicles exhibited excessive rust corrosion and perforation because they did not have adequate corrosion-resistant protection. Similar frames on other Toyota vehicles exhibited the same excessive rust corrosion and perforation. Further, Limited Service Campaigns initiated by Toyota to address this known defect were inadequate and failed to warn consumers about the extent and gravity of this hazard. Toyota has long been aware that frames on the Toyota Vehicles were exhibiting excessive rust corrosion because they were not manufactured correctly.

29.   In or around March 2008, after receiving numerous reports that frames on approximately 813,000 model year 1995 through 2000 Tacoma vehicles had exhibited excessive rust corrosion, Toyota initiated a Customer Support Program that extended the vehicles' warranty coverage for frame

BLOOD HURST & O'REARDON, LLP

00110878

perforation caused by rust corrosion. Under the program, Toyota, at its option, was to repair or repurchase any vehicle exhibiting perforation of the frame due to rust corrosion.

30.   At that time, Toyota conceded that it had investigated "reports of 1995-2000 model year Tacoma vehicles exhibiting excessive rust corrosion to the frame causing perforation of the metal" and "determined that the vehicle frames in some vehicles may not have adequate corrosion-resistant protection." In a memorandum sent to dealers, distributors, and certain owners, Toyota emphasized that "[t]his [rust corrosion] is unrelated to and separate from normal surface rust which is commonly found on metallic surfaces after some years of usage."

31.   Another Toyota "Warranty Policy Bulletin," distributed on or around March 7, 2008, instructed service managers and warranty administrators that "[v]ehicle inspections should only be performed if the customer has noticed excessive rust." Toyota sought to limit the costs of this campaign by offering inspections only when a customer requested one. Toyota, knowing that many owners would not notice excessive rust corrosion in the undercarriage of the vehicle, disregarded its responsibility to correct latent defects in its products and reduce the unreasonable risk that its customers and others would be injured by the undiscovered, hidden defect.

32.   Toyota subsequently modified and expanded this Customer Support Program to include 2001-2004 Tacoma models.

33.   In November 2012, Toyota recalled approximately 150,000 Tacoma vehicles to inspect and replace the spare-tire carrier on vehicles sold in twenty cold weather states. The recall was issued to address the problem of spare-tire carriers rusting through and causing the spare tire to drop to the ground.

///

///

BLOOD HURST & O'REARDON, LLP

00110878

*Toyota Tacoma Limited Service Campaigns*

34.    Although Toyota has known that the Toyota Vehicles suffer from excessive premature rust corrosion and that this is a safety-related defect, Toyota continues to mislead consumers and fails to adequately remedy the problem.

35.    Through the issuance of two separate Limited Service Campaigns in 2014 and 2015, Toyota admits that the Tacoma Vehicles suffer from inadequate rust protection leading to excessive premature rust corrosion. However, Toyota has failed to adequately inform consumers of the true nature of the defect, the number of vehicles and models actually affected and continues to offer inadequate remedies.

36.    In 2014, Toyota issued the first Limited Service Campaign ("2014 Campaign"), which applied only to certain 2005-2008 Tacoma Vehicles registered in certain cold weather states (Connecticut, Delaware, Illinois, Indiana, Massachusetts, Maryland, Maine, Michigan, Minnesota, New Hampshire, New Jersey, Ohio, Pennsylvania, Rhode Island, Virginia, Vermont, Wisconsin, and West Virginia). In notifying dealerships of the 2014 Campaign, Toyota expressly admitted as follows:

- Toyota has received reports that certain 2005 through 2008 model year Tacoma vehicles operated in specific cold climate areas (Cold Climate States) with high road salt usage may exhibit more-than-normal corrosion to the vehicle's frame.

- Toyota investigated these reports and determined that the frames in some vehicles may not have corrosion-resistant protection sufficient for use in these areas.

- This combined with prolonged exposure to road salts and other environmental factors, may contribute to the development of more-than-normal rust in the frame of some vehicles.

BLOOD HURST & O'REARDON, LLP

SECOND AMENDED COMPLAINT

00110878

- This condition is unrelated to and separate from normal surface rust which is commonly found on metallic surfaces after some years of usage and/or exposure to the environment.

37.     The 2014 Campaign was not a formal recall and was not widely publicized. Rather, Toyota's efforts to notify affected individuals of the 2014 Campaign consisted solely of sending letters to certain owners of affected Tacoma Vehicles registered in above-mentioned cold-weather states based on address information obtained from a third party and instructing dealerships to forward notice of the 2014 Campaign to non-original purchasers of Tacoma Vehicles whom they were aware of. Accordingly, by design, the 2014 Campaign did not reach numerous affected Class members.

38.     Additionally, the relief provided under the 2014 Campaign was inadequate and unnecessarily limited. Under this Campaign, owners of Tacoma Vehicles registered in the 20 defined cold weather states could bring their vehicles to a participating Toyota dealership for inspection to determine whether rust perforation of 10 mm or larger was identifiable on certain designated areas of the vehicle's frame. Compliance with the program and requirements was inconsistent.

39.     If a dealership's inspection revealed a hole 10 mm or larger on a designated portion of a Tacoma Vehicle's frame, a new frame was to be installed. However, Toyota did not mandate that a replacement frame be installed within a defined time period, forcing owners to unwittingly drive unsafe vehicles.

40.     Additionally, the 2014 Campaign limited relief to only those vehicles that were brought in for inspection before March 31, 2016, an arbitrary deadline. Thus, Tacoma Vehicles that suffered from excessive rust corrosion after March 31, 2016, were not eligible for any repair from Toyota.

BLOOD HURST & O'REARDON, LLP

00110878

41.     In April 2015, after the filing of Plaintiffs' initial complaint, Toyota issued a second Limited Service Campaign (the "2015 Campaign") for certain model year 2005-2008 Tacoma Vehicles in the 30 states not covered by the 2014 Campaign. Through the 2015 Campaign, Toyota conceded that Toyota Vehicles in warm weather states also suffer from excessive rust corrosion and perforation.

42.     Like the 2014 Campaign, the 2015 Campaign was not widely publicized. Rather, Toyota's efforts to notify affected individuals of the 2015 Campaign consisted solely of sending letters to certain owners of affected Tacoma Vehicles registered in above-mentioned cold weather states based on address information obtained from a third party and instructing dealerships to forward notice of the 2015 Campaign to non-original purchasers of Tacoma Vehicles whom they were aware of.

43.     The letters Toyota sent to owners of certain Toyota Vehicles registered in the 30 states covered by the 2015 Campaign were misleading on the cause of the rust corrosion attributing it solely to cold climate areas with "high" road salt use. Each such letter stated:

### What is the condition?

Toyota has received reports that certain 2005 through 2008 model year Tacoma Vehicles operated in specific cold climate areas with high road salt use may exhibit more-than-normal corrosion to the vehicle's frame. This condition is unrelated to and separate from normal surface rust which is commonly found on metallic surfaces after some years of usage and/or exposure to the environment.

44.     The 2015 Campaign letters left decisions to the vehicle owner, rather than directing all vehicles to be inspected:

### What is included in this Limited Service Campaign?

If you believe your vehicle has been operated in cold climate regions of the United States where high road salt is frequently used, any authorized Toyota Dealer will inspect your vehicle's frame for excessive rust corrosion.

BLOOD HURST & O'REARDON, LLP

Case No. 2:15-cv-02171 FMO (FFMx)

SECOND AMENDED COMPLAINT

00110878

45.     A reasonable person would interpret such language to mean that the 2015 Campaign only applied to vehicles that had been operated in certain areas of cold climate regions of the United States where "high" road salt was used. However, the excessive rust corrosion and perforation exhibited by Tacoma Vehicles in states throughout the country has little or nothing to do with road salt.

46.     The 2015 Campaign was even more restrictive than the 2014 Campaign, providing remedies, if any, for vehicles already exhibiting excessive rust corrosion to certain portions of the vehicle's frame. The 2015 Campaign did not allow for application of rust protection on the majority of vehicles affected. Indeed, the instruction to the Toyota dealer was that "[i]f the vehicle's frame passes Toyota's inspection, no further action is required."

47.     Like the 2014 Campaign, the 2015 Campaign limited all relief to vehicles that were inspected before the arbitrary deadline of March 31, 2016. Accordingly, Tacoma Vehicles that suffered from excessive rust corrosion after March 31, 2016, would not receive any repair.

48.     Replacing the rusted-through frames on Tacoma Vehicles pursuant to the 2014 and 2015 Campaigns is a lengthy and highly complex process. The Technical Instructions that Toyota sent to dealerships relating to replacing frames under the 2015 Campaign are 73-pages long and contained matters unrelated to frame corrosion.

### Toyota Tundra Limited Service Campaigns

49.     Toyota was also forced to acknowledge excessive frame corrosion on early model year Toyota Tundra Vehicles. In November 2009, Toyota was forced to issue a limited safety recall for 110,000 first generation Tundra vehicles sold or registered in twenty cold weather states and the District of Columbia ("Safety Recall 90M"). The recall followed a NHTSA investigation, which found that Tundra spare tires (mounted to the rear cross-member) were falling off due

BLOOD HURST & O'REARDON, LLP

to frame rust. The Tundra safety recall required dealers to inspect the rear cross-member and rear brake line mounts on certain model year 2000-2003 Tundra vehicles for significant rust. If dealers found significant rust, the corroded parts (but not the entire frame) were to be replaced. According to Toyota, the excessive corrosion could cause "the spare tire stowed under the truck bed [to] become separated from the rear cross-member," or "lead to the loss of the rear brake circuits which will increase vehicle stopping distances and the risk of a crash."

50.     The Tundra safety recall did not cover many of the components on the frame of first generation Tundra vehicles that were exhibiting excessive rust. Accordingly, in May 2010, Toyota announced a Limited Service Campaign for all 2000-2003 Tundra vehicles (regardless of geographic location) for excessive frame rust ("LSC A0F"). However, Toyota instructed dealers "***that direct marketing of warranty or this LSC is strictly prohibited***" and emphasized that "exposure to cold climate and high road salt usage conditions are primary contributors" to the abnormal rust. (Emphasis in original). Under LSC A0F, Toyota provided a limited time offer to replace the vehicle frame if specific areas of the frame had perforation of 10mm or larger.

51.     Toyota also issued a Corrosion Resistant Compound ("CRC") Campaign B0D "as the extension to Safety Recall 90M – CRC application to the rear portion of the frame" for 2000-2003 model year Tundra vehicles registered in cold weather states ("Tundra B0D"). Tundra B0D is a combination of Safety Recall 90M that offered to apply a CRC to the rear portion of the vehicle frame, and a limited time offer for a CRC to the front portion of the frame. Toyota issued Tundra B0D "as an additional measure of confidence" to owners.

52.     In December 2011, for the same excessive spare tire rust defects relating to Safety Recall 90M, Toyota issued a Limited Service Campaign for approximately 316,000 model year 2000-2003 Tundra Vehicles sold or

BLOOD HURST & O'REARDON, LLP

BLOOD HURST & O'REARDON, LLP

registered in the remaining 30 states ("LSC 9SM"). Again, Toyota instructed dealers to "***not solicit opportunities to perform this campaign***" and told owners "it is unlikely that these vehicles will experience prolonged exposure to high concentrations of road salts and other environmental factors that contribute to [excessive corrosion]." (Emphasis in original). Owners who brought in eligible vehicles by December 2012, could have the rear cross-member, fuel tank mounting system, brake tubes and valves, and spare tire carrier inspected. Only, if "significant corrosion" was found could the impacted parts be replaced.

53.   In August 2013, Toyota began another Limited Service Campaign for approximately 78,000 model year 2004-2006 Tundra vehicles ("LSC D0D"). LSC D0D applied to 2004-2006 Tundra vehicles only then "currently registered" in "cold climate states" (CT, DE, IL, IN, KY, MA, MD, ME, MI, MN, NH, NJ, NY, OH, PA, RI, VA, VT, WI & WV) and the District of Columbia. According to Toyota, it investigated reports that these vehicles may "exhibit more-than-normal corrosion to the vehicle's frame" and "determined that the frames in some vehicles may not have corrosion-resistant protection sufficient for use in these areas." Toyota stated "[t]his condition is unrelated to and separate from normal surface rust which is commonly found on metallic surfaces after some years of usage and/or exposure to the environment."

54.   LSC D0D did not apply to 2004-2006 Tundra vehicles registered outside the twenty cold climate states or in the District of Columbia. LSC D0D did not provide a full "remedy" for eligible vehicles either. Pursuant to LSC D0D, owners only had until March 31, 2015, to have their vehicle inspected at an authorized Toyota dealer.

### Toyota Sequoia Limited Service Campaign

55.   In late 2012 through early 2013, Toyota issued a Limited Service Campaign for certain 2001 through 2004 model year Toyota Sequoia vehicles ("LSC C0D"). LSC C0D was limited to vehicles then currently registered in

what Toyota described as the "Cold Climate States" or the District of Columbia: CT, IN, KY, MA, MD, ME, MI, MN, NH, NJ, NY, OH, PA, RI, VA, VT, WI & WV. Pursuant to LSC C0D, vehicles brought to an authorized Toyota dealer in those "Cold Climate States" would be inspected for "more than normal corrosion to the vehicle's frame" because Toyota had determined the vehicles lacked "corrosion-resistant protection sufficient for use in [Cold Climate States]."

56.   Pursuant to LSC C0D, eligible Sequoia vehicles would be inspected and provided one of two so-called remedies at Toyota's sole discretion, but only "until *July 31, 2014*."

57.   In its letter to owners announcing LSC C0D, Toyota added an untrue and vague condition on LSC C0D, representing that only vehicles "operated in specific cold climate areas with high road salt usage" were at risk of above average rust problems. This was false, deceptive and likely to dissuade customers from bringing in their vehicles for inspection and/or provided them with a false sense of security by thinking their vehicle was not subject to excessive corrosion if it was not driven in so-called "cold climate areas with high road salt usage." In fact, the defect was and is present on all Toyota Vehicles nationwide.

58.   Under Toyota's definition, "Cold Climate States" excluded states such as North Dakota, Montana, Idaho, Washington and Alaska.

59.   In a tacit admission that LSC C0D was inadequate (from both geographic and remedial standpoints), in or about September 2013, Toyota issued a Limited Service Campaign ("LSC CSD") for certain 2001 through 2004 model year Toyota Sequoia vehicles. LSC CSD applied to approximately 200,000 Sequoia vehicles in all states other than the so-called "Cold Climate States."

60.   In its notice letter accompanying LSC CSD, Toyota downplayed the scope of the defect by stating "If you believe your vehicle has been operated in

BLOOD HURST & O'REARDON, LLP

cold climate regions of the United States where high road salt is frequently used," then you could ask for an inspection. Even then, eligible owners had less than one year, until July 31, 2014, to complete vehicle inspection under LSC CSD.

61.     Toyota's letter Q&A accompanying the LSD CSD stated:

### What is the condition?

Toyota has received reports that certain 2001 through 2004 model year Sequoia vehicles operated in specific cold climate areas with high road salt usage may exhibit more-than-normal corrosion to the vehicle's frame. Toyota investigated these reports and determined that the frames in some vehicles may not have adequate corrosion-resistant protection. This combined with prolonged exposure to road salts and other environmental factors may contribute to the development of more than normal rust in the frame of some vehicles. This condition is unrelated to and separate from normal surface rust which is commonly found on metallic surfaces after some years of usage and/or exposure to the environment.

62.     Like the others, this letter to owners was false, deceptive and likely to dissuade customers from bringing in their vehicles for inspection and/or provided them with a false sense of security by thinking their vehicle was not subject to excessive corrosion if it was not driven in so-called "cold climate areas with high road salt usage." The defect was and is present on all Toyota Vehicles nationwide.

### *Plaintiffs' Experiences with Their Toyota Vehicles*

**Michael Watson**

63.     In September 2005, Michael Watson purchased a new 2005 Toyota Tacoma from Stadium Toyota in Tampa, Florida.

64.     Watson monitored his truck's condition diligently and noticed modest rust corrosion sometime in 2013. Shortly thereafter, Watson contacted his local Toyota dealer, Toyota Melbourne, regarding rust corrosion protection. He was advised that the dealer did not offer that service.

BLOOD HURST & O'REARDON, LLP

SECOND AMENDED COMPLAINT

00110878

65. During the fall of 2014, Watson corresponded with Toyota regarding the rust corrosion on the frame of his truck. Watson was told that because his truck was not included in the 2014 Limited Service Campaign for certain Tacoma trucks registered in certain salt-belt states, there was nothing Toyota would do to remedy the frame rust issue with his truck.

66. The frame on Watson's Tacoma truck was finally replaced in May 2016, under the 2015 Limited Service Campaign.

**Kenneth MacLeod**

67. In 2009, Kenneth MacLeod purchased a new 2009 Toyota Tacoma, from Toyota of Bowie, located in Bowie, Maryland.

68. MacLeod independently discovered significant rust accumulation and blistering of the frame while inspecting his vehicle in late 2014. Defendant did not notify MacLeod of the Limited Service Campaign or the defective nature of the frame on his vehicle.

69. MacLeod sought out Toyota's website regarding his concerns, which directed him to contact a local dealership. When MacLeod contacted a local dealer, the dealer did not offer to repair or replace his frame; rather, the dealer attempted to sell MacLeod another vehicle. When they discussed the condition of MacLeod's frame, the dealer stated that a new frame was needed and that it would cost about $15,000.

**Ryan Burns**

70. Ryan Burns purchased a 2005 Toyota Tacoma from J. Pauley Toyota Dealership in Fort Smith, Arkansas on April 30, 2005.

71. In February 2014, Burns took his Toyota Tacoma in for service of the fan, which was coming into contact with the fan shroud. Shortly thereafter, Burns was advised that the frame on his Tacoma vehicle was rusted through and broken, resulting in the engine sitting two or three inches lower than normal, and that the condition rendered the vehicle unsafe to drive. In July 2014, Burns was

BLOOD HURST & O'REARDON, LLP

00110878

informed by an employee of J. Pauley Toyota that it would cost in excess of $10,600 plus tax to replace the frame on his vehicle.

72.    Toyota has refused to replace the frame on Burns' Tacoma vehicle. With the exception of being towed to J. Pauley Toyota for a few days for inspection in March 2016, Burns' Tacoma has been sitting in his backyard since March of 2014.

**Michael Meade**

73.    Michael Meade owns a 2006 Toyota Tacoma, which he acquired in Maryland in July 2010 as a Toyota-certified used vehicle. He subsequently moved to Louisiana.

74.    In September 2014, Meade noticed excessive rust accumulation and flaking on the frame of his truck. Shortly thereafter, he took his truck to Toyota of Slidell, Louisiana, for an inspection. The dealer confirmed that the frame on Meade's vehicle exhibited excessive rust corrosion, but told Meade that Toyota would not replace the frame because no perforation was found.

75.    In January 2015, while changing the oil on the truck, Meade noticed a clear perforation of the truck's frame. Meade took his truck to the Slidell dealership, but Toyota again refused to replace the frame on his vehicle.

76.    The frame on Meade's Tacoma was replaced through the 2015 Limited Service Campaign.

**Brian Warner**

77.    Brian Warner owns a 2006 Toyota Tacoma, which he purchased used on March 18, 2010, in Ohio.

78.    In November 2014, Warner took his Tacoma to Alamo Toyota Collision Center in San Antonio, Texas, to get an inspection pursuant to Toyota's Limited Service Campaign. An employee at the Collision Center informed Warner that the frame on his truck was severely corroded and that the dealership would need to get further guidance from Toyota on what actions to take.

BLOOD HURST & O'REARDON, LLP

BLOOD HURST & O'REARDON, LLP

79.     On or around January 21, 2015, Warner was informed by employees at Alamo Toyota Collision Center that Toyota refused to repair or replace his frame or otherwise resolve his predicament, claiming that the absence of any rust perforation warranted that no corrective, remedial, or curative measures would be done. A Toyota employee repeated this information to Warner on or about January 28, 2015.

80.     After being notified that Warner's Tacoma was from Ohio – a state included in the Limited Service Campaign – Toyota still refused repair or replacement. Specifically, Toyota refused to offer to apply compounds that might delay or prevent further rusting. Toyota explained that it did not apply rust corrosion countermeasures to vehicles in the State of Texas.

**Dale Franquet**

81.     Dale Franquet purchased a used 2005 Tacoma in a private sale in New York in 2009. He has primarily used the truck in Pennsylvania.

82.     When Franquet took his truck in for regular maintenance in Pennsylvania, he was informed that his frame had excessive rust corrosion accumulation and multiple perforations. The condition of the frame was so severe that the technician refused to release the vehicle to Franquet, saying that it was too dangerous to operate on the roads.

83.     It took the Toyota dealer approximately six months to replace the frame on Franquet's Tacoma. After the frame was replaced Franquet's Tacoma vehicle experienced multiple problems, including problems steering, a shredded serpentine belt, and a broken hose, all of which are attributable to the replacement of the frame on his vehicle and process relating to same.

**James Fuller**

84.     James Fuller owns a 2006 Toyota Tacoma. He purchased it used in January 2014 from Hendrick Toyota Scion of South Charleston in South Carolina.

85.     After contacting Toyota and at Toyota's instruction, Fuller took his Tacoma to Hendrick Toyota in North Charleston, South Carolina, on or around June 19, 2014, and January 19, 2015. As of January 2015, the frame on Fuller's vehicle was severely corroded and perforated, including a hole of around 6 inches in diameter appearing on the inside of the frame. Despite that fact, Toyota refused to replace the frame on Fuller's vehicle. Rather, Toyota recommended that Fuller replace the frame on the Tacoma at his own expense.

86.     During the Spring of 2015, the frame on Fuller's Tacoma was finally replaced by Toyota under the Limited Service Campaign.

**James Good**

87.     On May 20, 2006, James Good purchased a new 2006 Toyota Sequoia SR5 from Beltway Toyota, Marlow Heights, Maryland.

88.     On September 20, 2016, Mr. Good took his Toyota Sequoia to Younger Toyota, Hagerstown, Maryland to replace the recalled Takata airbag and to inspect the front end of the vehicle for an unidentified rattle. During this inspection, the service technician discovered a large perforation (over 10 mm) in the frame. Mr. Good was advised that the vehicle was unsafe to drive until the frame was replaced at an estimated cost of over $12,000. Mr. Good was denied any remedy or rust corrosion countermeasures other than the offer of a loyalty coupon for a new or used Toyota.

## CLASS ACTION ALLEGATIONS

89.     Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of a proposed class defined as:

> All persons, entities or organizations who, at any time as of the entry of the Preliminary Approval Order, own or owned, purchase(d) or lease(d) Subject Vehicles distributed for sale or lease in any of the fifty States, the District of Columbia, Puerto Rico and all other United States territories and possessions.

BLOOD HURST & O'REARDON, LLP

Excluded from the Class are: (a) Toyota, its officers, directors and employees; its affiliates and affiliates' officers, directors and employees; its distributors and distributors' officers, directors and employees; and Toyota Dealers and Toyota Dealers' officers and directors; (b) Plaintiffs' Counsel; (c) judicial officers and their immediate family members and associated court staff assigned to this case; and (d) persons or entities who or which timely and properly excluded themselves from the Class.

90.    Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

91.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The Class consists of more than one million people. Therefore, the Class is so numerous that joinder of all members would be impracticable. The sheer number of Class members makes joinder of all members impracticable.

92.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact that predominate over any questions affecting individual Class members, including:

        a.    whether the Toyota Vehicles are defective;

        b.    whether Toyota misrepresented the standard, quality, and characteristics of the Toyota Vehicles;

        c.    whether Toyota's misrepresentations regarding the standard, quality and characteristics of the Toyota Vehicles were likely to mislead reasonable consumers;

        d.    whether Toyota's omission that frames on the Toyota Vehicles lacked adequate rust corrosion protection was a material fact that a reasonable consumer would be expected to

BLOOD HURST & O'REARDON, LLP

BLOOD HURST & O'REARDON, LLP

rely on when deciding whether to purchase a vehicle;

e.  whether Plaintiffs and the other Class members have been damaged and, if so, the extent of such damages; and

f.  whether Plaintiffs and the other Class members are entitled to equitable relief, including but not limited to, restitution and injunctive relief.

93.  Toyota engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

94.  **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other Class members because, among other things, Plaintiffs and the other Class members were injured through the substantially uniform misconduct described above. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, and no defense is available to Toyota that is unique to any one Plaintiff.

95.  **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other Class members. Additionally, Plaintiffs have retained counsel competent and experienced in complex class action litigation. Thus, the Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

96.  **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be

encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Toyota, making it impracticable for Class members to individually seek redress for Toyota's wrongful conduct. Even if Class members could afford individual litigation, the court system should not be forced to shoulder such inefficiency. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I

### VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT

97.   Plaintiffs repeat and reallege all other paragraphs as if fully set forth herein.

98.   Toyota is a "person," under Cal. Civ. Code §1761(c).

99.   Plaintiffs are "consumers," as defined by Cal. Civ. Code §1761(d), who purchased or leased one more Toyota Vehicles.

100.   Defendant's conduct, as described herein, in misrepresenting that it used state-of-the-art methods and materials to prevent rust corrosion on the Toyota Vehicles, and omitting the fact that it failed to use adequate and reasonable rust preventative measures, and manufactured the Toyota Vehicles with a uniform defect that caused excessive and significant rust corrosion and perforation to the frames of the Vehicles, violates the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §1750, *et seq*. Specifically, Defendant violated the CLRA by omitting material facts and stating in the

BLOOD HURST & O'REARDON, LLP

Vehicle manuals that it used state-of-the-art methods and materials to prevent rust corrosion on the Toyota Vehicles, and by engaging in the following practices proscribed by Civil Code §1770(a) in transactions that were intended to result in, and did result in, the sale of the product:

    a.    representing that the Toyota Vehicles have approval, characteristics, ingredients, uses, benefits, or quantities which they do not have;

    b.    representing that the Toyota Vehicles are original or new if they have deteriorated unreasonably;

    c.    representing that the Toyota Vehicles are of a particular standard, quality, or grade if they are of another;

    d.    advertising the Toyota Vehicles with intent not to sell them as advertised; and

    e.    representing that the Toyota Vehicles have been supplied in accordance with previous representations when they have not.

101.   Defendant violated the Act by selling Toyota Vehicles that it knew did not have adequate rust corrosion protection, possessed uniform defects that caused the Toyota Vehicles' frames to rust excessively and perforate, and exposed the public to an unreasonable safety risk. Defendant omitted from Plaintiffs and the other Class members the material fact that Toyota Vehicles were sold with defective frames that caused excessive rust corrosion and perforation to who it had a duty to disclose. This is a fact that a reasonable consumer would consider important in selecting a vehicle to purchase or lease.

102.   Toyota's Limited Service Campaigns were false, deceptive and purposely dissuaded customers from bringing their Vehicles in for inspection and/or provided them with a false sense of security by representing that the Vehicles were not subject to excessive corrosion if they were not driven in so-called "cold climate areas with high road salt usage." The Limited Service Campaigns instituted by Toyota were not adequate and the Toyota Vehicles are

1    still defective.

2         103.   Pursuant to Civil Code §1782(d), Plaintiffs, individually and on

3    behalf of the other members of the Class, seek a Court order enjoining the above-

4    described wrongful acts and practices of Defendant, ordering Defendant to

5    extend repair and replacement remedies to all Class members who experience

6    significant rust corrosion, and awarding restitution and disgorgement.

7         104.   Pursuant to §1782 of the Act, Plaintiffs notified Defendant in

8    writing by certified mail of the particular violations of §1770 of the Act and

9    demanded that Defendant rectify the problems associated with the actions

10   detailed above and give notice to all affected consumers of Defendant's intent to

11   so act. A copy of the letter is attached hereto as Exhibit A.

12        105.   Defendant did not rectify the problems associated with the actions

13   detailed above, which are continuing. Accordingly, Plaintiffs seek actual,

14   punitive, and statutory damages, as appropriate.

15        106.   Defendant's conduct is fraudulent, wanton, and malicious.

16        107.   Pursuant to §1782(d) of the Act, attached hereto as Exhibit B is the

17   affidavit showing that this action has been commenced in the proper forum.

## COUNT II

## VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW

20        108.   Plaintiffs repeat and reallege all other paragraphs as if fully set forth

21   herein.

22        109.   The Unfair Competition Law, Business & Professions Code

23   §17200, *et seq*. ("UCL"), and similar laws in other states, prohibits any

24   "unlawful," "fraudulent," or "unfair" business act or practice and any false or

25   misleading advertising. In the course of conducting business, Defendant

26   committed "unlawful" business practices by, among other things, making the

27   representations and omissions of material facts, as set forth more fully herein,

28   and violating Civil Code §§1572, 1573, 1709, 1711, 1770(a)(5), (6), (7), (9), and

BLOOD HURST & O'REARDON, LLP

(16), and Business & Professions Code §§17200, *et seq.*, 17500, *et seq.*, and the common law. Plaintiffs, individually and on behalf of the other Class members, reserve the right to allege other violations of the law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

110.   In the course of conducting business, Defendant committed "unfair" business practices by, among other things, making the representations and omissions of material facts regarding rust corrosion on the frame of the Toyota Vehicles, as alleged. There is no societal benefit from such false and misleading representations and omissions – only harm. While Plaintiffs and the other Class members were harmed by this conduct, Defendant was unjustly enriched. As a result, Defendant's conduct is "unfair" as it has offended an established public policy. Further, Defendant engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

111.   Further, as set forth in this Complaint, Plaintiffs allege violations of consumer protection, unfair competition, and truth in advertising laws in California and other states, resulting in harm to consumers. Defendant's acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers. This conduct constitutes violations of the unfair prong of Business & Professions Code §17200, *et seq*. There were reasonably available alternatives to further Defendant's legitimate business interests other than the conduct described herein.

112.   Business & Professions Code §17200, *et seq.*, also prohibits any "fraudulent business act or practice." In the course of conducting business, Defendant committed "fraudulent business act[s] or practices" by among other things, prominently making the representations (which also constitute advertising within the meaning of §17200) and omissions of material facts regarding the

BLOOD HURST & O'REARDON, LLP

25          Case No. 2:15-cv-02171 FMO (FFMx)
SECOND AMENDED COMPLAINT

1    safety, characteristics, and production quality of the Toyota Vehicles.

2        113.   Defendant's actions, claims, omissions, and misleading statements,

3    as more fully set forth above, were also false, misleading and likely to deceive

4    the consuming public within the meaning of Business & Professions Code

5    §17200, *et seq*.

6        114.   Plaintiffs have in fact been deceived as a result of their reliance on

7    Defendant's material representations and omissions, which are described above.

8    Plaintiffs have suffered injury in fact and lost money as a result of purchasing the

9    deceptively advertised Toyota Vehicles by paying more than they should have

10   and expending time, effort, and money to attempt to repair or replace the frame

11   and arrange alternative means of transportation.

12       115.   Unless restrained and enjoined, Defendant will continue to engage

13   in the above-described conduct. Accordingly, injunctive relief is appropriate.

14       116.   Plaintiffs, on behalf of themselves, all others similarly situated, and

15   the general public, seeks restitution from Defendant of all money obtained from

16   Plaintiffs and the other members of the Class collected as a result of unfair

17   competition, an injunction prohibiting Defendant from continuing such practices,

18   corrective advertising, and all other relief this Court deems appropriate,

19   consistent with Business & Professions Code §17203.

20                           **COUNT III**

21              **VIOLATION OF FLORIDA DECEPTIVE AND**

22                **UNFAIR TRADE PRACTICE ACT**

23   **Claims Brought in the Alternative on Behalf of the Florida State Class**

24       117.   Plaintiff Watson repeats and realleges all other paragraphs as if fully

25   set forth herein.

26       118.   Florida declares unlawful all unfair methods of competition,

27   unconscionable acts or practices, and unfair or deceptive acts or practices in the

28   conduct of any trade or commerce. Fla. Stat. §501.201, *et seq*.

BLOOD HURST & O'REARDON, LLP

00110878

119.   Defendant engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive practices in the conduct of trade or commerce under Florida law by manufacturing and selling Toyota Vehicles with defective frames, misrepresenting the quality, reliability, and safety of Toyota Vehicles, and omitting material facts concerning the defective frames and inadequate rustproofing with the intent that Plaintiff Watson and the other Florida Class members rely on the omissions. Plaintiff Watson and the other Florida Class members would not have purchased or leased Toyota Vehicles had they been informed of the important fact that they lacked adequate rustproofing, were defective, and would pose serious risks to their safety and the safety of others.

120.   Plaintiff Watson and the other Florida Class members justifiably relied on Defendant's wrongful conduct and omissions. No reasonable consumer would have purchased a Toyota Vehicle knowing that its frame did not possess adequate rust corrosion protection, that this defect would greatly diminish the useful life of Toyota Vehicles, and that they would be exposed (and expose others) to an unreasonable risk of serious injury.

121.   Plaintiff Watson and the other Florida Class members are persons who suffered loss as a result of Defendant's unfair methods of competition, unconscionable acts or practices, and unfair or deceptive practices. Plaintiff Watson and the other Florida Class members overpaid for Toyota Vehicles because the defective frames made them less valuable than the purchase price, incurred losses in order to arrange alternate means of transportation, and paid for repairs.

///

///

///

///

BLOOD HURST & O'REARDON, LLP

00110878

**COUNT IV**

**VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT**

**Brought in the Alternative on Behalf of the Maryland State Class**

122.   Plaintiffs MacLeod and Good repeat and reallege all other paragraphs as if fully set forth herein.

123.   The prohibition on unfair and deceptive trade practices under Maryland law extends to any misrepresentation that consumer goods are of a particular quality and any failure to state a material fact if the failure deceives or tends to deceive. *See* Md. Code, Com. Law §§13-101, *et seq*.

124.   Defendant committed unfair and deceptive trade practices in violation of the Maryland Consumer Protection Act by marketing, distributing, and selling Toyota Vehicles with frames that lacked adequate rust corrosion protection and failing to disclose the material fact that the Toyota Vehicles were equipped with defective frames that were prone to excessive and premature rust corrosion with the intent that Plaintiffs MacLeod, Good and the other Maryland Class members rely upon these misrepresentations and omissions of material fact.

125.   Defendant's unfair and deceptive acts or practices were likely to and did deceive reasonable consumers, including Plaintiffs MacLeod, Good and the other Maryland Class members, causing actual damages. Plaintiffs MacLeod's, Good's and the other Maryland Class members' Toyota Vehicles are unsafe for ordinary use, diminished in value, unmerchantable, and a risk to Maryland Class members and others.

126.   Toyota Vehicles were less valuable than the purchase price. Plaintiffs MacLeod, Good and the other Maryland Class members also suffered actual damages when they had to arrange alternate means of transportation and paid for repairs.

BLOOD HURST & O'REARDON, LLP

00110878

BLOOD HURST & O'REARDON, LLP

**COUNT V**

**VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT**

**Brought in the Alternative on Behalf of the Ohio Class**

127. Plaintiff Warner repeats and realleges all other paragraphs as if fully set forth herein.

128. The Ohio Consumer Protection Act, Ohio Rev. Code §1345.02, prohibits suppliers from committing unfair and deceptive acts or practices in connection with a consumer transaction. The Act enumerates an inclusive list of unfair and deceptive acts and includes the following: representing that the subject of the consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not.

129. Defendant's conduct alleged herein constitutes unfair and deceptive acts or practices in violation of the Ohio Consumer Sales Practices Act. Defendant made false misrepresentations that Toyota Vehicles were free from defects and safe to operate on the roadways. Defendant also knowingly omitted material facts with respect to the inadequate rustproofing and excessive rust risk and failed to disclose the frame defect in Toyota Vehicles.

130. Defendant was on notice that its actions had been declared deceptive and unfair. Defendant's conduct was declared unfair and deceptive with reasonable specificity under the following rules adopted under Ohio Rev. Code §1345.05(B)(2) and court decisions, among others:

- *Amato v. General Motors Corp.*, 463 N.E.2d 625 (Ohio Ct. App. 1982);

- Ohio Admin. Code 109:4-3-16(B)(14);

- *Mason v. Mercedes-Benz USA, LLC*, Online Public Inspection File[1] ("O.P.I.F.") No. 10002382 (Ohio Ct. App. Aug. 26, 2005);

---

[1] Ohio's Online Public Inspection File is available at http://opif.ag.state.oh.us/Secured/Landing2.aspx.

00110878

- *Bellinger v. Hewlett-Packard Co.*, O.P.I.F. No. 10002077 (Ohio Ct. App. 2002);

- *Khouri v. Lewis*, O.P.I.F. No. 10001995 (Ohio Ct. App. 2001);

- *Quality Pontiac, Buick, Cadillac, GMC, Inc. v. Ringwald*, O.P.I.F. No. 10000937 (Ohio Ct. App. 1988).

131. Had Plaintiff Warner and the other Ohio Class members been informed of the defect that rendered Toyota Vehicles prone to excessive and premature rust corrosion, they would not have purchased the Toyota Vehicles.

132. Had Plaintiff Warner and the other Ohio Class members been informed of the defect that rendered Toyota Vehicles prone to excessive and premature rust corrosion, they would not have purchased the Toyota Vehicles.

133. As a direct and foreseeable result of Defendant's unfair and deceptive acts or practices, Plaintiff Warner and the other Ohio Class members sustained damages. They overpaid for their Toyota Vehicles, incurred out-of-pocket losses related to repairing, maintaining, and servicing their defective Toyota Vehicles, costs associated with arranging and obtaining alternative means of transportation, treble, consequential, and incidental damages recoverable under the law.

## COUNT VI

## VIOLATION OF THE NEW YORK DECEPTIVE PRACTICES ACT, NEW YORK GENERAL BUSINESS LAW §349

### Brought in the Alternative on Behalf of the New York Class

134. Plaintiff Franquet repeats and realleges all other paragraphs as if fully set forth herein.

135. Plaintiff and other members of the alternative New York State Class are persons within the meaning of New York General Business Law ("GBL") §349(h). Defendant engaged in business, trade or commerce within the meaning of GBL §349(a).

BLOOD HURST & O'REARDON, LLP

00110878

136.   GBL §349(a) declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York State]."

137.   As described herein, Defendant engaged in consumer-oriented conduct that was misleading and directed at the consuming public. The fundamental nature of Defendant's activities was to mislead the consuming public into believing that their Toyota Vehicles had adequate rust protection when in fact Defendant knew that was not true.

138.   Plaintiff Franquet and the other members of the alternative New York Class have been injured by Defendant's deceptive acts and practices in that they purchased Toyota Vehicles reasonably believing them to have adequate rust protection when they do not.

139.   Defendant willfully and/or violated GBL §349.

140.   The damages suffered by Plaintiff Franquet and the other members of the alternative New York Class were directly and proximately caused by the materially misleading acts and/or practices of Defendant, as more fully described herein.

141.   Plaintiff Franquet and the other members of the alternative New York Class have no adequate remedy at law.

142.   Pursuant to GBL §349(h), Plaintiff Franquet, individually and on behalf of the other members of the alternative New York Class, seeks a court order enjoining the above-described wrongful acts and practices of Defendant.

## COUNT VII

## VIOLATION OF NORTH CAROLINA'S UNFAIR DECEPTIVE TRADE PRACTICES ACT, N.C. GEN. STAT. ANN. §75-1, *et seq.*

### Brought in the Alternative on Behalf of the North Carolina Class

143.   Plaintiff Fuller repeats and realleges all other paragraphs as if fully set forth herein.

BLOOD HURST & O'REARDON, LLP

00110878

144. N.C. Gen. Stat. Ann. §75-1.1(a) states: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

145. As alleged herein, Defendant engaged in unfair or deceptive acts and practices by failing to inform Plaintiff and Class members that the Toyota Vehicles did not have adequate rust corrosion protection in violation of N.C. Gen. Stat. Ann. §75-1.1.

146. Defendant's deceptive acts and practices as alleged herein caused and continue to cause injury to Plaintiff Fuller and the members of the alternative North Carolina Class. Plaintiff Fuller has suffered actual injury in the purchase of his Toyota Tacoma Vehicle.

**COUNT VIII**

**VIOLATION OF LOUISIANA'S UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, LA. REV. STAT. §51.1401,** *et seq.*

**Brought on in the Alternative on Behalf of the Louisiana Class**

147. Plaintiff Meade repeats and realleges all other paragraphs as if fully set forth herein.

148. The Louisiana Unfair Trade Practices and Consumer Protection Law §51.1401, *et seq.*, prohibits acts of unfair competition, which means and includes any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," and further §51.411 prohibits any "untrue, deceptive, or misleading" advertising.

149. Defendant violated the Louisiana Unfair Trade Practices and Consumer Protection Law §51.1401, *et seq.* prohibition against engaging in an "unfair or deceptive act," *inter alia*, by engaging in the conduct alleged, including the omissions regarding adequate rust corrosion protection, which information Defendant had a duty to disclose under the Louisiana Unfair Trade Practices and Consumer Protection Law, §51.1401, *et seq.*

150. Plaintiff Meade reserves his right to allege on behalf of himself and others similarly situated, other violations of law which constitute other unlawful, unfair, or fraudulent business acts or practices.

151. Plaintiff Meade and the members of the alternative Louisiana Class have been actually injured by Defendant's unfair or deceptive acts and practices.

152. Plaintiff Meade and the members of the alternative Louisiana Class are entitled to equitable relief in the form of full restitution, including all monies paid for the Toyota Vehicles.

## COUNT IX

## VIOLATION OF ARKANSAS DECEPTIVE TRADE PRACTICES ACT

### Brought in the Alternative on Behalf of the Ohio Class

153. Plaintiff Burns repeats and realleges all other paragraphs as if fully set forth herein.

154. The Arkansas Deceptive Trade Practices Act, Ark. Stat. Ann. §4-88-107(a)(10), prohibits suppliers from committing unconscionable, false, and deceptive acts and practices in business, commerce, or trade.

155. The Arkansas Deceptive Trade Practices Act also prohibits the omission of any material fact in connection with the sale or advertising of goods with the intent that others rely upon the omission. *See* Ark. Stat. Ann. §4-88-108.

156. Toyota's marketing, distribution, and sale of Toyota Vehicles with frames that lacked adequate rust corrosion protection was unconscionable, false, and deceptive under the Arkansas Deceptive Trade Practices Act.

157. Toyota made false misrepresentations that Toyota Vehicles were free from defects and safe to operate on the roadways. Defendant also knowingly omitted material facts with respect to the inadequate rustproofing and excessive rust risk and failed to disclose the frame defect in Toyota Vehicles.

158. A reasonable consumer would consider the fact that the Toyota Vehicles had frames that did not possess adequate rust corrosion protection to be

00110878

BLOOD HURST & O'REARDON, LLP

1   important when deciding whether to purchase a Toyota Vehicle.

2       159.   Toyota's unconscionable conduct and omission of material facts

3   occurred in connection with Toyota's conduct of trade and commerce in

4   Arkansas.

5       160.   As a direct and foreseeable result of Defendant's unfair and

6   deceptive acts or practices, Plaintiff Burns and the other Arkansas Class

7   members sustained damages. They overpaid for their Toyota Vehicles, incurred

8   out-of-pocket losses related to repairing, maintaining, and servicing their

9   defective Toyota Vehicles, costs associated with arranging and obtaining

10  alternative means of transportation, treble, consequential, and incidental damages

11  recoverable under the law.

### COUNT X

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

14      161.   Plaintiffs repeat and reallege all other paragraphs as if fully set forth

15  herein.

16      162.   Toyota is and was at all relevant times a merchant with respect to

17  motor vehicles under Cal. Com. Code §2104.

18      163.   A warranty that the Toyota Vehicles were in merchantable condition

19  was implied by law in the instant transaction, pursuant to Cal. Com. Code §2314.

20      164.   Plaintiffs and the other Class members purchased the Toyota

21  Vehicles that were manufactured and sold by Defendant in consumer

22  transactions. Defendant was and is in the business of selling vehicles and was

23  and is a merchant of the Toyota Vehicles.

24      165.   The Toyota Vehicles, when sold and at all times thereafter, were not

25  in merchantable condition and were not fit for the ordinary purpose for which

26  cars are used. The Toyota Vehicles left Defendant's possession and control

27  equipped with defective frames that rendered them at all times thereafter

28  unmerchantable, unfit for ordinary use, unsafe, and a threat to public safety.

BLOOD HURST & O'REARDON, LLP

00110878

Plaintiffs and the other Class members used their Toyota Vehicles in the normal and ordinary manner for which the Toyota Vehicles were designed and advertised.

166.   Toyota knew before the time of sale to Plaintiffs or earlier, that the Toyota Vehicles were produced with defective frames that lacked adequate rust corrosion protection, rendering the Toyota Vehicles unfit for their ordinary purpose.

167.   Despite Plaintiffs' and the other Class members' normal and ordinary use, maintenance, and upkeep, the frames of the Toyota Vehicles experienced an unusually rapid rate of rust corrosion, rust perforation, and structural degradation as a result of a manufacturing or design defect that existed at the time Defendant transferred the Toyota Vehicles from its possession or control. The defect rendered the Toyota Vehicles unfit for their ordinary use and incapable of performing the tasks they were designed, advertised, and sold to perform.

168.   As a result, the Toyota Vehicles' frames are not of fair average quality. Nor would they pass without objection in the automotive industry. Excessive rust corrosion to a vehicle frame affects the stability of a vehicle, rendering the vehicle unsafe to drive and requiring substantial repairs or even replacement of the Vehicle's entire frame before safe, ordinary use can resume.

169.   All conditions precedent have occurred or been performed.

170.   Defendant has actual notice of its breach of warranty. Through consumer complaints and regulatory agencies' investigations, Defendant learned that the defect, the existence and ubiquity of which it knew much earlier, has been the subject of publicized consumer disputes nationwide. Its implementation of the Limited Service Campaigns directed to the Toyota Vehicles shows actual notice. Prior related lawsuits also establish that Defendant had actual notice of its breach of warranty.

171.   Defendant's warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendant knew when it first made these warranties and their limitations that the defect existed and that the warranties would expire before a reasonable consumer would notice or observe the defect. Defendant also failed to take necessary actions to adequately disclose or cure the defect after the existence of the defect came to the public's attention and sat on its reasonable opportunity to cure or remedy the defect, its breaches of warranty, and consumers' losses. Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendant any more time to cure the defect, its breaches of warranty, or otherwise attempt to resolve or address Plaintiffs' and the other Class members' claims.

172.   As a direct and foreseeable result of the defect in the Toyota Vehicles' frames, Plaintiffs and the other Class members suffered diminution in the value of the Toyota Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Toyota Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

173.   Plaintiffs and Class members have had sufficient direct dealings with either the Toyota or its agents (dealerships) to establish privity of contract between Plaintiffs and the Class members. Notwithstanding this, privity is not required in this case because Plaintiffs and Class members are intended third-party beneficiaries of contracts between Toyota and its dealers; specifically, they are the intended beneficiaries of Toyota's implied warranties. The dealers were not intended to be the ultimate consumers of the Toyota Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because Plaintiffs' and Class members'

BLOOD HURST & O'REARDON, LLP

Toyotas are inherently dangerous due to the aforementioned defects and nonconformities.

## COUNT XI

## BREACH OF EXPRESS WARRANTY

174.   Plaintiffs repeat and reallege all other paragraphs as if fully set forth herein.

175.   Toyota is and was at all relevant times a merchant with respect to motor vehicles under Cal. Com. Code §2104.

176.   When marketing, distributing, and selling the Toyota Vehicles, Toyota expressly warranted that it provided 36 months or 36,000 miles of comprehensive coverage, whichever occurred first, during which time Toyota represented it would cover the cost of any repair or replacement necessary due to a defect in materials or workmanship relating to the Toyota Vehicles.

177.   Defendant also represented and affirmed, contrary to facts, that it used the most advanced technology to help prevent corrosion on the Toyota Vehicles. In actuality, Defendant failed to use adequate rust prevention techniques or materials in constructing the Toyota Vehicles. It has admitted that frames on the Toyota Vehicles experience an unnatural and excessive degree of rust corrosion. The rust corrosion is a result of a defect in the manufacture or design of the Toyota Vehicles.

178.   Toyota knew that the frames on the Toyota Vehicles were defective at the time of sale. Indeed, Toyota was well aware of the frame rust corrosion problems on the Toyota Vehicles. Defendant breached express warranties when Defendant delivered the Toyota Vehicles that did not conform to its affirmations of fact and industry standards for truck frames.

179.   Toyota breached the express warranty to repair the defects in the Toyota Vehicles, because it failed to repair the inadequately coated frames on the Toyota Vehicles to ensure such vehicles did not exhibit severe rust corrosion and

1    perforation.

2    180.   Despite Toyota's knowledge of the problem and opportunity to cure

3    (as evidenced by the Limited Service Campaigns), Toyota failed to notify

4    Plaintiffs and the other members of the Class of the defect and to repair or

5    replace, at no charge to the Class, the defective frames.

6    181.   All conditions precedent have occurred or been performed.

7    182.   Defendant had actual notice of its breaches of express warranty.

8    Through consumer complaints and regulatory agencies' investigations Defendant

9    learned that the defect, the existence and ubiquity of which it knew much earlier,

10   was the subject of consumer disputes nationwide. Its implementation of the

11   Limited Service Campaigns directed at the Toyota Vehicles shows actual notice.

12   Prior related lawsuits also establish that Defendant had actual notice of its breach

13   of warranty.

14   183.   Defendant's warranty disclaimers, exclusions, and limitations, to the

15   extent that they may be argued to apply, were, at the time of sale, and continue to

16   be unconscionable and unenforceable to disclaim liability for a known, latent

17   defect. Defendant knew when it first made these warranties and their limitations

18   that the defect existed and that the warranties would expire before a reasonable

19   consumer would notice or observe the defect. Defendant also failed to take any

20   actions to adequately disclose or cure the defect after the existence of the defect

21   came to the public's attention and sat on its reasonable opportunity to cure or

22   remedy the defect, its breaches of warranty, and consumers' losses. Under these

23   circumstances, it would be futile to enforce any informal resolution procedures or

24   give Defendant any more time to cure the defect, its breaches of warranty, or

25   otherwise attempt to resolve or address Plaintiffs' and the other Class members'

26   claims.

27   184.   Plaintiffs and the other Class members were damaged as a result of

28   Toyota's breach of express warranty because the frames on the Toyota Vehicles

BLOOD HURST & O'REARDON, LLP

are defective, compromising the stability and safety of the vehicles, and requiring repair and even replacement of the Vehicles' frames.

185.   As a direct and foreseeable result of Defendant's failure to repair the Toyota Vehicles' frames, Plaintiffs and the other Class members suffered diminution in the value of the Toyota Vehicles, out-of-pocket losses related to the repairing, maintaining, and servicing their defective Toyota Vehicles, costs associated with arranging other forms of transportation, and other incidental and consequential damages recoverable under the law.

**COUNT XII**

**DECLARATORY RELIEF**

**Claim Brought on Behalf of the Declaratory Relief Class**

186.   Plaintiffs repeat and reallege all paragraphs as if fully set forth herein.

187.   Pursuant to 28 U.S.C. §2201, the Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

188.   Defendant marketed, distributed, and sold the Toyota Vehicles equipped with frames prone to exhibiting excessive rust corrosion and perforation on account of Defendant's failure to treat the frames on such vehicles with adequate rust corrosion protection.

189.   Accordingly, Plaintiffs seek entry of the following declarations: (1) model years 2005 to 2010 Tacoma Vehicles, model years 2007 to 2008 Tundra Vehicles, and model years 2005 to 2008 Sequoia Vehicles, lack adequate rust corrosion protection and are defective; (2) all persons who purchased model years 2005 to 2010 Tacoma Vehicles, model years 2007 to 2008 Tundra Vehicles, and model years 2005 to 2008 Sequoia Vehicles, are to be provided the best practicable notice of the defect, which cost shall be borne by Defendant; and (3) Defendant must establish an inspection, repair, and replacement program and

BLOOD HURST & O'REARDON, LLP

SECOND AMENDED COMPLAINT

00110878

1  protocol and notify Class members of such program, pursuant to which
2  Defendant, including its authorized representatives, and at no cost to Class
3  members, will inspect, upon request, Class members' Toyota Vehicles for frame
4  rust corrosion, treat the Toyota Vehicles that have not exhibited rust corrosion
5  with adequate rust corrosion protection, and to repair or replace the frames on the
6  Toyota Vehicles that have experienced frame rust corrosion.

**REQUESTS FOR RELIEF**

8  **WHEREFORE**, Plaintiffs, individually and on behalf of all others
9  similarly situated, respectfully request that the Court enter an Order:

10  a.  certifying the Class under Federal Rule of Civil Procedure 23(a),
11  23(b)(2), and 23(b)(3), as requested herein;

12  b.  appointing Plaintiffs as Class Representatives and undersigned
13  counsel as Class Counsel;

14  c.  finding that Toyota engaged in the unlawful conduct as alleged
15  herein;

16  d.  awarding Plaintiffs and the other Class members damages;

17  e.  awarding Plaintiffs and the other Class members restitution and
18  disgorgement of monies Defendant acquired through its violations
19  of the law;

20  f.  awarding Plaintiffs and the other Class members declaratory and
21  injunctive relief;

22  g.  requiring Toyota to repair or replace the frames on the Toyota
23  Vehicles;

24  h.  awarding Plaintiffs and the other Class members pre-judgment and
25  post-judgment interest on all amounts awarded;

26  i.  awarding Plaintiffs and the other Class members reasonable
27  attorneys' fees, costs, and expenses; and

28  j.  granting such other relief as the Court deems just and appropriate.

# JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims in this Class Action Complaint so triable.

Respectfully Submitted,

Dated: November 8, 2016

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
PAULA R. BROWN (254142)

By:      *s/  Timothy G. Blood*
TIMOTHY G. BLOOD

701 B Street, Suite 1700
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com

BARNOW AND ASSOCIATES, P.C.
BEN BARNOW  (*pro hac vice*)
ERICH P. SCHORK (*pro hac vice*)
1 North LaSalle Street, Suite 4600
Chicago, IL  60602
Tel: 312/621-2000
312/641-5504 (fax)
b.barnow@barnowlaw.com
e.schork@barnowlaw.com

MILLIGAN LAW OFFICES
PHILIP J. MILLIGAN (*pro hac vice*)
500 South 16th Street
Fort Smith, Arkansas  72901
Tel: 479/783-2213
milliganlaw@sbcglobal.net

ROBERTS LAW FIRM, P.A.
MICHAEL L. ROBERTS (*pro hac vice*)
20 Rahling Circle
P.O. Box 241790
Little Rock, Arkansas  72223
Tel: 501/821-5575
501/821-4474 (fax)
mikeroberts@robertslawfirm.us

MONTELEONE & McCORY, LLP
Jeffrey S. Hurst (138664)
725 South Figueroa Street, Suite 3200
Los Angeles, CA  90017
Tel: 213/784-3108

SECOND AMENDED COMPLAINT

00110878

BLOOD HURST & O'REARDON, LLP

213/612-9930 (fax)
Hurst@mmlawyers.com

*Attorneys for Plaintiffs*

SECOND AMENDED COMPLAINT

BLOOD HURST & O'REARDON, LLP

00110878

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on November 8, 2016, I electronically filed the

3   foregoing with the Clerk of the Court using the CM/ECF system which will send

4   notification of such filing to the e-mail addresses denoted on the Electronic Mail

5   Notice List, and I hereby certify that I have mailed the foregoing document or

6   paper via the United States Postal Service to the non-CM/ECF participants

7   indicated on the Electronic Mail Notice List.

8      I certify under penalty of perjury under the laws of the United States of

9   America that the foregoing is true and correct. Executed on November 8, 2016.

10

11                                    *s/  Timothy G. Blood*
                                      TIMOTHY G. BLOOD

12
                                      BLOOD HURST & O'REARDON, LLP
13                                    701 B Street, Suite 1700
                                      San Diego, CA  92101
14                                    Telephone:  619/338-1100
                                      619/338-1101 (fax)
15                                    tblood@bholaw.com

16

17

18

19

20

21

22

23

24

25

26

27

28

BLOOD HURST & O'REARDON, LLP

00110878

43      Case No. 2:15-cv-02171 FMO (FFMx)