**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

BRIAN WARNER, et al., individually and
on behalf of all others similarly situated,

               Plaintiffs,

      v.

TOYOTA MOTOR SALES, U.S.A., INC.,
a California Corporation,

               Defendant.

Case No. CV 15-2171 FMO (FFMx)

**ORDER RE: JOINT MOTION FOR ENTRY
OF AN ORDER GRANTING PRELIMINARY
APPROVAL OF CLASS ACTION
SETTLEMENT, CERTIFICATION OF
SETTLEMENT CLASS, AND APPROVAL
OF CLASS NOTICE**

Having reviewed and considered all the briefing filed with respect to the parties' Joint Motion for Entry of Order Granting Preliminary Approval of Class Action Settlement, Certification of Settlement Class, and Approval of Class Notice (Dkt. 88, "Motion") and the oral argument presented at the hearing on November 10, 2016, the court concludes as follows.

**INTRODUCTION**

On October 3, 2014, Ryan Burns ("Burns") filed a class action complaint against Toyota Motor Sales, U.S.A., Inc. ("Toyota" or "defendant") in Arkansas entitled, Burns v. Toyota Motor Sales, U.S.A., Inc., Case No. CV 14-2208 (W.D. Ark.) ("Related Action"), alleging, among other things, that Toyota designed, manufactured, distributed, advertised, and sold certain Tacoma vehicles, model years 2005 to 2009, that lacked adequate rust protection on the vehicles' frames resulting in premature rust corrosion.  (See Dkt. 89, Toyota's Memorandum of Points and

Authorities in Support of Joint Motion for Entry of an Order Granting Preliminary Approval of Class Action Settlement and Issuance of Related Orders ("Def. Memo") at 2). On March 24, 2015, Brian Warner ("Warner"), Kenneth MacLeod ("MacLeod"), Michael Meade ("Meade"), Michael Watson ("Watson"), Dale Franquet ("Franquet"), and James Fuller ("Fuller") filed a similar class action in this court ("the Action"). (See id. at 2-3; Dkt. 1, Complaint at ¶¶ 1-2).

The Second Amended Complaint ("SAC"), the operative complaint in this matter, was filed on November 8, 2016, and asserts 12 claims under various state consumer laws based on the same allegations with respect to Toyota Tacoma vehicles, model years 2005 to 2010; Toyota Tundra vehicles, model years 2007 to 2008; and Toyota Sequoia vehicles, model years 2005 to 2008 ("Subject Vehicles"). (See Dkt. 86, SAC at ¶¶ 1 & 97-189). The SAC also added Burns and James Good ("Good") as named plaintiffs. (See id. at ¶ 15).

After engaging in discovery and lengthy negotiations coordinated by the Special Master, Patrick A. Juneau ("Juneau"), the parties reached a settlement on October 31, 2016. (See Dkt. 88-1, Plaintiffs' Memorandum in Support of Joint Motion for Preliminary Approval of Class Action Settlement, Certification of Settlement Class, and Approval of Class Notice ("Plfs. Memo") at 1). In their Motion, the parties seek an order: (1) certifying a nationwide class for settlement purposes; (2) preliminarily approving the settlement; (3) approving the notice plan and authorizing notice of the settlement to the class; (4) appointing a Settlement Notice Administrator and a Settlement Claims Administrator; (5) setting a schedule and procedures for final approval of the proposed settlement; (6) issuing a preliminary injunction; (7) appointing Warner, MacLeod, Meade, Watson, Fuller, Burns, Good, and Franquet as class representatives; and (8) appointing Timothy G. Blood ("Blood") of Blood Hurst and O'Reardon LLP and Ben Barnow ("Barnow") of Barnow and Associates P.C. as class counsel. (See Dkt. 88, Motion at 2).

## BACKGROUND

This case arises from allegations that the frames on the Subject Vehicles lack adequate rust protection, resulting in premature rust corrosion that compromises the structural integrity, safety, stability, and crash-worthiness of the vehicles. (See Dkt. 88-1, Plfs. Memo at 4; Dkt. 86, SAC at ¶¶ 1-2 & 17-26). Plaintiffs allege that Toyota represented to plaintiffs and class members

that the Subject Vehicles were manufactured "us[ing] the most advanced technology available, [that] helps prevent corrosion[.]"[1]  (Dkt. 86, SAC at ¶ 27).  Despite Toyota's representation, plaintiffs allege that the Subject Vehicles "are prone to excessive, premature rust corrosion because the frames were not properly prepared and treated against rust corrosion when they were manufactured."  (Id. at ¶ 1).  "The function of frames include handling static and dynamic loads with unintended deflection and distortion, preventing undesirable forces and twisting from driving over uneven surfaces, engine torque, vehicle handling and accelerating and decelerating.  [They] also are the primary component that guard against sudden impacts and collisions."  (Id. at ¶ 17). According to plaintiffs, the premature and excessive rust "affects the structural integrity of the vehicles, rendering them unsafe to drive and a hazard on the roadways[,]" (id. at ¶ 18), because rust weakens the frames "by replacing the strong iron or steel with flaky powder, ultimately leading to perforations."  (Id. at ¶ 19).

During the litigation of this Action and the Related Action, which included motions to dismiss and a motion for summary judgment, (see Dkt. 88-1, Plfs. Memo at 4-6; Dkt. 89, Def. Memo at 3-4), the parties began to explore a global settlement of both cases.  (See Dkt, 89, Def. Memo at 4; Dkt. 88-1, Plfs. Memo at 6).  The parties reached a settlement following "a seven month negotiation process" assisted by Juneau.  (See Dkt. 88-2, Declaration of Timothy G. Blood in Support of Joint Motion for Preliminary Approval of Class Action Settlement, Certification of Settlement Class, and Approval of Class Notice ("Blood Decl.") at ¶ 4).

The parties have defined the settlement class as:

> all persons, entities or organizations who, at any time as of the entry of the Preliminary Approval Order, own or owned, purchase(d) or lease(d) Subject Vehicles distributed for sale or lease in any of the fifty States, the District of Columbia, Puerto Rico and all other United States territories and/or possessions.

---

[1]  Capitalization, emphasis, internal alteration marks, and internal quotation marks may be altered or omitted without notation in record citations.

(Dkt. 91, Settlement Agreement at § II.A.8).  Excluded from the class are "(a) Toyota, its officers, directors and employees; its affiliates and affiliates' officers, directors and employees; its distributors and distributors' officers, directors and employees; and Toyota Dealers and Toyota Dealers' officers and directors; (b) Plaintiffs' Counsel; (c) judicial officers and their immediate family members and associated court staff assigned to this case; and (d) persons or entities who or which timely and properly exclude themselves from the Class[.]"  (Id.).

Pursuant to the settlement, Toyota has developed and will implement a "Frame Inspection and Replacement Program" whereby Toyota will inspect all Subject Vehicles for rust to determine whether the Subject Vehicle's frame should be replaced.  (See Dkt. 88-1, Plfs. Memo at 7; Dkt. 89, Def. Memo at 6).  More specifically,

> [t]he Frame Inspection and Replacement Program will provide prospective coverage for replacement of frames on Subject Vehicles in accordance with Rust Perforation Standard and the Inspection Protocol.  The duration of prospective coverage will begin following the date of Final Order and Final Judgment and will be calculated by the longer of 12 years from the date of First Use[2] of the Subject Vehicle or, if the Class Member has owned or leased the vehicle beyond 12 years from date of First Use, 1 year from the date of entry of the Final Order and Final Judgment.[3]

(Dkt. 91, Settlement Agreement at § III.A.1).  "Pursuant to the Frame Inspection and Replacement Program and the Inspection Protocol, Toyota shall offer an initial inspection of the Subject Vehicles and additional inspections, as necessary."  (Id.).

As part of the Frame Inspection and Replacement Program and the Inspection Protocol, class members "may have their Subject Vehicles' frames inspected by authorized Toyota Dealers

---

[2]  "First Use" is defined as "the date that the Subject Vehicle is originally sold or leased." (Dkt. 91, Settlement Agreement at § II.A.19).

[3]  Salvaged vehicles or vehicles with titles marked flood-damaged are not eligible for this benefit.  (See Dkt. 91, Settlement Agreement at § III.A.1; id. at § II.A.34).

and, if the vehicle is located in a CRC State,[4] for evaluation for application of the Corrosion Resistant Compounds ("CRC")."[5]  (Dkt. 91, Settlement Agreement at § III.A.3).  For Subject Vehicles registered in CRC States, application of the CRC is available for a two year period for: (a) the Tundra and Sequoia Subject Vehicles; and (b) the Tacoma Subject Vehicles for which the CRC has not been previously applied and the frame was not previously replaced.[6]  (See id.). "Toyota, at its sole discretion, may periodically mail reminder notices of this benefit to Class Members after the issuance of the Final Order and Judgment.  Toyota shall mail a reminder notice to Class Members in CRC States when there [are] only six (6) months remaining for the possible application of the CRC.  The reminder notices shall notify the Class Members of the timing of this Frame Inspection and Replacement Program and will encourage Class Members to bring in their Subject Vehicles for an inspection, pursuant to the terms of [the] Settlement Agreement."[7]  (Id.).

Inspections of the Subject Vehicles in CRC States that disclose a perforation less than ten millimeters ("mm") will result in the frame being "cleaned and if the vehicle has not previously received CRC or a new frame, pursuant to a prior [Limited Service Campaign], CRC will be applied[.]" (Dkt. 91-1, Exh. 11 (Frame Inspection and Replacement Protocol ("Protocol")) at § III; see also id. at § I; Dkt. 91, Settlement Agreement at § II.A.33).  "If any perforation in the frame is found to be 10 mm or larger, then the frame will be replaced, as well as all applicable parts and service items incidental to frame replacement, such as cables, harnesses, pipes, clamps, tubes, hoses, spare tire carrier, spare tire carrier plate, bolts, brackets, and wires and all fluids will be

---

[4]  CRC States, "which have high road salt use," include Connecticut, Delaware, the District of Columbia, Illinois, Indiana, Kentucky, Massachusetts, Maryland, Maine, Michigan, Minnesota, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Rhode Island, Virginia, Vermont, Wisconsin, and West Virginia.  (See Dkt. 91, Settlement Agreement at § III.A.3 n. 1).

[5]  If a class member disputes the findings of the Toyota Dealer that conducted the inspection, the class member may take the Subject Vehicle to a second Toyota Dealer for another frame inspection.  (See Dkt. 91, Settlement Agreement at § III.A.4).

[6]  The timing of the availability of the CRC will depend on Toyota's ability to obtain the applicable environmental permits.  (See Dkt. 91, Settlement Agreement at § III.A.3).

[7]  Toyota will provide draft reminder notices to class counsel for their review and comment. (See Dkt. 91, Settlement Agreement at § III.A.3).

replaced, as required." (Dkt. 91-1, Exh. 11, Protocol at § IV; see also id. at § I).

In addition, "[w]ithout cost to Class Members and upon request from the Class Member, Toyota shall arrange a complimentary Loaner Vehicle (upon proof of adequate insurance) if the vehicle is required by the Toyota dealer to remain at the dealership at least overnight pursuant to the Frame Inspection and Replacement Program, for up to seven (7) days, absent exceptional circumstances, to eligible Class Members whose Subject Vehicles are undergoing frame replacement[.]" (Dkt. 91, Settlement Agreement at § III.A.2; see also Dkt. 91-1, Exh. 11, Protocol at § VI). In appropriate circumstances, where a class member demonstrates a need for a vehicle similar to the Subject Vehicles, Toyota "shall use good faith efforts to satisfy that request." (Dkt. 91, Settlement Agreement at § III.A.2; see also Dkt. 91-1, Exh. 11, Protocol at § VI).

During the Claim Period,[8] class members may submit claims for "previously paid out-of-pocket expenses for frame replacement incurred to address a condition that satisfies the Rust Perforation Standard on the Subject Vehicles that were not otherwise reimbursed and that were incurred prior to the Initial Notice Date." (Dkt. 91, Settlement Agreement at § III.B.1). Claim forms will be submitted to and processed by the Settlement Notice Administrator. (See id. at §§ III.B.2-3). The Settlement Notice Administrator will then send timely claims to the Settlement Claims Administrator, who will process the claims. (See id. at §§ III.B.4-5).

All the "costs and expenses associated with providing the relief and otherwise implementing the relief specified in Section III of [the] Settlement Agreement shall be the sole obligation of and paid by Toyota." (Dkt. 91, Settlement Agreement at § III). Toyota will also bear the cost of disseminating and implementing the notice program, which is estimated to be between $1.75 million and $2.5 million. (See id. at § IV.A). Finally, Toyota will not oppose an application for an award of attorney's fees in the amount of $9.75 million and costs and expenses up to $150,000. (See id. at § VIII.B). Toyota will also pay for incentive awards of up to $2,500 per class representative. (See id. at § VIII.C).

_____

[8] The Claim Period will "run from the date of the Initial Notice Date up to and including sixty (60) days after the Court's issuance of the Final Order and Final Judgment." (See Dkt. 91, Settlement Agreement at § II.A.6).

**LEGAL STANDARD**

"[I]n the context of a case in which the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003).

I.      CLASS CERTIFICATION.

At the preliminary approval stage, the court "may make either a preliminary determination that the proposed class action satisfies the criteria set out in Rule 23 or render a final decision as to the appropriateness of class certification."[9] Smith v. Wm. Wrigley Jr. Co., 2010 WL 2401149, *3 (S.D. Fla. 2010) (internal citation omitted); see also Sandoval v. Roadlink USA Pac., Inc., 2011 WL 5443777, *2 (C.D. Cal. 2011) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620, 117 S.Ct. 2231, 2248 (1997)) ("Parties seeking class certification for settlement purposes must satisfy the requirements of Federal Rule of Civil Procedure 23[.]").  "A court considering such a request should give the Rule 23 certification factors 'undiluted, even heightened, attention in the settlement context.'"  Sandoval, 2011 WL 5443777, at *2 (quoting Amchem, 521 U.S. at 620, 117 S.Ct. at 2248).  "Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold."  Amchem, 521 U.S. at 620, 117 S.Ct. at 2248.

A party seeking class certification must first demonstrate that:  "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

"Second, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)."  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 345, 131 S.Ct. 2541, 2548 (2011).  Rule 23(b) is satisfied if:

---

[9]      All "Rule" references are to the Federal Rules of Civil Procedure.

(1) prosecuting separate actions by or against individual class members would create a risk of:

    (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

    (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

    (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

    (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

    (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

    (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(1)-(3).

    The party seeking class certification bears the burden of demonstrating that the proposed class meets the requirements of Rule 23. See Dukes, 564 U.S. at 350, 131 S.Ct. at 2551 ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that

there are in fact sufficiently numerous parties, common questions of law or fact, etc."). However, courts need not consider the Rule 23(b)(3) considerations regarding manageability of the class action, as settlement obviates the need for a manageable trial. See Morey v. Louis Vuitton N. Am., Inc., 2014 WL 109194, *12 (S.D. Cal. 2014) ("[B]ecause this certification of the Class is in connection with the Settlement rather than litigation, the Court need not address any issues of manageability that may be presented by certification of the class proposed in the Settlement Agreement."); Rosenburg v. I.B.M., 2007 WL 128232, *3 (N.D. Cal. 2007) (discussing "the elimination of the need, on account of the [s]ettlement, for the Court to consider any potential trial manageability issues that might otherwise bear on the propriety of class certification").

II.     FAIRNESS OF CLASS ACTION SETTLEMENT.

Rule 23 provides that "the claims, issues, or defenses of a certified class may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e). "The primary concern of [Rule 23(e)] is the protection of th[e] class members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties." Officers for Justice v. Civil Service Comm'n of the City & Cnty. of San Francisco, 688 F.2d 615, 624 (9th Cir. 1982), cert. denied 459 U.S. 1217 (1983). Accordingly, a district court must determine whether a proposed class action settlement is "fundamentally fair, adequate, and reasonable." Staton, 327 F.3d at 959; see Fed. R. Civ. Proc. 23(e). Whether to approve a class action settlement is "committed to the sound discretion of the trial judge." Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir.), cert. denied, Hoffer v. City of Seattle, 506 U.S. 953 (1992) (internal quotation marks and citation omitted).

"If the [settlement] proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). "[S]ettlement approval that takes place prior to formal class certification requires a higher standard of fairness [given t]he dangers of collusion between class counsel and the defendant, as well as the need for additional protections when the settlement is not negotiated by a court designated class representative[.]" Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998). As the Ninth Circuit has observed, "[p]rior to formal class certification, there is an even greater potential

for a breach of fiduciary duty owed the class during settlement.  Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 946 (9th Cir. 2011).

Approval of a class action settlement requires a two-step process – a preliminary approval followed by a later final approval.  See West v. Circle K Stores, Inc., 2006 WL 1652598, *2 (E.D. Cal. 2006) ("[A]pproval of a class action settlement takes place in two stages."); Tijero v. Aaron Bros., Inc., 2013 WL 60464, *6 (N.D. Cal. 2013) ("The decision of whether to approve a proposed class action settlement entails a two-step process.").  At the preliminary approval stage, the court "evaluate[s] the terms of the settlement to determine whether they are within a range of possible judicial approval."  Wright v. Linkus Enters., Inc., 259 F.R.D. 468, 472 (E.D. Cal. 2009).  Although "[c]loser scrutiny is reserved for the final approval hearing[,]" Harris v. Vector Mktg. Corp., 2011 WL 1627973, *7 (N.D. Cal. 2011), "the showing at the preliminary approval stage – given the amount of time, money and resources involved in, for example, sending out new class notices – should be good enough for final approval."  Spann v. J.C. Penney Corp., 314 F.R.D. 312, 319 (C.D. Cal. 2016).  "At this stage, the court may grant preliminary approval of a settlement and direct notice to the class if the settlement: (1) appears to be the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval."  Id. (internal quotation marks omitted); Harris, 2011 WL 1627973, at *7 (same); Cordy v. USS-Posco Indus., 2013 WL 4028627, *3 (N.D. Cal. 2013) ("Preliminary approval of a settlement and notice to the proposed class is appropriate if the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval.") (internal quotation marks omitted).

**DISCUSSION**

I.    CLASS CERTIFICATION.

    A.    Rule 23(a) Requirements.

        1.    **Numerosity**.

The first prerequisite of class certification requires that the class be "so numerous that joinder of all members is impractical[.]"  Fed. R. Civ. P. 23(a)(1).  Although impracticability does not hinge only on the number of members in the putative class, joinder is usually impracticable if a class is "large in numbers."  See Jordan v. Cnty. of Los Angeles, 669 F.2d 1311, 1319 (9th Cir.), vacated on other grounds, 459 U.S. 810 (1982) (class sizes of 39, 64, and 71 are sufficient to satisfy the numerosity requirement).  "As a general matter, courts have found that numerosity is satisfied when class size exceeds 40 members, but not satisfied when membership dips below 21."  Slaven v. BP Am., Inc., 190 F.R.D. 649, 654 (C.D. Cal. 2000); see Tait v. BSH Home Appliances Corp., 289 F.R.D. 466, 473 (C.D. Cal. 2012) ("A proposed class of at least forty members presumptively satisfies the numerosity requirement.").

Here, the members of the class are so numerous that joinder of all members is impracticable.  According to the parties, there are approximately 1.5 million Subject Vehicles.  (See Dkt. 88-2, Blood Decl. at ¶ 4; Dkt. 89, Def. Memo at 5).  The large number of vehicles leaves no doubt that the class exceeds 40 members.

        2.    **Commonality**.

The commonality requirement is satisfied if "there are common questions of law or fact common to the class[.]"  Fed. R. Civ. P. 23(a)(2).  Commonality requires plaintiffs to demonstrate that their claims "depend upon a common contention . . . [whose] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Dukes, 564 U.S. at 350, 131 S.Ct. at 2551; see also Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168, 1172 (9th Cir. 2010) (The commonality requirement demands that "class members' situations share a common issue of law or fact, and are sufficiently parallel to insure a vigorous and full presentation of all claims for relief.") (internal quotation marks omitted).  "The plaintiff[s] must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or

fact that are apt to drive the resolution of the litigation." Mazza v. Am. Honda Motor Co., 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted).  "This does not, however, mean that every question of law or fact must be common to the class; all that Rule 23(a)(2) requires is a single significant question of law or fact." Abdullah v. U.S. Sec. Assocs., Inc., 731 F.3d 952, 957 (9th Cir. 2013), cert. denied, 135 S.Ct. 53 (2014) (emphasis and internal quotation marks omitted); see Mazza, 666 F.3d at 589 (characterizing commonality as a "limited burden[,]" stating that it "only requires a single significant question of law or fact").  Proof of commonality under Rule 23(a) is "less rigorous" than the related preponderance standard under Rule 23(b)(3). See Mazza, 666 F.3d at 589.  "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." Hanlon, 150 F.3d at 1019.

Here, the litigation involves common class-wide issues that would drive the resolution of plaintiffs' claims.  The common questions include:  whether the Subject Vehicles are prone to excessive, premature rust corrosion because the frames were not properly prepared and treated against rust corrosion when they were manufactured, (see Dkt. 86, SAC at ¶ 1); whether Toyota knew or should have known of the defect; whether Toyota misrepresented the standard, quality, and characteristics of the Subject Vehicles; whether Toyota's misrepresentations regarding the standard, quality, and characteristics of the Subject Vehicles were likely to mislead reasonable consumers; whether Toyota's omission that the frames on the Subject Vehicles lacked adequate rust corrosion protection was a material fact that a reasonable consumer would be expected to rely on when deciding whether to purchase a vehicle; whether plaintiffs and class members have been damaged; and whether plaintiffs and class members are entitled to equitable relief.  (See id. at ¶¶ 20 & 92; see also Dkt. 88-1, Plfs. Memo at 26); Wolin, 617 F.3d at 1172 ("Appellants' complaints set forth more than one issue that is common to the class, including: 1) whether the [vehicles'] alignment geometry was defective; 2) whether [defendant] was aware of th[e] defect; 3) whether [defendant] concealed the nature of the defect; 4) whether [defendant's] conduct violated [state consumer protection laws]; and 5) whether [defendant] was obligated to pay for or repair the alleged defect pursuant to the express or implied terms of its warranties.  These

1   common core questions are sufficient to satisfy the commonality test.").

2              3.      **Typicality**.

3          "Typicality refers to the nature of the claim or defense of the class representative, and not

4   to the specific facts from which it arose or the relief sought."  Ellis v. Costco Wholesale Corp., 657

5   F.3d 970, 984 (9th Cir. 2011) (internal quotation marks and citation omitted).  To demonstrate

6   typicality, plaintiffs' claims must be "reasonably co-extensive with those of absent class

7   members[,]" although "they need not be substantially identical."  Hanlon, 150 F.3d at 1020; see

8   Ellis, 657 F.3d at 984 ("Plaintiffs must show that the named parties' claims are typical of the

9   class.").  "The test of typicality is whether other members have the same or similar injury, whether

10  the action is based on conduct which is not unique to the named plaintiffs, and whether other class

11  members have been injured by the same course of conduct."  Ellis, 657 F.3d at 984 (internal

12  quotation marks and citation omitted).

13         Here, the claims of the representative plaintiffs are typical of the claims of the class.

14  Plaintiffs' claims arise from the same nucleus of facts and are based on the same legal theory, i.e.,

15  that the Subject Vehicles have a defect that Toyota failed to disclose.  (See, e.g., Dkt. 86, SAC

16  at ¶¶ 1, 18 & 27-28).  Additionally, the court is not aware of any facts that would subject the class

17  representatives "to unique defenses which threaten to become the focus of the litigation."  Hanon

18  v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992).

19              4.      **Adequacy of Representation**.

20         "The named Plaintiffs must fairly and adequately protect the interests of the class."  Ellis,

21  657 F.3d at 985 (citing Fed. R. Civ. P. 23(a)(4)).  "To determine whether named plaintiffs will

22  adequately represent a class, courts must resolve two questions:  (1) do the named plaintiffs and

23  their counsel have any conflicts of interest with other class members and (2) will the named

24  plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  Id. (internal

25  quotation marks and citation omitted).  "Adequate representation depends on, among other

26  factors, an absence of antagonism between representatives and absentees, and a sharing of

27  interest between representatives and absentees."  Id.

28

The proposed class representatives do not appear to have any conflicts of interest with the absent class members, as they have no individual claims separate from the class claims. As plaintiff Warner states: "My interests are aligned with those of the Class. Throughout my involvement with this case, I have sought to maximize the benefits recovered by the Class. . . . I am not aware of any interest that is antagonistic with or which conflicts with the interests of the Class." (See Dkt 88-4, Declaration of Brian Warner ("Warner Decl.") at ¶ 9). The other proposed class representatives made similar representations. (See Dkt. 88-5, Declaration of Kenneth MacLeod ("McLeod Decl.") at ¶ 6; Dkt. 88-6, Declaration of Michael Meade ("Meade Decl.") at ¶ 8; Dkt. 88-7, Declaration of Michael Watson ("Watson Decl.") at ¶ 6; Dkt. 88-8, Declaration of James Fuller ("Fuller Decl.") at ¶ 7; Dkt. 88-9, Declaration of Dale Franquet ("Franquet Decl.") at ¶ 6; Dkt. 88-10, Declaration of Ryan Burns ("Burns Decl.") at ¶ 12; Dkt. 88-11, Declaration of James Michael Good ("Good Decl.") at ¶ 15). Indeed, all of the class representatives understand their duties "to put the Class's interests ahead of [their] own individual interests and to act in the best interests of the Class." (Dkt. 88-1, Warner Decl. at ¶ 8; see Dkt. 88-5, McLeod Decl. at ¶ 5; Dkt. 88-6, Meade Decl. at ¶ 7; Dkt. 88-7, Watson Decl. at ¶ 5; Dkt. 88-8, Fuller Decl. at ¶ 6; Dkt. 88-9, Franquet Decl. at ¶ 5; Dkt. 88-10, Burns Decl. at ¶ 11; Dkt. 88-11, Good Decl. at ¶ 14). "The adequacy-of-representation requirement is met here because Plaintiffs have the same interests as the absent Class Members[.] Further, there is no apparent conflict of interest between the named Plaintiffs' claims and those of the other Class Members' – particularly because the named Plaintiffs have no separate and individual claims apart from the Class." Barbosa v. Cargill Meat Solutions Corp, 297 F.R.D. 431, 442 (E.D. Cal. 2013).

Additionally, the court is satisfied that plaintiffs' counsel are competent and willing to prosecute this action vigorously. Plaintiffs' counsel request, and the Settlement Agreement provides, that the court appoint as class counsel Blood of Blood Hurst and O'Reardon LLP and Barnow of Barnow and Associates P.C. (See Dkt. 88, Motion at 2; Dkt. 88-1, Plfs. Memo at 1; Dkt. 91, Settlement Agreement at § II.A.9). Blood states that he has "significant experience leading consumer protection class action lawsuits, including consumer protection actions involving automobiles[, and has] been appointed lead counsel by numerous state and federal courts,

including in complex and multi-district litigation involving false advertising claims brought on behalf of consumers." (Dkt. 88-2, Blood Decl. at ¶ 58; see also id. at Exh. A (Blood Hurst & O'Reardon LLP Firm Resume)). Blood adds that Barnow "also has significant experience leading consumer protection class action lawsuits, including class actions [Blood has] litigated with him." (Dkt. 88-2, Blood Decl. at ¶ 59; see also id. at Exh. B (Barnow and Associates Firm Resume)). Based on Blood's representations and the firms' resumes, and having observed counsel's diligence in litigating this case, the court finds that plaintiffs' counsel are competent, and that the adequacy of representation requirement is satisfied. See Barbosa, 297 F.R.D. at 443 ("There is no challenge to the competency of the Class Counsel, and the Court finds that Plaintiffs are represented by experienced and competent counsel who have litigated numerous class action cases."); Avilez v. Pinkerton Gov't Servs., Inc., 286 F.R.D. 450, 457 (C.D. Cal. 2012) vacated and remanded on other grounds, 595 Fed. Appx. 579 (9th Cir. 2015) ("Defendants do not dispute and the evidence confirms that, as detailed in their declarations, Plaintiff's counsel are experienced class action litigators who have litigated many . . . class actions and have been certified as class counsel in numerous other class actions[.]").

B.    Rule 23(b) Requirements.

Certification under Rule 23(b)(3) is proper "whenever the actual interests of the parties can be served best by settling their differences in a single action." Hanlon, 150 F.3d at 1022 (internal quotation marks omitted). The rule requires two different inquiries, specifically a determination as to whether (1) "questions of law or fact common to class members predominate over any questions affecting only individual members[;]" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); see Spann, 314 F.R.D. at 321-22.

1.    **Predominance**.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623, 117 S.Ct. at 2249. "Rule 23(b)(3) focuses on the relationship between the common and individual issues. When common questions present a significant aspect of the case and they can be resolved for all

members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." Hanlon, 150 F.3d at 1022 (internal quotation marks and citations omitted); see In re Wells Fargo Home Mortg. Overtime Pay Litig., 571 F.3d 953, 959 (9th Cir. 2009) ("[T]he main concern in the predominance inquiry . . . [is] the balance between individual and common issues."). Additionally, the class damages must be sufficiently traceable to plaintiffs' liability case. See Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1433 (2013).

As an initial matter, courts often find predominance in automobile defect class actions. See, e.g., Wolin, 617 F.3d at 1173 ("Common issues predominate such as whether [defendant] was aware of the existence of the alleged defect, whether [defendant] had a duty to disclose its knowledge and whether it violated consumer protection laws when it failed to do so."); Keegan v. American Honda Motor Co., Inc., 284 F.R.D. 504, 532-34 (C.D. Cal. 2012) (finding that plaintiffs satisfied the predominance requirement as to their CLRA, UCL, and warranty claims because of common questions regarding "the nature of the design defect in question, the likely effect of the defect on class vehicles, its likely impact on vehicle safety, what Honda knew or did not know, and what it disclosed or did not disclose to consumers"); Chamberlan v. Ford Motor Co., 223 F.R.D. 524, 526-27 (N.D. Cal. 2004) ("[C]ommon questions include whether the design of the plastic intake manifold was defective, whether Ford was aware of the alleged design defects, whether Ford had a duty to disclose its knowledge, whether it failed to do so, whether the facts that Ford allegedly failed to disclose were material, and whether the alleged failure to disclose violated the CLRA. Common questions thus predominate over individual questions in this case.").

Here, plaintiffs have demonstrated that "[a] common nucleus of facts and potential legal remedies dominates this litigation." Hanlon, 150 F.3d at 1022. As discussed above, see supra at § I.A.2., there are many common questions regarding the existence of a manufacturing defect in the Subject Vehicles and Toyota's knowledge of this defect. (See Dkt. 86, SAC at ¶¶ 1, 20 & 92; Dkt. 88-1, Plfs. Memo at 31). The answers to these questions, which would drive the resolution of this litigation, do not depend on the individual facts or circumstances of an individual plaintiff's purchase or lease of the Subject Vehicles. The Subject Vehicles either have a defect

or they do not; Toyota knew or should have known about the defect or it did not; and Toyota withheld or omitted material information from consumers or it did not. Additionally, the relief sought applies to all class members and is traceable to plaintiffs' liability case. (See Dkt. 88-1, Plfs. Memo at 31); Comcast, 133 S.Ct. at 1433. In short, there are several common questions that predominate over all others in this litigation.

2.      **Superiority**.

"The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case" and "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." Hanlon, 150 F.3d at 1023. Rule 23(b)(3) provides a list of four non-exhaustive factors relevant to superiority. See Fed. R. Civ. P. 23(b)(3)(A)-(D).

The first factor considers "the class members' interests in individually controlling the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). "This factor weighs against class certification where each class member has suffered sizeable damages or has an emotional stake in the litigation." Barbosa, 297 F.R.D. at 444. Here, plaintiffs do not assert claims for emotional distress damages, nor is there any indication that the amount of damages any individual class member could recover is significant or substantially greater than the potential recovery of any other class member. (See, generally, Dkt. 86, SAC). The alternative method of resolution is individual claims for a relatively modest amount of damages, and such claims would likely never be brought, as "litigation costs would dwarf potential recovery." Hanlon, 150 F.3d at 1023; see Leyva v. Medline Indus., Inc., 716 F.3d 510, 515 (9th Cir. 2013) ("In light of the small size of the putative class members' potential individual monetary recovery, class certification may be the only feasible means for them to adjudicate their claims. Thus, class certification is also the superior method of adjudication."); Bruno v. Quten Research Inst., LLC, 280 F.R.D. 524, 537 (C.D. Cal. 2011) ("Given the small size of each class member's claim, class treatment is not merely the superior, but the only manner in which to ensure fair and efficient adjudication of the present action."). As plaintiffs note, given the issues involved in this litigation, "the expert costs alone would dwarf any individual recovery." (Dkt. 88-1, Plfs. Memo at 34). In short, "there is no

evidence that Class members have any interest in controlling prosecution of their claims separately nor would they likely have the resources to do so." Munoz v. PHH Corp., 2013 WL 2146925, *26 (E.D. Cal. 2013).

The second factor to consider is "the extent and nature of any litigation concerning the controversy already begun by or against class members." Fed. R. Civ. P. 23(b)(3)(B).  There is no indication that any class member is involved in any other litigation concerning the claims in this case. (See Dkt. 88-1, Plfs. Memo at 34).

The third factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum[,]" Fed. R. Civ. P. 23(b)(3)(C), and the fourth factor is "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(D).  As noted above, "[i]n the context of settlement . . . the third and fourth factors are rendered moot and are irrelevant." Barbosa, 297 F.R.D. at 444; see Amchem, 521 U.S. at 620, 117 S.Ct. at 2248 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial.") (internal citation omitted).

The only factor in play here weighs in favor of class treatment.  Further, the filing of separate suits by several thousand class members "would create an unnecessary burden on judicial resources." Barbosa, 297 F.R.D. at 445.  Under the circumstances, the court finds that the superiority requirement is satisfied.

II.    FAIRNESS, REASONABLENESS, AND ADEQUACY OF THE PROPOSED SETTLEMENT.

A.    The Settlement is the Product of Arm's-Length Negotiations.

"This circuit has long deferred to the private consensual decision of the parties." Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 965 (9th Cir. 2009).  The Ninth Circuit has "emphasized" that "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all

concerned." Id. (internal quotation marks omitted).  When the settlement is "the product of an arms-length, non-collusive, negotiated resolution[,]" id., courts afford the parties the presumption that the settlement is fair and reasonable.  See Spann, 314 F.R.D. at 324 ("A presumption of correctness is said to attach to a class settlement reached in arm's-length negotiations between experienced capable counsel after meaningful discovery.") (internal citation omitted); In re Netflix Privacy Litig., 2013 WL 1120801, *4 (N.D. Cal. 2013) ("Courts have afforded a presumption of fairness and reasonableness of a settlement agreement where that agreement was the product of non-collusive arms' length negotiations conducted by capable and experienced counsel.").

Here, there is no evidence of collusion or fraud leading to, or taking part in, the settlement negotiations between the parties.  On the contrary, in this Action and the Related Action, Toyota filed "multiple motions to dismiss, moved for summary judgment, preemptively moved to deny class certification, moved to stay discovery, opposed two motions to compel, and initially aggressively withheld discovery." (Dkt. 88-2, Blood Decl. at ¶ 3; see id. at ¶¶ 17-18, 21-25 & 28-33 (describing procedural and substantive history with respect to Toyota's pretrial motions)).  With respect to discovery, plaintiffs' counsel "engaged in a hard-fought and contested discovery process with Toyota, obtained and then analyzed approximately 2.5 million pages of documents produced by Toyota, subpoenaed five third parties, and analyzed the documents obtained from th[ose] entities." (Id. at ¶ 34).

Moreover, throughout the litigation, plaintiffs' counsel communicated with three consulting experts for guidance on technical issues relating to metallurgy and vehicle safety and structural integrity engineering issues.  (See Dkt. 88-2, Blood Decl. at ¶ 42).  Counsel also interviewed Toyota's National Manager of Quality Operations regarding, among other things, pre- and post-launch vehicle testing and quality assurance practices, rust corrosion and perforation root cause analyses, frame manufacturing and phosphate coating practices, and consumer complaints. (See id. at ¶ 43).  Additionally, the work of Toyota's experts was provided to plaintiffs' engineering expert, and plaintiffs' counsel interviewed Toyota's engineering experts about their analyses and the engineering justification for the frame replacement standard.  (See id. at ¶ 45).

In March 2016, the parties began settlement discussions.  (See Dkt. 88-2, Blood Decl. at ¶ 47).  According to plaintiffs' counsel, when negotiations began, they "had a clear view of the strengths and weaknesses of their case and were in a strong position to make an informed decision regarding the reasonableness of a potential settlement." (Dkt. 88-1, Plfs. Memo at 19-20).  The parties "engaged in extensive arm's length negotiations, including numerous mediation sessions . . . before Settlement Special Master Patrick A. Juneau[.]" (Dkt. 89, Def. Memo at 4; see also Dkt. 88-2, Blood Decl. at ¶ 48 (describing settlement negotiations as "hard-fought")).  The parties had nine face-to-face meetings in various parts of the country.  (See Dkt. 88-2, Blood Decl. at ¶ 48; Dkt. 89, Def. Memo at 4).  During the discussions, the parties drafted, negotiated, and exchanged many revisions of the Settlement Agreement and related exhibits.  (See Dkt. 88-2, Blood Decl. at ¶ 5).  After more than "seven months of hard-fought negotiations," the parties reached agreement on all the substantive terms of the settlement on October 18, 2016.  (See id. at ¶¶ 48 & 55).  Subsequently, the parties negotiated attorney's fees and costs, and plaintiffs' incentive awards.  (See id. at ¶ 55; see also Dkt. 89, Def. Memo at 4).

Based on the evidence and record before the court, the court is persuaded that the parties thoroughly investigated and considered their own and the opposing parties' positions.  The parties clearly had a sound basis for measuring the terms of the settlement against the risks of continued litigation, and there is no evidence that the settlement is "the product of fraud or overreaching by, or collusion between, the negotiating parties[.]" Rodriguez, 563 F.3d at 965 (quoting Officers for Justice, 688 F.2d at 625).

B.    The Amount Offered In Settlement Falls Within a Range of Possible Judicial Approval and is a Fair and Reasonable Outcome for Class Members.

1.    **Recovery for Class Members.**

The settlement is fair, reasonable, and adequate, particularly when viewed in light of the litigation risks in this case.  As described above, the benefits to the class members include: free frame inspections for each Subject Vehicle for up to 12 years from first use, or for up to one year from the entry of final judgment, whichever is longer; application of CRC for certain vehicles in CRC States; and free frame replacement for frames exhibiting a perforation of 10 mm or more.

(See Dkt. 91, Settlement Agreement at § III.A; see also Dkt. 91-1, Exh. 11, Protocol).  Also, if a Subject Vehicle is required to be kept overnight for a frame inspection or frame replacement, Toyota will provide a loaner vehicle, at no cost, to the class member.  (See Dkt. 91, Settlement Agreement at § III.A.2).  Finally, class members who previously paid for a frame replacement to address a condition that satisfies the Protocol's criteria will be reimbursed for their out-of-pocket expenses.  (See id. at § III.B).

Plaintiffs characterize the settlement as "a complete and total success for the Class, achieving the very purpose of filing this lawsuit – frame inspections for all Subject Vehicles and frame replacements for all that merit it." (Dkt. 88-1, Plfs. Memo at 14).  According to plaintiffs,  the settlement "makes available over $3.4 billion worth of benefits to the Class, including about $90 million worth of frame inspections ($60 x 1.5 million vehicles) and $3.375 billion in frame repairs (222,500 vehicles x $15,000)[.]"[10] (Dkt. 88-2, Blood Decl. at ¶ 8).  The settlement thus confers an excellent recovery for plaintiffs and the class members.  See, e.g. In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 459 (9th Cir. 2000) (ruling that "the [s]ettlement amount of almost $2 million was roughly one-sixth of the potential recovery, which, given the difficulties in proving the case, [was] fair and adequate"); Rodriguez, 563 F.3d at 964 (affirming settlement approval where the settlement represented 30% of the damages estimated by the class expert); Linney Cellular Alaska P'ship, 151 F.3d 1234, 1242 (9th Cir. 1998) ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.") (internal quotation marks and citation omitted).

The settlement here is even more compelling given the substantial litigation risks in this case.  Nationwide class certification under the laws of multiple states can be very difficult for plaintiffs' counsel.  See, e.g., Mazza, 666 F.3d at 590-94; In re Pharm. Indus. Average Wholesale

---

[10] The number of expected frame replacements is based on the rate of frame replacements from prior inspections of the vehicles at issue, (see Dkt. 88-2, Blood Decl. at ¶ 8), i.e., Toyota's 2014 limited service campaign ("LSC") for model year 2005-2008 Tacoma vehicles registered in certain cold weather states, as well as a second LSC in 2015.  (See id. at ¶¶ 14-15; Dkt. 88-1, Plfs. Memo at 8; Dkt. 86, SAC at ¶¶ 35-43).

Price Litig., 252 F.R.D. 83, 94 (D. Mass. 2008) (noting that "[w]hile numerous courts have talked-the-talk that grouping of multiple state laws is lawful and possible, very few courts have walked the grouping walk").  Moreover, as plaintiffs acknowledge, "significant risk exists, as shown by the Court's ruling on Toyota's motion to dismiss."  (See Dkt. 88-1, Plfs. Memo at 17; see also Dkt. 61, Court's Order of March 8, 2016 (dismissing plaintiffs' First Amendment Complaint with leave to amend)).  Plaintiffs also recognize that should they "prosecute these claims against Toyota to conclusion any recovery would come years in the future, and at the very real risk that Class Members may receive nothing."  (Dkt. 88-1, Plfs. Memo at 18).  In short, the risks of continued litigation are formidable, and the court takes these real risks into account.  Weighed against those risks, and coupled with the delays associated with continued litigation, the settlement's benefits to the class easily fall within the range of reasonableness.

>               **2.    Release of Claims**.

Beyond the value of the settlement, potential recovery at trial, and inherent risks in continued litigation, courts also consider whether a class action settlement contains an overly broad release of liability.  See Newberg on Class Actions § 13:15, at p. 326 (5th ed. 2014) ("Beyond the value of the settlement, courts have rejected preliminary approval when the proposed settlement contains obvious substantive defects such as . . . overly broad releases of liability."); see, e.g., Fraser v. Asus Computer Int'l, 2012 WL 6680142, *3 (N.D. Cal. 2012) (denying preliminary approval of proposed settlement that provided defendant a "nationwide blanket release" in exchange for payment "only on a claims-made basis," without the establishment of a settlement fund or any other benefit to the class).

Here, plaintiffs and class members who do not exclude themselves from the settlement release "any and all claims . . . regarding the subject matter of the Action and the Related Action . . . whether past, present, or future, mature, or not yet mature, known or unknown, suspected or unsuspected, contingent or non-contingent, derivative or direct, asserted or un-asserted, . . . arising from, related to, connected with, and/or in any way involving the Action, the Related Action, the Subject Vehicles' frames and/or associated parts that are, or could have been, defined, alleged or described in the Second Amended Complaint, the Action, the Related Action or any

22

amendments of the Action or the Related Action." (See Dkt. 91, Settlement Agreement at § VII.B). The release does not extinguish "claims for personal injury, wrongful death or actual physical property damages arising from an accident involving a Subject Vehicle." (Id.). Also, the provision regarding unknown harm includes a waiver of rights protected by California Civil Code § 1542 ("§ 1542"), which preserves unknown claims. (See id. at § VII.H); see also Cal. Civ. Code § 1542 ("A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."). Finally, the release "constitutes an essential and material term of the Agreement and shall be included in any Final Judgment and Final Order entered by the Court." (Dkt. 91, Settlement Agreement at § VII.O).

The carving out of claims for personal injury, wrongful death, and property damage arising from an accident indicates that such claims are not unknown, and are not within – nor intended to be within – the scope of the § 1542 waiver. For these reasons, and with the above-described understanding of the release, i.e., that neither the general release nor the § 1542 waiver applies to claims of personal injury, wrongful death, and property damage arising from an accident, the court finds that the release adequately balances fairness to absent class members with defendant's business interests in ending this litigation with finality. See Fraser, 2012 WL 6680142, at *4 (recognizing defendant's "legitimate business interest in 'buying peace' and moving on to its next challenge" as well as the need to prioritize "[f]airness to absent class member[s]").

C.    The Settlement Agreement Does Not Improperly Grant Preferential Treatment to the Class Representatives.

"Incentive awards are payments to class representatives for their service to the class in bringing the lawsuit." Radcliffe v. Experian Info. Solutions Inc., 715 F.3d 1157, 1163 (9th Cir. 2013). The Ninth Circuit has instructed "district courts to scrutinize carefully the awards so that they do not undermine the adequacy of the class representatives." Id. The court must examine whether there is a "significant disparity between the incentive awards and the payments to the rest of the class members" such that it creates a conflict of interest. See id. at 1165. "In deciding whether [an incentive] award is warranted, relevant factors include the actions the plaintiff has

taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998).

The Settlement Agreement provides that class counsel may petition the court for incentive awards of up to $2,500 per class representative "for bringing the Action and the Related Action and for their time in connection with the Action and Related Action." (Dkt. 91, Settlement Agreement at § VIII.C). It further provides that the incentive payments "are intended to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the settlement." (Id. at § VIII.E). The court's denial of any incentive award "shall [not] affect whether the Final Order and Final Judgment are final or constitute grounds for cancellation or termination of the settlement."[11] (Id.).

Here, there is no doubt that the settlement does not improperly grant preferential treatment to the class representatives. As an initial matter, the $2,500 incentive award per class member is presumptively reasonable. See Dyer v. Wells Fargo Bank, N.A., 303 F.R.D. 326, 335 (N.D. Cal. 2014) (finding an incentive award of $5,000 presumptively reasonable). Further, the record reflects that the class representatives have taken on substantial responsibility in litigating this case, and the class has benefitted from the time and effort they spent doing so. (See, e.g., Dkt. 88-4, Warner Decl. at ¶¶ 10-13 (describing "substantial time and effort instituting, monitoring and participating in this litigation" including communicating with counsel, assisting in answering interrogatories, providing documents, reviewing documents and the settlement); Dkt. 88-5, MacCleod Decl. at ¶¶ 7-9 (similar); Dkt. 88-6, Meade Decl. at ¶¶ 9-11 (similar); Dkt. 88-7, Watson Decl. at ¶¶ 8-10 (similar); Dkt. 88-8, Fuller Decl. at ¶¶ 8-10 (similar); Dkt. 88-9, Franquet Decl. at ¶¶ 11-14 (similar); Dkt. 88-10, Burns Decl. at ¶¶ 13-15 (similar); Dkt. 88-11, Good Decl. at ¶¶ 16-

---

[11] The named plaintiffs acknowledge that the "requested incentive awards are to be considered by the Court separately from whether the settlement is fair, reasonable, and adequate, and that if the Court declines to award the requested incentive awards, that determination will not affect the validity or finality of the settlement." (Dkt. 88-1, Warner Decl. at ¶ 14; see also Dkt. 88-5, McLeod Decl. at ¶ 10; Dkt. 88-6, Meade Decl. at ¶ 12; Dkt. 88-7, Watson Decl. at ¶ 11; Dkt. 88-8, Fuller Decl. at ¶ 11; Dkt. 88-9, Franquet Decl. at ¶ 15; Dkt. 88-10, Burns Decl. at ¶ 16; Dkt. 88-11, Good Decl. at ¶ 19).

18 (similar)).

Plaintiffs state that they have reviewed the settlement and "believe that the benefits provided by the settlement represent an excellent result for the settlement class." (Dkt. 88-4, Warner Decl. at ¶ 12; <u>see also</u> Dkt. 88-5, MacCleod Decl. at ¶ 8 (same); Dkt. 88-6, Meade Decl. at ¶ 10 (similar); Dkt. 88-7, Watson Decl. at ¶ 9 (same); Dkt. 88-8, Fuller Decl. at ¶ 9 (similar); Dkt. 88-9, Franquet Decl. at ¶ 13 (same); Dkt. 88-10, Burns Decl. at ¶ 14 (same); Dkt. 88-11, Good Decl. at ¶ 17 (same)).  The court agrees.  In short, because the parties agree that the settlement shall remain in force regardless of any incentive awards and the amount of the awards are presumptively reasonable, the court is persuaded that there is no conflict of interest between the named plaintiffs and absent class members.

D.     <u>Proposed Class Notice and Notification Procedures</u>.

Upon a settlement of a certified class, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).  Federal Rule of Civil Procedure 23(c)(2) requires the "best notice that is practicable under the circumstances, including individual notice" of particular information.  <u>See</u> Fed. R. Civ. P. 23(c)(2)(B) (enumerating notice requirements for classes certified under Rule 23(b)(3)).

A class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard."  <u>Churchill Vill., LLC v. Gen. Elec.</u>, 361 F.3d 566, 575 (9th Cir.), <u>cert. denied</u>, 543 U.S. 818 (2004) (internal quotation marks omitted).  "The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness."  <u>Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.</u>, 396 F.3d 96, 113 (2d Cir.), <u>cert. denied</u>, 544 U.S. 1044 (2005).  Settlement notices must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings."  <u>Weinberger v. Kendrick</u>, 698 F.2d 61, 70 (2d Cir. 1982), <u>cert. denied</u>, 464 U.S. 818 (1983) (internal quotation marks and brackets omitted); <u>see</u> <u>Trotsky v. Los Angeles Fed. Sav. & Loan Ass'n.</u>, 48 Cal.App.3d 134, 151-52 (1975) (same);  <u>Wershba v. Apple Computer, Inc.</u>, 91 Cal.App.4th 224, 252 (2001) ("As a general rule, class notice must strike

a balance between thoroughness and the need to avoid unduly complicating the content of the notice and confusing class members."). The notice should provide sufficient information to allow class members to decide whether they should accept the benefits of the settlement, opt out and pursue their own remedies, or object to its terms. See Wershba, 91 Cal.App.4th at 251-52. "[N]otice is adequate if it may be understood by the average class member." 4 Newberg on Class Actions § 11:53, at p. 167 (4th ed. 2013).

Here, the parties have selected, subject to court approval, Jeanne Finegan ("Finegan") of Heffler Claims Group ("Heffler") as the Settlement Notice Administrator. (See Dkt. 91, Settlement Agreement at § II.A.36). The notice program that Heffler has developed utilizes a combination of individual notice to known class members in the form of Direct Mail Notice, (see Dkt. 91-1, Exh. 9, Declaration of Jeanne C. Finegan ("Finegan Decl.") at ¶¶ 15-16), a schedule of publication notices in territorial newspapers and magazines such as People Magazine and Sports Illustrated, (see id. at ¶¶ 15, 25 & 28-29), banner ads on the internet and social media platforms such as Facebook, Instagram, and Twitter, (see id. at ¶¶ 15, 32-36 & 38-39), and a multimedia news release. (See id. at ¶¶ 15 & 43). Most publication notices will be in English with a Spanish language sub-headline. (See id. at ¶¶ 15, 26, 28 & 33). Also, a website will be established to enable class members to get information about the settlement and review the Long Form Notice, Claim Form, Opt-Out Form, Settlement Agreement, relevant court orders, and plaintiffs' motion for attorney's fees, expenses, and incentive awards. (See id. at ¶¶ 45-46). Finally, Heffler will establish and maintain a 24-hour toll-free telephone line where class members can obtain information. (See id. at ¶ 47). Heffler anticipates that the notices will reach 95% of potential class members with an average frequency of five times each. (See id. at ¶ 4).

The Direct Mail Notice, which will be sent via U.S. Mail to class members identified by R.L. Polk & Co., (see Dkt. 91-1, Exh. 9, Finegan Decl. at ¶ 16), describes the nature of the action and identifies the Subject Vehicles. (See Dkt. 91-1, Exh. 6 ("Direct Mail Notice") at 1). It advises the recipients that Toyota's records indicate that he or she may be a class member for the vehicle with a certain Vehicle Identification Number and that the class member's rights may be affected by the settlement. (See id.). It also describes the relief provided by the settlement. (See id. at 1-2).

Additionally, the Direct Mail Notice: informs class members how to obtain the Long Form Notice by visiting the settlement website, calling the toll-free number, or writing to the Settlement Notice Administrator; provides the deadlines for opting out of the class, submitting objections, and submitting claim forms; and includes the date of the final fairness hearing. (See id. at 2). The Direct Mail Notice states in bold: "If you are a class member, you must consult [the settlement website] to determine how this settlement may affect you." (Id.).

The Long Form Notice, which will be located on the settlement website, (see Dkt. 91-1, Exh. 9, Finegan Decl. at ¶¶ 46, 48 & 51), describes the nature of the action, including the class claims and Toyota's defenses. (See Dkt. 91-1, Exh. 4 ("Long Form Notice") at 4); see also Fed. R. Civ. P. 23(c)(2)(B)(i) & (iii). The class definition is conspicuously included in a section entitled, "How do I know if I am part of the Settlement?" (see Dkt. 91-1, Exh. 4, Long Form Notice at 6), and the Subject Vehicles are identified in a section entitled, "What vehicles are included in the settlement?" (See id. at 5-6); see also Fed. R. Civ. P. 23(c)(2)(B)(ii). The Long Form Notice also explains the terms of the settlement, including the benefits class members will receive. (See Dkt. 91-1, Exh. 4, Long Form Notice at 7-12). It explains what class members need to do to obtain each of the available types of relief. (See id.). The Long Form Notice also includes an explanation laying out the class members' options under the settlement, i.e., they may exclude themselves, object, or do nothing. (See id. at 3, 12-13, 14-16); see also Fed. R. Civ. P. 23(c)(2)(B)(v)-(vi). Class members may elect to exclude themselves from the settlement by completing and mailing a simple Request to Opt Out form (or a letter) to the Settlement Notice Administrator, which is attached to the Long Form Notice and available on the settlement website. (See Dkt. 91-1, Exh. 4, Long Form Notice at 13; see also Dkt. 91-1, Exh. 10 (Request to Opt Out/Request for Exclusion Form)). Also, if class members choose to object to the settlement, they may do so by submitting their written objections to the court, and they may attend the Final Fairness Hearing with or without an attorney.[12] (See Dkt. 91-1, Exh. 4, Long Form Notice at 14-17); see Fed. R. Civ. P. 23(c)(2)(B)(iv).

---

[12]   The Long Form Notice explains that class members who object and wish to speak at the Final Fairness Hearing must file a notice of intent to appear. (See Dkt. 91-1, Exh. 4, Long Form Notice at 15-17).

The Long Form Notice also explains that all members of the class who do no exclude themselves will release all claims that relate to the claims or issues asserted in the lawsuit, and it indicates in an attached appendix that the release does not include claims for personal injury, wrongful death, or physical property damage arising from an accident.  (See Dkt. 91-1, Exh. 4, Long Form Notice at 12 & 18-21); see also Fed. R. Civ. P. 23(c)(2)(B)(vii).  Information regarding the final approval hearing is also included.  (See Dkt. 91-1, Exh. 4, Long Form Notice at 16-17).

Based on the foregoing, the court finds there is no alternative method of distribution that would be more practicable here, or any more reasonably likely to notify the class members.  Under the circumstances, the court finds that the procedure for providing notice and the content of the class notice constitute the best practicable notice to class members and  complies with the requirements of due process.

E.     Summary.

The court's preliminary evaluation of the Settlement Agreement "does not disclose grounds to doubt its fairness[,] . . . such as unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys, and appears to fall within the range of possible approval[.]"  In re Vitamins Antitrust Litig., 2001 WL 856292, *4 (D.D.C. 2001) (quoting Manual for Complex Litigation § 30.41 (3d ed. 1999)); see also Spann, 314 F.R.D. at 323 (same); In re NVIDIA Corp. Derivative Litig., 2008 WL 5382544, *2 (N.D. Cal. 2008) (same).

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT:

1.   The Joint Motion for Entry of Order Granting Preliminary Approval of Class Action Settlement, Certification of Settlement Class, and Approval of Class Notice  **(Document No. 88)** is **granted** upon the terms and conditions set forth in this Order.

2.   The court preliminarily certifies the class, as defined in § II.A.8 of the Settlement Agreement ("Settlement Agreement") **(Document No. 91)** for the purposes of settlement.  The Subject Vehicles are identified in Exhibit 7 to the Settlement Agreement.  (See Dkt. 91-1, Settlement Agreement, Exh. 7).

3.   The court preliminary appoints plaintiffs Brian Warner, Kenneth MacLeod, Michael

Meade, Michael Watson, Dale Franquet, James Fuller, Ryan Burns, and James Good as class representatives for settlement purposes.

4. The court preliminarily appoints Timothy G. Blood of Blood Hurst and O'Reardon LLP and Ben Barnow of Barnow and Associates P.C. as class counsel for settlement purposes.

5. The court preliminarily finds that the terms of the Settlement are fair, reasonable and adequate, and comply with Rule 23(e) of the Federal Rules of Civil Procedure.

6. The proposed manner of the notice of settlement set forth in the Settlement Agreement constitutes the best notice practicable under the circumstances and complies with the requirements of due process.

7. The court approves the form, substance, and requirements of the: Direct Mail Notice (Dkt. 91-1, Settlement Agreement, Exh. 6); Long Form Notice (Dkt. 91-1, Settlement Agreement, Exh. 4); Publication Notice (Dkt. 91-1, Settlement Agreement, Exh. 8); the Frame Replacement Reimbursement Claim Form (Dkt. 91-1, Settlement Agreement, Exh. 1); and Request to Opt Out/Request for Exclusion Form (Dkt. 91-1, Settlement Agreement, Exh. 10).

8. The parties shall carry out the settlement and claims process according to the terms of the Settlement Agreement.

9. Jeanne Finegan ("Finegan") of Heffler Claims Group ("Heffler") is hereby appointed as the Settlement Notice Administrator. Promptly following entry of this order, Finegan will prepare final versions of the notices, claim, and exclusion forms, incorporating the relevant dates and deadlines set forth in this Order and the Settlement Agreement, and will commence the notice process, in accordance with the Settlement Agreement. Notice shall commence no later than **January 3, 2017**.

10. Patrick A. Juneau and Michael Juneau are hereby appointed as the Settlement Claims Administrators.

11. Any class member who wishes to: (a) object to the settlement, including the requested attorney's fees, costs and incentive awards; and/or (b) exclude him or herself from the settlement must file his or her objection to the settlement or request for exclusion (i.e., the Opt-Out Form) no later than **March 27, 2017**, in accordance with the Settlement Agreement, Long Form Notice

and/or Opt-Out Form.

12. Any class member who wishes to appear at the final approval (fairness) hearing, either on his or her own behalf or through an attorney, to object to the settlement, including the requested attorney's fees, costs and incentive awards, shall, no later than **March 27, 2017**, file with the court and serve on class counsel and defendants a Notice of Intent to Appear at Fairness Hearing ("Notice"). The Notice shall indicate whether the class member will appear on his or her own behalf or through an attorney.

13. A final approval (fairness) hearing is hereby set for **April 27, 2017,** at **10:00 a.m.** in Courtroom 6D of the First Street Courthouse, to consider the fairness, reasonableness, and adequacy of the Settlement as well as the award of attorney's fees and costs to class counsel, and service awards to the class representatives.

14. Plaintiffs shall file a motion for an award of class representative incentive payments and attorney's fees and costs no later than **February 27, 2017,** and notice it for hearing for the date set forth in paragraph 13 above. Any objection to the motion for an award of class representative incentive payments and attorney's fees and costs, by class members, shall be filed by the deadline set forth in paragraph 11 above. In the event any objections to the motion for an award of class representatives incentive payments and attorney's fees and costs are filed, class counsel shall, no later than **April 10, 2017,** file a reply addressing the objections.

15. Plaintiffs shall, no later than **April 10, 2017,** file and serve a motion for final approval of the settlement and a response to any objections to the settlement. The motion shall be noticed for hearing for the date set forth in paragraph 13 above. Defendant may file and serve a memorandum in support of final approval of the Settlement Agreement or in response to objections no later than **April 10, 2017.**

16. All proceedings in the Action, other than proceedings necessary to carry out or enforce the Settlement Agreement or this Order, are stayed pending the final fairness hearing and the court's decision whether to grant final approval of the settlement.

Dated this 2nd day of December, 2016.

_____
/s/
Fernando M. Olguin
United States District Judge