

Transcript of the Testimony of:

# Georgia Gay Whittington-Hopkins

Warner v. Toyota Motor Sales, USA, Inc.

April 12, 2017

Volume I

LITIVATE REPORTING + TRIAL SERVICES
P: 877.771.3312 | F: 877.561.5538
www.litivate.com

```
 1              UNITED STATES DISTRICT COURT

 2                 CENTRAL OF CALIFORNIA

 3

 4   BRIAN WARNER, ET AL         *
                                 *
 5   VS.                         *   NO. 2:15-CV-02171-FMO-(FFMx)
                                 *
 6   TOYOTA MOTOR SALES, USA,    *
     INC.                        *
 7

 8

 9              ----------------------------
                     ORAL DEPOSITION OF
10            GEORGIA GAY WHITTINGTON-HOPKINS
                      APRIL 12, 2017
11              ----------------------------

12

13

14

15

16

17        ANSWERS AND DEPOSITION OF GEORGIA GAY

18   WHITTINGTON-HOPKINS, a witness produced at the instance

19   of the Plaintiff, taken in the above styled and numbered

20   cause, on the 12th day of April, 2017 from 9:32 a.m. to

21   11:05 a.m., before Gail Spurgeon, a Certified Court

22   Reporter in and for the State of Texas, at the offices

23   of Preston Commons Center, 8117 Preston Road, Suite 300,

24   City of Dallas, County of Dallas, and State of Texas,

25   pursuant to the Federal Rules of Civil Procedure.
```

LITIVATE REPORTING + TRIAL SERVICES   |   877.771.3312   |   www.litivate.com

1                    A P P E A R A N C E S

2

3        MR. ERICH P. SCHORK
         Barnow & Associates
4        One North LaSalle Street
         Suite 4600
5        Chicago, Illinois  60602
         e.schork@barnowlaw.com
6             APPEARING FOR THE PLAINTIFF

7

         MS. KELLY B. D'AURIA
8        Reed Smith
         599 Lexington Avenue
9        New York, New York  10022
         kdauria@reedsmith.com
10            APPEARING FOR THE DEFENDANT

11

         MR. MICHAEL CREAMER
12       Law Offices Of Michael Creamer
         PO Box 17743
13       Anaheim, California  92817
         shoya@yahoo.com
14            APPEARING FOR THE OBJECTOR (via telephone)

15

         ALSO PRESENT:
16            Carlton Hughes

17

18

19

20

21

22

23

24

25

```
 1                            INDEX

 2                                                       PAGE
       Appearances................................................   2
 3
       Reporter's Certificate.....................................  62
 4
       GEORGIA GAY WHITTINGTON-HOPKINS
 5
            EXAMINATION BY MR. SCHORK.............................   4
 6

 7
                            EXHIBITS
 8
       EXHIBITS        DESCRIPTION                          PAGE
 9
       Exhibit 1       Second Amended Complaint................... 37
10
       Exhibit 2       Subpoena.................................... 38
11
       Exhibit 3       Settlement Agreement........................ 43
12
       Exhibit 4       Objection to Proposed Class Action ......... 56
13                     Settlement

14     Exhibit 5       Signature................................... 60

15     Exhibit 6       Title....................................... 60

16

17

18

19

20

21

22

23

24

25
```

```
 1              GEORGIA GAY WHITTINGTON-HOPKINS,
 2    having been first duly sworn, testified as follows:
 3                        EXAMINATION
 4    BY MR. SCHORK:
 5        Q.  Good morning, Ms. Hopkins.  Can you please
 6    state and spell your name for the record, please.
 7        A.  Georgia, G-e-o-r-g-i-a, Gay, G-a-y,
 8    Whittington, W-h-i-t-t-i-n-g-t-o-n, hyphen, Hopkins,
 9    H-o-p-k-i-n-s.
10        Q.  Okay.  Have you ever been deposed before,
11    Ms. Hopkins?
12        A.  I'm sorry?
13        Q.  Have you ever been deposed before?
14        A.  Posed?
15        Q.  Deposed.
16        A.  Oh.  No.
17        Q.  Okay.  Now, today I'm going to ask you some
18    questions.
19        A.  Okay.
20        Q.  If at any time during the deposition you don't
21    understand what I'm asking you or you need me to provide
22    more information, just let me know, okay?
23        A.  Okay.
24        Q.  Now, if you need a break at any point during
25    today's deposition, just let me know.  And I'll ask that
```

```
 1   you answer a question if a question is pending, but

 2   otherwise, that should be fine.  Okay?

 3        A.  Okay.

 4        Q.  Now, are you under influence of any medications

 5   or is there any other reason why you wouldn't be able to

 6   give your best testimony today?

 7        A.  No.

 8        Q.  Okay.  Do you understand that you're here today

 9   in connection with a case that's pending in federal

10   court?

11        A.  Yes.

12        Q.  Okay.  And what's your understanding of your

13   involvement in that case?

14        A.  I have an objection filed.

15        Q.  Okay.  What do you mean by an objection filed?

16        A.  Well, tell me what you mean by what do I mean.

17        Q.  Okay.  But you understand that you filed an

18   objection?

19        A.  Yes.

20        Q.  Do you understand what the case is about?

21        A.  Yes.

22        Q.  Okay.  And in your own words, what's the case

23   about?

24        A.  Okay.  I have read the settlement and it's

25   everywhere on the Internet, so anybody can read it, and
```

1    I'm -- I don't like it.

2        Q.  Okay.  Now, you stated that you've read the

3    settlement; is that correct?

4        A.  Correct.

5        Q.  And when did you read the settlement?

6        A.  Sometime in March this year.

7        Q.  And where did you get the settlement from?

8        A.  Internet.

9        Q.  Okay.  Do you know where on the Internet you

10   got it from?

11       A.  No, I -- I don't know.

12       Q.  Now, let's take a step back.

13           You own a Toyota vehicle, correct?

14       A.  Correct.

15       Q.  And what model Toyota do you own?

16       A.  2007 Tundra.

17       Q.  Okay.  And where did you purchase that from?

18       A.  Dallas.

19       Q.  Do you know --

20       A.  Texas.

21       Q.  Okay.  I didn't mean to interrupt you.

22           Do you remember the dealership that you

23   purchased that vehicle from?

24       A.  Toyota of Dallas.

25       Q.  Okay.  Do you remember when you purchased it?

Georgia Gay Whittington-Hopkins                              April 12, 2017

```
 1        A.   September 2007.
 2        Q.   Okay.  And why did you choose that Tundra
 3   vehicle at the time?
 4        A.   Because I totaled trade, for one thing, because
 5   I like it because I'm a country girl.
 6        Q.   Do you still like the vehicle?
 7        A.   I love it.
 8        Q.   Do you know how many miles are on the vehicle?
 9        A.   A lot.
10        Q.   More than a hundred thousand?
11        A.   Yes.
12        Q.   More than 200,000?
13        A.   No.
14        Q.   Do you consider the vehicle to be in good shape
15   right now?
16        A.   Yes, excellent.
17        Q.   Do you own any other vehicles?
18        A.   Yes.
19        Q.   What vehicles do you own?
20        A.   I own a Escalade SUV.
21        Q.   And what model year is that?
22        A.   2013.
23        Q.   Okay.  Any other vehicles?
24        A.   Not that are drivable.
25        Q.   When you say "not that are drivable" --
```

LITIVATE REPORTING + TRIAL SERVICES   |   877.771.3312   |   www.litivate.com

Georgia Gay Whittington-Hopkins                          April 12, 2017

```
1         A.  An RV that you tow is a vehicle.  You can't
2    drive it.
3         Q.  So you own an RV?
4         A.  Yes.
5         Q.  And when did you purchase that?
6         A.  2000 of -- July of 2011.
7         Q.  Is anyone else on the title for your 2007
8    Toyota Tundra?
9         A.  No.
10        Q.  Just you?
11        A.  Yes.
12        Q.  Okay.  Now, with respect to your 2007 Tundra,
13   have you brought the vehicle in for regular maintenance
14   since you've owned it?
15        A.  Yes.
16        Q.  Have there been any major repairs to the
17   vehicle since you've owned it?
18        A.  What are you considering major?
19        Q.  I mean anything -- any --
20        A.  Tires?
21        Q.  -- over 3- or $400?
22        A.  Water pump.
23        Q.  Anything else?
24             MS. D'AURIA:  What did she say?
25             THE REPORTER:  Water pump.
```

LITIVATE REPORTING + TRIAL SERVICES  |  877.771.3312  |  www.litivate.com

Georgia Gay Whittington-Hopkins                                    April 12, 2017

```
 1                    THE WITNESS:  Let me think.
 2                    MR. HUGHES:  Are you talking about that
 3    pumps?  They changed those or --
 4                    THE WITNESS:  No.  I'm talking about --
 5                    MR. HUGHES:  Okay.
 6                    THE WITNESS:  -- early on a water pump.
 7    And the other is a hair --
 8                    MR. HUGHES:  It's sort of a --
 9                    MR. SCHORK:  Okay.  I'm sorry.  I need to
10    interrupt you.  I don't mind if you stay in the room
11    during the deposition, but you can't -- you can't speak.
12                    MR. HUGHES:  Okay.
13                    MR. SCHORK:  Okay?
14                    MR. HUGHES:  All right.  Okay.
15         A.  Okay.  Well, whatever the smog thing was that
16    had to be replaced.  Some -- I don't know what it's
17    called.  Air pump, I think.
18         Q.  (BY MR. SCHORK)  Anything else?
19         A.  Not other than tires and regular oil change
20    and, you know, just regular maintenance.
21         Q.  Have you ever brought the vehicle in pursuant
22    to a limited service campaign?
23         A.  Unlimited.
24         Q.  Initiated by Toyota?
25         A.  Okay.  Are you talking about a recall?
```

1          Q.  It would be either -- let's start with a

2    limited service campaign and then we can talk about

3    recall.

4          A.  Well, I don't even know what -- what you're

5    saying when you say "unlimited."

6          Q.  Okay.  And I can explain.

7                 Have you ever gotten a letter from Toyota

8    that says, "We're voluntarily fixing this issue with

9    your Tundra.  Please bring it in to a dealership and

10   we'll take care of it"?

11         A.  Okay.  The floor mats and a switch on the

12   driver's side, a control switch.

13         Q.  Anything else?

14         A.  I cannot recall anything else.

15         Q.  Did you ever -- do you recall anything related

16   to rust on the vehicle?

17         A.  No.

18         Q.  Okay.  Now, have you ever brought the vehicle

19   in relating to a recall notice that you had received?

20         A.  No.

21         Q.  Okay.  Do you think there are any rust issues

22   with the car right now?

23         A.  I don't know.

24         Q.  Okay.  When you look at the car, the outside of

25   the car, to your knowledge, is there any rust that's

Georgia Gay Whittington-Hopkins                                    April 12, 2017

```
 1   plainly visible?
 2        A.  I don't -- I really don't know how to answer
 3   that, no.
 4        Q.  You don't?
 5        A.  No.
 6        Q.  Not to your knowledge?
 7        A.  Huh-uh.
 8        Q.  Have you taken a look at the underside of the
 9   car at all?
10        A.  I don't get under the car.
11        Q.  Okay.  Have you ever asked a Toyota dealer to
12   take a look at the underside of the car?
13        A.  I'm sure they do when they change tires and put
14   -- you know, change the oil, but they've never said
15   anything to me about it.
16        Q.  Okay.  So no --
17        A.  Never alerted me.
18        Q.  So no Toyota dealer has ever told you --
19        A.  No.
20        Q.  -- there's any rust issues with the underside
21   of the car?
22        A.  No.
23        Q.  Okay.
24        A.  And I've always gone to a Toyota dealer for all
25   of my maintenance.
```

LITIVATE REPORTING + TRIAL SERVICES   |   877.771.3312   |   www.litivate.com

Georgia Gay Whittington-Hopkins                                    April 12, 2017

1         Q.   Now, you've stated before that you understand
2    that you've objected to a settlement in the -- in the
3    Warner case, which is the case that we're here for
4    today.  Is that correct?
5         A.   Correct.
6         Q.   Do you know what the claims that are alleged in
7    that case are?
8         A.   I've read the settlement.
9         Q.   Have you read any other documents relating to
10   the case?
11        A.   No.
12        Q.   No.  Do you know what claims the plaintiffs in
13   the case are asserting generally?
14        A.   Something about rust.
15        Q.   Okay.  What -- what's your understanding of
16   what they're alleging relating to rust?
17        A.   Well, possibly some rust could cause something
18   to happen to your vehicle and cause a problem, you know,
19   a big problem.
20        Q.   Okay.  And what kind of rust are you talking
21   about?
22        A.   I don't know.  It's a rust.
23        Q.   Are we -- is it your understanding that the
24   case relates to Toyota Tundra vehicles suffering rust?
25        A.   Yes.

LITIVATE REPORTING + TRIAL SERVICES   |   877.771.3312   |   www.litivate.com

1        Q.  Do you have any understanding as to whether the

2    rust at issue -- excuse me.  Strike that.

3            Do you have any understanding as to what

4    parts are alleged to be rusted?

5        A.  No.

6        Q.  Okay.  So just to be clear, you know -- you

7    understand that the plaintiffs are alleging that there's

8    some rust issues with certain Toyota vehicles but you're

9    not sure of anything further than that, right?

10        A.  I believe that's -- yes.

11        Q.  Okay.  And now, you've stated previously that

12    you have read the settlement, right?

13        A.  Yes.

14        Q.  What's your understanding of the terms of

15    settlement?

16        A.  Well, can I just tell you I don't like it?

17        Q.  You can -- you can tell me that you don't like

18    it, but I'll -- I would ask that you answer the

19    question.

20        A.  It's not fair.

21        Q.  Okay.  Can you explain what you mean by "it's

22    not fair"?

23        A.  It could have been written better.

24        Q.  And what do you mean by that?

25        A.  That's why I did an objective.

1       Q.   An objection?

2       A.   Uh-huh.

3       Q.   Okay.  And how did you -- when did you decide

4    to do an objection?

5       A.   I have friends that know that I have a Toyota

6    and they talked to me about it.

7       Q.   What are the names of the friends?

8       A.   Carlton Hughes.

9       Q.   Okay.  And what did you and Mr. Hughes talk

10   about?

11      A.   That I probably needed to be represented since

12   I read it and didn't think it was fair.

13      Q.   Okay.  Do you recall when you and Mr. Hughes

14   had your first conversation regarding the settlement?

15      A.   Sometime this month.  March, I mean.  This is

16   April already.  March.

17      Q.   Okay.  And during that first conversation, what

18   did you guys talk about?

19      A.   Did I know about it.

20      Q.   Did you know about the settlement?

21      A.   Uh-huh.

22      Q.   Okay.  So he approached you and asked you

23   whether you knew about the settlement?

24      A.   Well, we were just talking in general.  I don't

25   know if he approached me or not.

Georgia Gay Whittington-Hopkins                              April 12, 2017

```
 1         Q.  Okay.  But you were just talking in general --
 2         A.  Sure.
 3         Q.  -- and it came up --
 4         A.  Sure.
 5         Q.  -- he asked you whether you knew about the
 6    settlement.  Is that correct?
 7         A.  Correct.
 8         Q.  And is that all that he asked you, just whether
 9    you knew generally about it?
10         A.  No.  Had I -- did I know about it.  And then I
11    found out it was just on the Internet.  You could --
12    anybody could read it.
13         Q.  So at the time when you talked to -- spoke with
14    Mr. Hughes, were you aware of the settlement?
15         A.  No.
16         Q.  So he brought it to your attention; is that
17    correct?
18         A.  Yes.
19         Q.  And is Mr. Hughes a friend of yours?
20         A.  Yes.
21         Q.  Is he an attorney?
22         A.  No.
23         Q.  Have you spoken with any other friends about
24    the Toyota settlement?
25         A.  No.  There was no reason to.
```

LITIVATE REPORTING + TRIAL SERVICES   |   877.771.3312   |   www.litivate.com

Georgia Gay Whittington-Hopkins                                      April 12, 2017

1      Q.  Do you know whether Mr. Hughes has spoken to
2    any other individuals about the Toyota --
3      A.  I don't know.
4      Q.  You don't know?
5      A.  I don't know.
6      Q.  So when you -- during this first conversation
7    that you were talking about, he just told you -- he just
8    asked you generally whether you were aware of the
9    settlement, right?
10     A.  True.
11     Q.  Okay.  Did he suggest that you object to the
12   settlement during that conversation?
13     A.  No.
14     Q.  And when did that happen?
15     A.  When I read --
16             MR. CREAMER:  Wait a minute.  Excuse me.
17             Counsel, when did what happen?
18             MR. SCHORK:  When did Mr. Hughes suggest
19   that you should object to the settlement?
20             MR. CREAMER:  I don't -- I don't think
21   that's her prior testimony.
22             MR. SCHORK:  Okay.
23     Q.  (BY MR. SCHORK)  Well, you can answer the
24   question.
25     A.  Okay.  Repeat it, please.

LITIVATE REPORTING + TRIAL SERVICES  |  877.771.3312  |  www.litivate.com

Georgia Gay Whittington-Hopkins                                    April 12, 2017

1       Q.  I asked when Mr. Hughes suggested that you
2    should object to the settlement.
3       A.  After I read the settlement and I didn't think
4    it was fair.
5       Q.  And when did you read the settlement, again?
6       A.  I didn't write down the date but it was in
7    March of 2017?
8       Q.  Was it a few days after you spoke with
9    Mr. Hughes?
10      A.  I thought about it a few days.
11      Q.  Okay.  And then you read the settlement; is
12   that correct?  I just want to get the timeline down.
13      A.  Okay.  Somewhere close to a few days.
14      Q.  Okay.  And after you read the settlement, did
15   you speak with Mr. Hughes again?
16      A.  Yes.
17      Q.  Okay.  And what did you guys talk about?
18      A.  That I probably should find an attorney.
19      Q.  And did you decide that you should probably
20   find an attorney or did Mr. Hughes suggest that to you?
21      A.  I -- I said, "I think I need an attorney."
22      Q.  Okay.  And at the time, if you can recall, why
23   did you think you needed an attorney?
24      A.  Because I didn't think the settlement was fair.
25      Q.  Okay.  And why didn't you think the settlement

LITIVATE REPORTING + TRIAL SERVICES  |  877.771.3312  |  www.litivate.com

1  was fair?

2      A.  Because it should have been written better.

3      Q.  And what do you mean by "written better"?

4      A.  It should have been written better.  I mean,

5  I'm a Toyota owner.  I knew -- I knew nothing about it

6  unless I did my own investigation.  Toyota has known

7  since 2007 who purchased that vehicle and who still owns

8  it.  If there was any issue, I should have been alerted.

9      Q.  So your issue is that you weren't alerted to

10 issues with the vehicle earlier?

11     A.  That would -- that would be true.

12     Q.  Okay.  Are there any other issues that you have

13 with the settlement?

14          MR. CREAMER:  Counsel, I think -- I think

15 that she has an objection that's been filed, and I think

16 you can refer to that document.  I think she's more than

17 answered your question why she thinks there's problems

18 with the settlement.

19          You can go ahead and answer if you have

20 anything else to add, ma'am.

21          MR. SCHORK:  All right.  Mr. Creamer, I'm

22 going to ask that you refrain from speaking objections.

23 If you've got issues with form, you can use those

24 objections, but that's totally improper.

25          MR. CREAMER:  Well, the question -- yeah, I

Georgia Gay Whittington-Hopkins                                    April 12, 2017

1  do have objections to the form.  It's argumentative in

2  that you're now repeatedly asking the same question and

3  she's giving you an answer.  So I'm going to -- I'm

4  going to object as to it's now argumentative.

5        Q.  (BY MR. SCHORK)  You can answer the question.

6            MR. SCHORK:  Can you repeat the question,

7  Ms. Court Reporter?

8            (Requested portion was read.)

9        A.  No.

10       Q.  (BY MR. SCHORK)  Okay.  Just so we're clear, I

11  want to make this clear, the two issues you've

12  identified that you have with the settlement is you

13  believe that it was poorly written and you believe that

14  Toyota should have notified you earlier of an issue with

15  the vehicle?

16       A.  That the settlement is not fair.

17       Q.  Okay.  And is that a third issue, that you

18  believe the settlement is not fair?

19            MR. CREAMER:  She's already answered the

20  question.  I'm going to object that she's already

21  answered the question.  We're now argumentative.  You

22  can read her -- her objection if you have any further

23  questions.

24            You can go ahead and answer, ma'am.

25       Q.  (BY MR. SCHORK)  You can answer the question.

LITIVATE REPORTING + TRIAL SERVICES  |  877.771.3312  |  www.litivate.com

1        A.   Okay.  Can we -- can we say it -- can you tell

2   me again?  Can you repeat exactly what you want me to

3   answer?

4        Q.   Of course.  One of the -- the reasons why we're

5   here today -- one of the reasons is we're -- I'm trying

6   to understand the basis of your objection to the

7   settlement.

8        A.   Uh-huh.

9        Q.   And so what I had asked you is you had

10  mentioned earlier that you believe that the settlement

11  is poorly written and you also believe that Toyota

12  should have notified you earlier of any issues with the

13  vehicle.

14             And my question to you was when you

15  stated --

16             MR. CREAMER:  And she also said she thought

17  it was --

18             MR. SCHORK:  Counsel, you know, if we need

19  to call the Court, we will, but at least let me finish

20  the questions because your conduct right now is totally

21  improper.  We're here to ask simple questions regarding

22  her involvement in the case, and that's what we're

23  doing.  So I'll start from the beginning.

24        Q.   (BY MR. SCHORK)  So what I had asked you is:

25  When you said that you believed the settlement was

1   unfair, like I previously stated, you said you thought

2   it was poorly written and you said that you believe that

3   Toyota should have notified you earlier of any issues

4   with the vehicle.  Correct?  I mean, is that correct?

5       A.  Okay.  I'm not the only Toyota owner and I

6   wasn't notified so possibly there are others that have

7   not been notified either.

8       Q.  Okay.  But as far as your issues --

9       A.  And I don't know --

10      Q.  I'm sorry.  I didn't mean to interrupt you.  Go

11  ahead.

12      A.  I don't know who else might have read the

13  settlement.  I know I did.

14      Q.  Okay.  Just so we're clear, the question I had

15  asked you is when you -- when you state that the

16  settlement is unfair, you said that you thought that it

17  was poorly written and that you thought you should have

18  received notice earlier about any issues with the

19  vehicle.  Is there anything else that you believe is a

20  basis for your belief that you thought the settlement

21  was not fair?

22      A.  I don't know.

23      Q.  You don't know?

24      A.  I don't know if there's any other issues.

25      Q.  But to your knowledge, those are the only two

Georgia Gay Whittington-Hopkins                                April 12, 2017

1    issues you can think of right now; is that correct?

2         A.  Yes.

3         Q.  Okay.  When you read the settlement, what is

4    your understanding of what the terms of the settlement

5    are?

6         A.  There's some issues with the trucks with rust

7    that could weaken certain parts of the -- possibly the

8    frame, and evidently, they didn't finish undercoating or

9    something well enough for that not to happen.

10        Q.  Do you have any understanding of what the

11   settlement is offering?

12        A.  No.

13        Q.  Now, after -- you stated earlier that around

14   the time that you spoke to Mr. Hughes the second time

15   about the settlement that you had decided to object to

16   the settlement; is that right?

17        A.  Yes.

18        Q.  And what did you do next to go about objecting

19   to the settlement?

20        A.  I asked him if he knew anybody that he would

21   refer me to.

22        Q.  Okay.  And why did you ask -- why did you

23   believe he would know somebody?

24        A.  You would have to ask him.

25        Q.  Okay.  And who did he refer you to?

Georgia Gay Whittington-Hopkins                                April 12, 2017

```
 1          A.   To Michael Creamer.
 2          Q.   Okay.  Did he refer you to anyone else
 3     initially or was Mr. Creamer the first attorney he
 4     directed you to?
 5          A.   He's the first attorney that I spoke with.
 6          Q.   And other than Mr. Hughes, did you speak with
 7     anybody else?
 8          A.   No.
 9          Q.   Okay.  Did you ever speak to an individual
10     named Darrell Palmer regarding your objection?
11          A.   Who?
12          Q.   Darrell Palmer.
13          A.   I don't -- I don't recall that name.
14          Q.   Did you ever speak to an individual named
15     Christopher Bandis (phonetic) regarding your objection?
16          A.   I don't recall that name.
17          Q.   So aside from Mr. Hughes and Mr. Creamer, is
18     there anyone else you spoke to regarding your objection
19     to the settlement?
20          A.   There was no one else that I needed to talk to.
21          Q.   Is that a "no"?
22          A.   That's a "no."
23          Q.   Did you speak -- are you married?
24          A.   No, I'm a widowed.
25          Q.   Oh, I'm sorry to hear that.
```

LITIVATE REPORTING + TRIAL SERVICES   |   877.771.3312   |   www.litivate.com

```
1              Did you speak with any friends or family
2     regarding the objection?
3         A.  No.
4         Q.  Did you contact Mr. Creamer or did Mr. Creamer
5     contact you?
6         A.  I contacted him.
7         Q.  You called him; is that correct?
8         A.  Yes.
9         Q.  And before you called him, what was your
10    understanding as to what you were going to be asking him
11    to do?
12        A.  I really didn't know.
13        Q.  Do you know what a class action is?
14              MR. CREAMER:  I'm sorry.  I missed that,
15    Counsel.
16              MR. SCHORK:  I said -- I asked her if she
17    knows what a class action is.
18        A.  Basically.
19        Q.  (BY MR. SCHORK)  Okay.  What's your
20    understanding of a class action?
21        A.  A few people who have issues and get together
22    to file a suit in any particular situation that they are
23    all involved with or could be.
24        Q.  Do you think that class actions are a good
25    thing when you've got a case against a big company like
```

Georgia Gay Whittington-Hopkins                          April 12, 2017

1   Toyota relating to an alleged defect?

2        A.  Sure.

3        Q.  You would agree with that?

4        A.  Yes.

5        Q.  Did you ever review any of the complaints filed

6   in this case?

7        A.  I reviewed the settlement.

8        Q.  And that's it?

9        A.  That's it.

10       Q.  So -- so when you called Mr. Creamer, how long

11  did your first conversation with him last?

12            MR. CREAMER:  I'm going to object that this

13  is starting to get into the -- this is privileged

14  information as far as the nature of the contact between

15  counsel and his client.

16            MR. SCHORK:  Okay.  I would disagree with

17  that.  The question related to how long the conversation

18  lasted.

19            MR. CREAMER:  Counsel, you know that's

20  inappropriate.

21            MR. SCHORK:  That's totally appropriate.

22            MR. CREAMER:  How long the conversations

23  lasts, it goes to the nature of the relationship.

24            MR. SCHORK:  The nature -- well, what

25  exactly is your -- can you state your objection?

LITIVATE REPORTING + TRIAL SERVICES  |  877.771.3312  |  www.litivate.com

Georgia Gay Whittington-Hopkins                    April 12, 2017

1              MR. CREAMER:  Yeah.  I object in that the

2    question tends to invade the privilege protected by the

3    attorney-client privilege.

4              MR. SCHORK:  Are you instructing the

5    witness not to answer, Counselor?

6              MR. CREAMER:  No, not at this time.

7    Q.  (BY MR. SCHORK)  You can answer the question.

8    A.  Approximately 15 minutes --

9              MR. CREAMER:  Just how long did the

10   conversation take, that's all he's asking.

11             THE WITNESS:  Okay.

12   Q.  (BY MR. SCHORK)  That was the question.

13             MR. CREAMER:  If you recall.

14   A.  Approximately 15 minutes.

15   Q.  (BY MR. SCHORK)  And after that conversation,

16   was it your understanding that you had retained

17   Mr. Creamer as an attorney?

18   A.  Yes.

19   Q.  Do you have a retention agreement with

20   Mr. Creamer?

21   A.  I don't know.

22   Q.  Do you have any agreement with him, to your

23   knowledge?

24   A.  Can you tell me what kind of -- what -- you're

25   saying "agreement"?  Are you talking about payment?  Are

LITIVATE REPORTING + TRIAL SERVICES  |  877.771.3312  |  www.litivate.com

1   you talking -- what is your --

2       Q.  I'm talking about do you have a written

3   agreement that you would have signed or he would have

4   signed?

5       A.  I have signed, yeah.

6       Q.  With Mr. Creamer?

7              MR. CREAMER:  Okay.  I am going to object

8   on any further questions regarding the attorney-client

9   relationship here.

10             MR. SCHORK:  What -- what's the basis of

11  your objection?

12             MR. CREAMER:  You're trying -- her

13  communications with counsel and what we've agreed to or

14  what we've entered into, all of that is privileges, and

15  you know that.

16             MR. SCHORK:  Whether or not she's retained

17  an attorney is not privileged, but if you're going to

18  instruct the witness --

19             MR. CREAMER:  She's answered that she has.

20  Now you're trying to get into, well, what kind of

21  agreement and how long the conversation is, what have

22  you talked about.  All of these things are -- it --

23             MR. SCHORK:  She asked for clarification as

24  to what I meant by an agreement so I attempted to

25  clarify the question.  If you're going to instruct the

1   witness not to answer, you can do that.  I don't think

2   you have any basis to do so.  It was a pretty simple

3   question.  So --

4              MR. CREAMER:  She's answered.  Anything

5   further than this, I'm going to start to instruct her

6   not to answer.

7              MR. SCHORK:  Okay.  Well, you can do that

8   on a question-by-question basis.  But the question was

9   simply:  Is there a written agreement between you and

10  your attorney?

11             MR. CREAMER:  She already answered that.

12      Q.  (BY MR. SCHORK)  Can you answer that question,

13  ma'am?

14      A.  I answered.  Yes.

15      Q.  Okay.  Are you paying your attorney?

16             MR. CREAMER:  Okay.  Objection, calls for

17  information that tends to invade the attorney-client

18  privilege and I'm going to instruct her not to answer.

19             MR. SCHORK:  You think whether or not she's

20  compen- --

21      Q.  (BY MR. SCHORK)  Okay.  Are you going to

22  following your counsel's advice --

23      A.  Yes.

24      Q.  -- and not answer the question?

25      A.  Yes.

Georgia Gay Whittington-Hopkins                          April 12, 2017

1      Q.   Now, prior to getting involved in this case,

2    were you promised anything from your attorney?

3      A.   No.

4      Q.   Okay.  Have your lawyers filed a case on your

5    behalf?

6      A.   Say that again.

7      Q.   I said, have your -- has your lawyer filed a

8    case on your behalf?

9      A.   I'm only aware of the objection.

10     Q.   Okay.  Is it your understanding that he's going

11   to file a case on your behalf against Toyota?

12     A.   It is not my understanding.

13     Q.   Okay.  Are you responsible for paying any costs

14   in connection with this case?

15          MR. CREAMER:  Objection, goes to the

16   attorney-client privilege.  She already answered that

17   there's an agreement.

18          MR. SCHORK:  Are you instructing the

19   witness not to answer the question?

20          MR. CREAMER:  Yes, I am.

21     Q.   (BY MR. SCHORK)  Are you going to take your

22   witness's here -- counsel's instruction?

23     A.   I will -- I take his counsel.

24          MR. SCHORK:  And I note for the record that

25   I don't think that that's a privileged issue at all, but

LITIVATE REPORTING + TRIAL SERVICES   |   877.771.3312   |   www.litivate.com

Georgia Gay Whittington-Hopkins                                    April 12, 2017

1   we can handle that later.

2        Q.  (BY MR. SCHORK)  Have you ever objected to a

3   class action before?

4        A.  No.

5        Q.  Okay.  And how did you learn that you could

6   object to a class action?

7              MR. CREAMER:  Objection.  Ma'am, you can

8   answer the question but don't -- don't say anything that

9   tends to invade -- don't -- you can answer it as long as

10  you don't talk about the things that you and I talked

11  about on the phone.  So if you can answer that outside

12  of the conversation you and I had, then you can answer

13  the question.

14       A.  Please repeat it.

15             MR. SCHORK:  Can you repeat the question,

16  ma'am?

17             (Requested portion was read.)

18             MR. CREAMER:  Same objection.

19       A.  It's pretty common knowledge what you can do

20  legally in the United States of America.  Anybody can.

21       Q.  (BY MR. SCHORK)  And what do you mean by that?

22  You mean it's common knowledge that you can object to a

23  class action settlement?

24       A.  Anybody.  Yes, if they -- if they think it's

25  unfair, yes.  Anybody can.

Georgia Gay Whittington-Hopkins                                      April 12, 2017

1        Q.  Do you have any specialized legal training?

2        A.  Yes.

3        Q.  And what is it?

4        A.  Twenty-five years with the Federal Aviation

5   Administration as a management and program analyst.

6        Q.  And what did you do there?

7        A.  What did I do?

8        Q.  Yes, in your position.

9        A.  I just told you.

10        Q.  And what were your responsibilities?

11        A.  Research and anything that was necessary for

12   dealing with our cases.

13        Q.  Okay.

14        A.  Working with the attorneys.

15        Q.  Were you a paralegal there?

16        A.  I was not a paralegal.  I was a management and

17   program analyst, who had continuing education.

18        Q.  Did you do legal research there?

19        A.  Yes, I did.

20        Q.  Do you have any other specialized legal

21   training?

22        A.  No, but I'm getting it now.

23        Q.  Do you have -- did you -- do you have any

24   certificates?  Professional certificates?

25        A.  No.

LITIVATE REPORTING + TRIAL SERVICES   |   877.771.3312   |   www.litivate.com

Georgia Gay Whittington-Hopkins                              April 12, 2017

1      Q.   Okay.  You said you worked for the Federal

2   Aviation Administration for 25 years; is that correct?

3      A.   Yes, the headquarters.

4      Q.   Are you still employed there?

5      A.   No, I'm retired.

6      Q.   Okay.  And when did you -- did you retire from

7   the Federal Aviation Administration?

8      A.   Yes.

9      Q.   And when did you retire?

10     A.   12/31/10.

11     Q.   So you've been retired for about --

12     A.   Six years.

13     Q.   -- six years.  Yeah.

14     A.   Yes.

15     Q.   Did you work on any class actions while you

16   were at the Federal Aviation Administration?

17     A.   It was not in our department.

18     Q.   Now, what's your understanding of the benefits

19   that the settlement offers to class members?

20     A.   I don't know.

21     Q.   Do you understand that under the settlement,

22   owners of certain Toyota vehicles are able to come in

23   for a free inspection of their vehicle?

24     A.   I don't know that.

25     Q.   You don't know?

Page 32

Georgia Gay Whittington-Hopkins                          April 12, 2017

1        A.  No.

2        Q.  Do you understand that under the settlement

3   that certain owners of Toyota vehicles are eligible for

4   a free frame inspection if the -- if an inspection

5   reveals certain rust on the vehicle's frames?

6        A.  No.

7        Q.  Would you agree that providing individuals with

8   Toyota vehicles who have got a significantly rusted

9   frame on their vehicles that the free frame replacement

10  is a -- is a good benefit?

11       A.  Yes.

12       Q.  Would you agree that it's unsafe to have

13  vehicles on the road that have rust -- severely rusted

14  frames, right?

15            MS. D'AURIA:  Objection, form.

16       A.  Yes.

17       Q.  (BY MR. SCHORK)  Do you know how much it costs

18  to replace a frame on a vehicle?

19       A.  No.  A lot.

20       Q.  You would expect it would be very expensive,

21  correct?

22       A.  Yeah.  They're very expensive vehicles.

23       Q.  Have you ever filed a claim in a class action

24  before?

25       A.  No.  I thought you already asked me that.

 1          Q.  I may have.  I wasn't sure whether I had asked
 2    you that.  I just wanted to make sure we're clear.
 3                  And today it sometimes happens during
 4    depositions that I may unintentionally ask -- well, come
 5    back and ask you the same question twice.  You have my
 6    apologies.  I just want to make sure all the ground --
 7    that I cover all the ground that we need to cover.
 8          A.  Okay.
 9          Q.  Have you seen your objection to the settlement
10    that was filed?
11          A.  Yes.
12          Q.  And when did you first see it?
13          A.  When it was prepared.
14          Q.  Do you remember when that was?
15          A.  I'm going to say around the 23rd of March,
16    2017.
17          Q.  So prior to the objection being filed, you saw
18    it; is that correct?
19          A.  Saw it -- you have to see it before you can
20    sign it.
21          Q.  And how did you -- did you receive it via
22    e-mail or fax or how did you receive the objection from
23    your attorney?
24          A.  E-mail.
25          Q.  And so did you read through it then?

1       A.   Yes.

2       Q.   Okay.  Did you make any -- any comments or

3   changes to it?

4       A.   No.

5       Q.   So as an objector to the settlement, what are

6   you seeking?

7       A.   What am I seeking?  Nothing.  Other than

8   someone to write it in a better way to benefit more than

9   a few people.  If there's a problem with those vehicles,

10  the other owners also need to know.

11      Q.   Do you think that the settlement will benefit

12  only a few people?

13      A.   There's only a few people noted.

14      Q.   And what do you mean by "there's only a few

15  people noted"?

16      A.   The class action only has a few names versus

17  Toyota.

18      Q.   So is it your understanding that the settlement

19  only benefits a few individuals?

20      A.   Compared to how many Toyotas that were sold,

21  yes.

22      Q.   Okay.  And what's the basis for that

23  understanding?

24      A.   I guess just my common thinking.

25      Q.   So you believe that only the plaintiffs listed

```
 1   on the -- in the case caption are actually benefitting
 2   from the settlement; is that correct?
 3        A.  Yes.
 4        Q.  When you read the settlement, how long did it
 5   take you?
 6        A.  A long time because I didn't read it just once.
 7        Q.  Okay.  How many times did you read it?
 8        A.  Parts of it several times.
 9        Q.  Okay.  Do you remember which parts you --
10        A.  No, I don't.
11        Q.  -- read several times?
12        A.  No.
13        Q.  Do you expect to be compensated for your
14   objection?
15        A.  I don't know.
16        Q.  Is there anything that you expect to receive
17   from Toyota relating to your objection?
18        A.  I don't know.  I love my truck.
19             MS. D'AURIA:  I'm sorry.  What was your
20   answer?
21             MR. SCHORK:  She said, "I don't know.  I
22   like my truck."
23             THE WITNESS:  I love my truck.
24        Q.  (BY MR. SCHORK)  I'm going to hand you a
25   document that I asked to be marked as Exhibit 1.
```

Georgia Gay Whittington-Hopkins                                    April 12, 2017

```
 1                 (Exhibit No. 1 marked.)
 2        Q.  (BY MR. SCHORK)  Now, I've handed the witness a
 3   document titled the "Second Amended Complaint."  Do you
 4   need a second, ma'am?
 5        A.  I've got glasses.
 6        Q.  Absolutely.
 7                 Have you seen this document before?
 8        A.  If this is not the same document that's on the
 9   Internet, it looks like it.
10        Q.  Now, this document is titled the "Second
11   Amended Complaint."  Do you recall reviewing this
12   document at all?
13        A.  I believe it's the same one that I reviewed on
14   the Internet.
15                 Okay.  So what -- what do you want?
16        Q.  You believe this is the document you looked
17   at --
18        A.  I believe it is, yes.
19        Q.  Now, on the first page in the case caption in
20   bold letters there are some names of plaintiffs.  Do you
21   see that?
22        A.  Yes.
23        Q.  And Brian Warner is listed?
24        A.  Yes.
25        Q.  And then there are some other names of
```

LITIVATE REPORTING + TRIAL SERVICES  |  877.771.3312  |  www.litivate.com

Georgia Gay Whittington-Hopkins                           April 12, 2017

 1   individuals?

 2        A.  Yes.

 3        Q.  Do you know any of those individuals

 4   personally?

 5        A.  No.

 6        Q.  But when we -- when we spoke earlier that you

 7   said you thought that only the plaintiffs were

 8   benefitting from the settlement, it was these

 9   individuals that you were talking about; is that right?

10        A.  Yes.

11        Q.  Okay.  We're done with that document.

12             I'm going to hand you what I've asked to be

13   marked as Exhibit 2.

14             (Exhibit No. 2 marked.)

15        A.  This is what I received but it didn't have this

16   page.

17        Q.  (BY MR. SCHORK)  And this document is entitled

18   "Subpoena to Testify at a Deposition in a Civil Action,"

19   correct?

20        A.  That's what we're doing right now, right?

21        Q.  That is what we're doing.  But what I'm asking

22   you is the first page states, "Subpoena" --

23        A.  Yes.

24        Q.  -- "to Testify in a Civil Action," correct?

25        A.  Yes.

Georgia Gay Whittington-Hopkins                        April 12, 2017

1      Q.  And when I ask you questions like that, they're

2  somewhat -- they may be basic questions.  What I'm

3  trying to do is create a record so that someone who

4  can -- who's reading the transcript understands what's

5  going on.  Okay?

6      A.  Okay.

7      Q.  Okay.  Good.  Now, you were served with this

8  subpoena, correct?

9      A.  Yes.

10      Q.  Okay.  I draw your attention to the fourth page

11  of the document.  At the top of the page it says

12  "Exhibit A."

13      A.  Okay.

14      Q.  Okay?  Now, it states document request under

15  Exhibit A, correct?

16      A.  Correct.

17      Q.  And the first thing that is requested is a copy

18  of the title to your Toyota vehicle.

19      A.  You want to make a copy of it?

20      Q.  Sure.  We can make copies.  You brought that

21  with you.  Thank you.

22              Now, the second document request is all

23  documents and communications between you and any

24  employee or representative of Toyota or any vehicle

25  service or repair shop concerning any inspections or

LITIVATE REPORTING + TRIAL SERVICES  |  877.771.3312  |  www.litivate.com

Georgia Gay Whittington-Hopkins                              April 12, 2017

1    repairs regarding frame rust or perforation of your

2    Toyota vehicle.

3         A.  I don't have any.

4         Q.  Okay.  So you have no documents responsive --

5         A.  For -- for inspection of -- or rust, that's

6    what it says.  I haven't had any kind of -- no one has

7    inspected it.

8         Q.  Okay.  That's fine.  I just want to understand

9    whether you guys --

10        A.  So I don't have any documents.

11        Q.  Okay.  And the last request is the written

12   agreements which refer -- refers or relates to your

13   written objection filed in Warner v Toyota Motor USA,

14   Inc.

15             Do you have anything responsive to that?

16        A.  I think you have the -- a copy of the

17   objective -- objection.

18        Q.  But you don't -- you're not producing any

19   written agreements with your attorney today relating to

20   your objection?

21        A.  No.

22        Q.  Okay.  And did you search for agreements with

23   your attorney relating to your objection?

24        A.  Did I search for?

25        Q.  Did you look for that?

1        A.   No.

2        Q.   Why not?

3        A.   Because there's no reason to.

4        Q.   Okay.  You understand that you were being asked

5    to produce that written agreement, correct?

6        A.   I saw that.  But I had nothing else other than

7    my title.

8        Q.   Okay.  So it's your testimony that you don't

9    have a written agreement in your possession relating to

10   your objection?

11       A.   Not in my possession.

12       Q.   Okay.

13               MR. SCHORK:  We've been going about an

14   hour.  Let's take a short break.

15               THE WITNESS:  That would be nice.

16               (Break taken from 10:19 a.m. to 10:29 a.m.)

17       Q.   (BY MR. SCHORK)  Do you understand that you're

18   still under oath?

19       A.   Yes.

20       Q.   Did you ever receive a professional license as

21   a legal services contract sales representative?

22       A.   Like explain a little better.

23       Q.   I mean, have you ever received a license from

24   the State of Texas to serve as a legal services contract

25   sales rep?

1     A.  I don't -- I don't really aware -- I don't
2  think so.  I don't believe so.
3     Q.  Okay.  Okay.  I was just asking.
4          Have you ever met with your attorney in
5  person?
6     A.  Telephonically.
7     Q.  But never in person; is that right?
8     A.  No.
9     Q.  And aside from this objection.  Have you ever
10  worked with your attorney previously?
11     A.  No.
12     Q.  In the last five years have you worked with any
13  other attorneys?
14     A.  No.
15     Q.  At all?
16     A.  No.
17     Q.  Have you ever been a party in a case filed?
18          MR. CREAMER:  I don't think she knows what
19  you mean.  Can you restate, please.
20     Q.  (BY MR. SCHORK)  I mean, have you ever been a
21  plaintiff or a defendant in a case that was filed in a
22  state or federal court.
23     A.  Divorce?
24     Q.  That would be one.  Anything else?
25     A.  I don't recall any other thing, any other one.

Georgia Gay Whittington-Hopkins                          April 12, 2017

1    No.

2         Q.  Okay.  I'm going to ask you to look at what's

3    been marked as Exhibit 3.

4              (Exhibit No. 3 marked.)

5         Q.  (BY MR. SCHORK)  Have you seen this document

6    before?

7         A.  It's not the same.  This is the long form

8    notice, isn't it?

9         Q.  The long form notice appears in that document,

10   yes.

11        A.  And all the exhibits.

12        Q.  The document itself is marked -- is entitled

13   "Settlement Agreement," but a long form notice appears

14   in the document.

15        A.  I'm going to say yes because of the length of

16   it and all, but I'm -- everything was -- all of it is on

17   the Internet.  I'm going to say yes.

18        Q.  But you're not sure?

19        A.  I'm not sure.

20        Q.  Okay.  That's a pretty voluminous document,

21   correct?

22        A.  Yes.

23        Q.  Do you recall, just looking at it briefly,

24   reading anything that's in that document?

25        A.  Scanning.  More scanning.

1        Q.   Okay.  Can I draw your attention to Page 10 of

2   the document.  And when I refer to page 10, I mean

3   Page 10 on the bottom --

4        A.   Numbered?

5        Q.   The number, yes.

6        A.   Does my attorney also have copies of --

7        Q.   He would have -- yeah.  Yes.

8        A.   Okay.

9        Q.   Okay.  Now, in the -- towards the bottom of the

10  page it says "frame inspection and replacement program,"

11  correct?

12       A.   Okay.

13       Q.   Now -- and I'm just going to read -- I'm going

14  to read the paragraph just into the record, okay?  Just

15  bear with me for a second.

16            Now, this paragraph states, "Toyota will

17  offer the frame inspection replacement program to all

18  class members.  The frame inspection and replacement

19  program will provide prospective coverage for

20  replacement of frames on subject vehicles in accordance

21  with the rust perforation standard and the inspection

22  protocol.  The duration of prospective coverage will

23  begin following the date of final order and final

24  judgment and will be calculated by no longer of 12 years

25  from the date of first use of the subject vehicle, or if

Georgia Gay Whittington-Hopkins                          April 12, 2017

1   the class member has owned or leased the vehicle beyond

2   12 years from date of first use, one year from the date

3   of the entry of the final order and final judgment.

4   Pursuant to the frame inspection and replacement program

5   and the inspection protocol, Toyota shall offer an

6   initial inspection of the subject vehicle and additional

7   inspections necessary.  Salvage vehicles and vehicles

8   with titles marked 'flood damage' are not eligible for

9   this benefit."

10                  Did I read that correctly?

11          A.  Yes.

12          Q.  Okay.  And do you understand that under the

13  settlement, one of the benefits that's being offered to

14  class members is this prospective coverage that was

15  discussed in that paragraph?

16          A.  Yes.

17          Q.  So, for example, an owner of a 2007 Tundra

18  vehicle that was first used in January of 2007 would be

19  eligible for this prospective coverage until January of

20  2019, correct?

21          A.  That's the way I read it.

22          Q.  Do you understand that?

23          A.  Yes.

24          Q.  Do you think that's a valuable -- I mean, do

25  you think that's a valuable benefit?

LITIVATE REPORTING + TRIAL SERVICES  |  877.771.3312  |  www.litivate.com

```
 1          A.   Certainly.
 2          Q.   Just to be able to come in and have your
 3    vehicle inspected and if there --
 4          A.   It says "class members."
 5          Q.   Okay.
 6          A.   I'm not a class.
 7          Q.   You don't believe that you're a class member?
 8          A.   I'm a -- I'm not in this class action.
 9          Q.   Okay.  Can I draw your -- so if you were
10    eligible for this benefit --
11          A.   I would want it.
12          Q.   You would want it, okay.
13          A.   Yes.
14          Q.   Would that change the -- I mean, would you not
15    want to object to the settlement then?
16          A.   No.  It still could have been -- it still could
17    have been written better.
18          Q.   Okay.  What do you mean by that?  I understand.
19               Can you just explain it to me for the
20    record?
21          A.   Originally, it could have been written better,
22    to include more than class members.
23          Q.   Can I -- can I draw your attention to Page 5?
24    Do you see the word "class"?
25          A.   Uh-huh.
```

1      Q.   And I'm going to read the first part of that.

2    It says, "Class means, for settlement purposes only, all

3    persons, entities, or organizations who, at any time as

4    of the entry of the preliminary approval order, own or

5    owned, purchased or leased subject vehicles distributed

6    for sale or lease in any of the 50 states, the District

7    of Columbia, Puerto Rico, and all other United States

8    territories and/or possessions"; is that correct?

9      A.   That's correct.

10      Q.   So you would fall within the class definition,

11    correct?

12      A.   For settlement purposes only, it says.

13      Q.   Yes.

14      A.   Yes.

15      Q.   But you -- and just for the record, so you

16    understand, "subject vehicles," for purposes of the

17    settlement, that means Toyota Tacomas model year 2005 to

18    2010; Toyota Tundras, '07 and '08; and certain models of

19    Sequoia vehicles.  Do you understand that?

20      A.   Yes.

21      Q.   Okay.  And you owned an '07 -- you own an '07

22    Tundra vehicle, right?

23      A.   Yes.

24      Q.   So then you would be a class member; do you

25    understand that?

1        A.  Okay.

2        Q.  Okay.  So you are eligible for the frame

3   inspection prospective coverage covered for the -- that

4   we discussed in the paragraph that I read previously; do

5   you understand that?

6        A.  Yes.

7        Q.  As a class member?

8        A.  Yes, but I can't go to Toyota and say, "Inspect

9   my vehicle under such and such case."  Toyota is going

10   to have to authorize that, for me to do that.

11        Q.  Okay.  And now can I just draw your attention

12   to page -- let's go with the top number, because I think

13   that might be easier -- 49.

14        A.  I don't know if that's better or not.  There's

15   48 and 50, 49.

16        Q.  Yes.

17        A.  Page 46 at the bottom?

18        Q.  That's correct.  Do you see here that the

19   settlement agreed is signed by the general counsel and

20   chief legal officer of Toyota Motor North America, as

21   well as Mr. John P. Cooper, who is an attorney at Reed

22   Smith for Toyota?  Do you see that?

23        A.  I see it.

24        Q.  Those signatures.

25             So Toyota has agreed to have Toyota dealers

1    provide the inspections and, if necessary, replacements

2    that were covered in this paragraph; do you understand

3    that?

4         A.   Okay.

5         Q.   But you didn't understand that previously,

6    right?

7         A.   No.

8         Q.   Okay.  And we talked about earlier, I mean,

9    frame inspections are --

10        A.   Extremely important.

11        Q.   -- extremely expensive?

12             Sorry.  You said "pretty important"; is

13   that right?

14        A.   Uh-huh.

15        Q.   And very expensive, right?

16        A.   Yes.

17        Q.   So that's a -- would you agree that the

18   inspection and replacement, I mean, that's a significant

19   benefit, right?

20        A.   Yes.

21        Q.   Okay.  Now can I draw your attention to

22   Page 11.

23        A.   11?

24        Q.   11 on the bottom; it would be 14 at the top.

25             Okay.  Paragraph 2.  And then I'm going to

 1  read this for the record.  It says, "Without cost to

 2  class members and upon request from the class member,

 3  Toyota shall arrange a complimentary loaner vehicle,

 4  upon proof of adequate insurance, if the vehicle is

 5  required by the Toyota dealer to remain at the

 6  dealership at least overnight pursuant to the frame

 7  inspection replacement program for up to seven days

 8  absent exceptional circumstances, to eligible class

 9  members whose subject vehicles are undergoing frame

10  replacement pursuant to the terms of this settlement

11  agreement."  Is that correct?

12      A.  That's what I see written.

13      Q.  So you understand that, you know, under the

14  settlement, if somebody needs to have their frame

15  replaced, Toyota would arrange for a loaner vehicle,

16  upon request, to be given to them; is that correct?

17      A.  That's what it says.

18      Q.  And that's another significant benefit for --

19      A.  Sure.

20      Q.  -- convenience sake.  Okay.

21              Now, can I draw your attention to

22  Paragraph 3.  It's at the bottom of Page 11.  And now

23  this paragraph states that pursuant to the frame

24  inspection and replacement program and the inspection

25  protocol, class members may have their subject vehicle's

1  frames inspected by authorized Toyota dealers, and if

2  the vehicle located in a CRC state for evaluation for

3  application of the corrosion-resistant compounds,

4  correct?

5       A.  Correct.

6       Q.  And then below defines -- a number of CRC

7  states are listed --

8       A.  Uh-huh.

9       Q.  -- and it also states that those are states

10  with high road salt use, correct?

11       A.  True.

12       Q.  And these are mostly northern states, just

13  looking at them, correct?

14       A.  Most of them are.

15       Q.  Yeah, okay.  So you understand that under the

16  settlement and states with high road salt use, another

17  benefit of the settlement is that subject vehicle owners

18  can come in, they can bring their vehicle in, and if

19  there are some rust but not enough to justify a frame

20  replacement, then they would receive corrosion-resistant

21  compounds to prevent rust from accumulating on their

22  vehicle's frame?  Do you understand that?

23       A.  Yes.

24       Q.  I mean, that's another good benefit, right?

25  That's an important benefit, right?

Georgia Gay Whittington-Hopkins                                    April 12, 2017

```
 1        A.   Sure.  Yes.
 2        Q.   But you were unaware of that before you came in
 3   today?
 4        A.   Yes.
 5        Q.   And the loaner vehicles, did you know about
 6   that before you came in today?
 7        A.   No.
 8        Q.   Can I draw your attention to paragraph 4 on the
 9   next page.  And this is a short paragraph; I'll read it.
10   It says, "If a class disputes the findings of the Toyota
11   dealer conducted pursuant to the frame inspection and
12   replacement program, the class member may take the
13   subject vehicle to a second Toyota dealer for another
14   frame inspection"; is that correct?
15        A.   That's what it says.
16        Q.   Okay.  And do you understand that this
17   paragraph serves to ensure that if somebody gets their
18   frame inspected at a Toyota dealer but they disagree
19   with the result, they can go to another Toyota dealer
20   and --
21        A.   Get a second opinion.
22        Q.   Yes.  And that's important, right?
23        A.   Sure.
24        Q.   Okay.  Were you aware of that before you came
25   in today?
```

Georgia Gay Whittington-Hopkins                              April 12, 2017

1        A.  No.

2        Q.  Okay.  Now, can I draw your attention to

3   Paragraph 1 at the bottom of this page.  Okay.  It

4   states that eligible class members, during the claim

5   period, may submit claims for previously paid

6   out-of-pocket expenses for frame replacement incurred to

7   address the condition that satisfies the rust

8   perforation standard on the subject vehicles that were

9   not otherwise reimbursed and that were incurred prior to

10   the initial notice date.  Do you see that?

11        A.  I see it.

12        Q.  Okay.  Did I read that correctly?

13        A.  Yes.

14        Q.  Okay.  And you understand that that provision

15   serves to allow class members who previously paid to

16   have a frame on their vehicle replaced because the rust

17   on the vehicle was a certain level under the settlement,

18   they would be reimbursed for those expenses?  Do you

19   know that?

20        A.  Yes.

21        Q.  And that's important because that's --

22        A.  Very.

23        Q.  Okay.  And were you aware of that benefit

24   before you came in today?

25        A.  No.

LITIVATE REPORTING + TRIAL SERVICES  |  877.771.3312  |  www.litivate.com

Georgia Gay Whittington-Hopkins                                    April 12, 2017

1          Q.   Okay.  Let me see here.  If your objection is

2     granted, what would happen?

3          A.   I don't know.

4          Q.   Do you understand -- do you have an

5     understanding that if the Court granted your objection

6     that none of these benefits would be available to the

7     class members?

8          A.   No.

9          Q.   You didn't know that?

10         A.   No.

11         Q.   Do you understand that there are somewhere

12    between 1.4 and 1.5 million vehicles that are covered

13    under this settlement?

14         A.   No.

15         Q.   Do you know that there are about approximately

16    2.5 class members covered under this settlement?

17         A.   No.

18         Q.   All of which are --

19         A.   How do they know?

20         Q.   I don't know.  I was just asking -- I was

21    asking just generally.

22         A.   No.

23         Q.   There's no...

24              But if you knew that if your objection was

25    granted that those approximately 2.5 million class

Georgia Gay Whittington-Hopkins                          April 12, 2017

1    members would get -- be eligible for none of these

2    benefits, would that change your --

3        A.  I don't believe my objection is to keep people

4    from benefitting.

5        Q.  Okay.  And if I told you if that was the case,

6    if the case was that none of the benefits of the

7    settlement would be available to those 2.5 million

8    individuals --

9        A.  How do I know --

10               MR. CREAMER:  Objection, improper

11   hypothetical.

12               MR. SCHORK:  I don't think it's a

13   hypothetical.  It's a...

14               MR. CREAMER:  Improper hypothetical but she

15   can go ahead and answer.

16       A.  I wouldn't want to be responsible for other

17   people not having their vehicles inspected if they have

18   problems having them fixed, but I don't believe my

19   objection is of such.

20       Q.  (BY MR. SCHORK)  Okay.  But if that was the

21   case with your objection?

22       A.  If that was the case --

23               MR. CREAMER:  Objection, improper

24   hypothetical; incomplete as well.

25       Q.  (BY MR. SCHORK)  "If that was the case," keep

Georgia Gay Whittington-Hopkins                                  April 12, 2017

```
 1   going.
 2       A.  If that was indeed the case, I would really
 3   have to take into consideration whether or not I would
 4   want to be responsible for the people not having that
 5   benefit.
 6       Q.  Would you want to withdraw your objection if
 7   that were the case?
 8       A.  Only -- only if it were the case.  I don't
 9   believe it is the case.
10       Q.  But if it were the case, you would?
11       A.  I said if --
12            MR. CREAMER:  Objection, asked and
13   answered.
14       Q.  (BY MR. SCHORK)  Okay.  I'm going to hand you a
15   document that I ask to be marked as Exhibit 4.
16            (Exhibit No. 4 marked.)
17       Q.  (BY MR. SCHORK)  This document is entitled
18   "Objection to Proposed Class Action Settlement," right?
19       A.  Yes.  This is mine.  This is my objection.
20       Q.  And you've seen this document before, right?
21       A.  Yes.
22       Q.  Okay.  Can I draw your attention to the second
23   to last page of the document?
24       A.  March 2 -- March 2 -- second to the last?
25       Q.  It's Page 7 of your objection, ma'am.  It's in
```

Georgia Gay Whittington-Hopkins                                April 12, 2017

1    the Conclusion.

2            A.  Oh, okay.

3            Q.  Can you read that?

4            A.  You want all that cellular of California

5    incorporated?  You want all --

6            Q.  No, just that -- under Conclusion.  It just

7    starts with, "In conclusion," just read that.

8            A.  "In conclusion, the objector respectfully asks

9    the Court to reject this settlement based upon the above

10   objections."

11           Q.  Okay.

12           A.  And it's dated 3/24/17.

13           Q.  And so you're asking for the Court to reject

14   the settlement that we just talked about, right?

15           A.  Yes.

16           Q.  Okay.  And if the court rejects the settlement,

17   you don't -- you have no understanding as to the effect

18   that would have on the other individuals, right?

19           A.  No.

20           Q.  Okay.  Do you know anything about the

21   requirements for class certification?

22           A.  Is that what you read to me a while ago?

23           Q.  No.

24           A.  Then no.

25                   MR. SCHORK:  Let's take a short break.

Georgia Gay Whittington-Hopkins                                    April 12, 2017

```
 1                    (Break taken from 10:52 a.m. to 10:55 a.m.)
 2          Q.  (BY MR. SCHORK)  Ms. Hopkins, you understand
 3     you're still under oath?
 4          A.  Yes.
 5          Q.  I only have a few more questions.
 6          A.  Okay.
 7          Q.  I'm going to hand you a blank piece of paper.
 8     Can you write your name and sign it on this, on the
 9     paper for us.
10          A.  What for?
11          Q.  Because we want to -- I want to put it in the
12     record?
13          A.  I can sign it, but I don't know what else you
14     would put on there.  Can I put a big "X" on there?
15          Q.  You can if you would like to, sure.
16          A.  I don't -- because, I mean, I'm not going to
17     sign something that's not --
18          Q.  What's going to happen after we leave here
19     today is the court reporter will take the exhibits with
20     her and then it will be introduced into the record.  I'm
21     not going to -- so that's how we establish chain of
22     custody so that nothing else happens to the document.
23     Okay?
24          A.  Okay.  You want my full signature, the one that
25     I use when I write a check?
```

LITIVATE REPORTING + TRIAL SERVICES  |  877.771.3312  |  www.litivate.com

Georgia Gay Whittington-Hopkins                                    April 12, 2017

1          Q.  You can do both, that's fine.

2          A.  So -- and that's all you want?

3          Q.  That's it.  Yes, ma'am.

4          A.  I have a -- feel really weird about signing a

5     blank piece of paper.

6          Q.  Okay.

7          A.  Because anything can go on here.

8          Q.  Okay.  You --

9          A.  And I would have signed.

10               MS. D'AURIA:  Maybe ask your lawyer to

11     weigh in here.

12               THE WITNESS:  What?

13               MS. D'AURIA:  Your lawyer has not

14     instructed you not to sign the document and --

15               MR. SCHORK:  Yeah, it's just --

16               MS. D'AURIA:  -- Mr. Schork just explained

17     that it's -- I'll let you, since it's your deposition.

18          Q.  (BY MR. SCHORK)  Yeah.  We're just looking to

19     verify your signature, that's what we're looking for.

20          A.  (Witness complies.)

21          Q.  You can "X" it out, if it makes you more

22     comfortable, above there.

23          A.  (Witness complies.)

24          Q.  Okay.

25          A.  Can I say "signature only"?

Georgia Gay Whittington-Hopkins                                    April 12, 2017

1          Q.  Sure.

2          A.  (Witness complies.)

3               MR. SCHORK:  And I'll ask that this be

4     introduced as Exhibit 5.

5               (Exhibit No. 5 marked.)

6          Q.  (BY MR. SCHORK)  Now, I'm going to hand you

7     this document.  I'll ask that it be marked as Exhibit 6.

8               (Exhibit No. 6 marked.)

9          Q.  (BY MR. SCHORK)  And this is a copy of the

10    front and back page of the title that you produced

11    today; is that right?

12         A.  It appears to be the same as I have right here,

13    yes.

14         Q.  So it is, correct?

15         A.  Yes.

16              MR. SCHORK:  I have no further questions.

17              MS. D'AURIA:  I have no questions.

18              MR. SCHORK:  Michael?

19              THE WITNESS:  Is he still on there?  What's

20    the little gizmo there on the phone?  Has he been

21    disconnected?

22              MR. SCHORK:  No.  As far as I can, tell

23    that's the speakerphone, and it looks like he's been on

24    there for an hour.

25              MR. CREAMER:  I'm here.

LITIVATE REPORTING + TRIAL SERVICES  |  877.771.3312  |  www.litivate.com

```
 1                    MR. SCHORK:  Okay.  Michael?
 2                    MR. CREAMER:  Yes, I'm here.
 3                    MR. SCHORK:  Do you have any questions?
 4                    MR. CREAMER:  No, I don't have any further
 5    questions.
 6                    THE REPORTER:  So this is Gail, the court
 7    reporter.  Is there anything else for the record?
 8                    MR. CREAMER:  Not from the Objector.
 9                    THE REPORTER:  Okay.  We're off the record
10    at 11:00 a.m. Dallas time.
11                    Mr. Creamer, do you need a copy of the
12    deposition?
13                    MR. CREAMER:  Yes, please.
14                    THE REPORTER:  Okay.  Thank you.
15                    MR. CREAMER:  Thank you, ma'am.
16                    THE REPORTER:  Kelly, do you need a copy?
17                    MS. D'AURIA:  Yes.
18                    MR. SCHORK:  Can we get us a copy by
19    tomorrow evening, do you think?
20                    THE REPORTER:  Yes.
21                    MR. SCHORK:  With the exhibits?  Thanks.
22                    (Proceedings concluded at 11:05 a.m.)
23
24
25
```

```
 1                 UNITED STATES DISTRICT COURT
 2                    CENTRAL OF CALIFORNIA
 3
 4   BRIAN WARNER, ET AL          *
                                  *
 5   VS.                          *   NO. 2:15-CV-02171
                                  *
 6   TOYOTA MOTOR SALES, USA,     *
     INC.                         *
 7
 8
                         REPORTER'S CERTIFICATION
 9          DEPOSITION OF GEORGIA GAY WHITTINGTON-HOPKINS
                            APRIL 12, 2017
10
11
            I, GAIL SPURGEON, Certified Shorthand Reporter
12   in and for the State of Texas, hereby certify to the
     following:
13
            That the foregoing deposition of GEORGIA GAY
14   WHITTINGTON-HOPKINS was reported by me stenographically
     at the time and place indicated, said witness having
15   been placed under oath by me, and that the transcript is
     a true record of the testimony given by the witness;
16
            I further certify that pursuant to FRCP Rule
17   30(f)(1) that the signature of the deponent:
            ___ was requested by the deponent or a party
18   before the completion of the deposition and is to be
     returned within 30 days from date of receipt of the
19   transcript.  If returned, the attached Changes and
     Signature Page contains any changes and the reasons
20   therefor;
            X  was not requested by the deponent or a
21   party before the completion of the deposition
22          I further certify that I am neither counsel
     for, related to, nor employed by any of the parties or
23   attorneys in the action in which this proceeding was
     taken, and further that I am not financially or
24   otherwise interested in the outcome of the action.
25
```

Page 62

Georgia Gay Whittington-Hopkins                                    April 12, 2017

1          Given under my hand this the 13th day of
    April, 2017.

2

3

4          _____

5                          GAIL SPURGEON
                           Texas CSR 1718
6                          Expiration Date: 12/31/17
                           Litivate Reporting
7                          501 West Broadway
                           Suite 1000
8                          San Diego CA  82101
                           619.233.2030

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Georgia Gay Whittington-Hopkins                                        April 12, 2017

---

**A**

a.m
1:20,21 41:16
  41:16 58:1,1
  61:10,22
able
5:5 32:22 46:2
absent
50:8
Absolutely
37:6
accumulating
51:21
action
3:12 24:13,17
  24:20 30:3,6
  30:23 33:23
  35:16 38:18
  38:24 46:8
  56:18 62:23
  62:24
actions
24:24 32:15
add
18:20
additional
45:6
address
53:7
adequate
50:4
Administration
31:5 32:2,7,16
advice
28:22
ago
57:22
agree
25:3 33:7,12
  49:17
agreed
27:13 48:19,25
agreement
3:11 26:19,22
  26:25 27:3,21
  27:24 28:9
  29:17 41:5,9
  43:13 50:11
agreements
40:12,19,22
ahead
18:19 19:24
  21:11 55:15
Air
9:17
AL
1:4 62:4
alerted
11:17 18:8,9
alleged
12:6 13:4 25:1
alleging
12:16 13:7
allow

53:15
Amended
3:9 37:3,11
America
30:20 48:20
Anaheim
2:13
analyst
31:5,17
and/or
47:8
answer
5:1 11:2 13:18
  16:23 18:19
  19:3,5,24,25
  20:3 26:5,7
  28:1,6,12,18
  28:24 29:19
  30:8,9,11,12
  36:20 55:15
answered
18:17 19:19,21
  27:19 28:4,11
  28:14 29:16
  56:13
ANSWERS
1:17
anybody
5:25 15:12
  22:20 23:7
  30:20,24,25
apologies
34:6
Appearances
3:2
APPEARING
2:6,10,14
appears
43:9,13 60:12
application
51:3
approached
14:22,25
appropriate
25:21
approval
47:4
approximately
26:8,14 54:15
  54:25
April
1:10,20 14:16
  62:9 63:1
argumentative
19:1,4,21
arrange
50:3,15
aside
23:17 42:9
asked
11:11 14:22
  15:5,8 16:8
  17:1 20:9,24
  21:15 22:20
  24:16 27:23

33:25 34:1
36:25 38:12
41:4 56:12
asking
4:21 19:2 24:10
  26:10 38:21
  42:3 54:20,21
  57:13
asks
57:8
asserting
12:13
Associates
2:3
attached
62:19
attempted
27:24
attention
15:16 39:10
  44:1 46:23
  48:11 49:21
  50:21 52:8
  53:2 56:22
attorney
15:21 17:18,20
  17:21,23 23:3
  23:5 26:17
  27:17 28:10
  28:15 29:2
  34:23 40:19
  40:23 42:4,10
  44:6 48:21
attorney-client
26:3 27:8 28:17
  29:16
attorneys
31:14 42:13
  62:23
authorize
48:10
authorized
51:1
available
54:6 55:7
Avenue
2:8
Aviation
31:4 32:2,7,16
aware
15:14 16:8 29:9
  42:1 52:24
  53:23

---

**B**

B
2:7
back
6:12 34:5 60:10
Bandis
23:15
Barnow
2:3
based

57:9
basic
39:2
Basically
24:18
basis
20:6 21:20
  27:10 28:2,8
  35:22
bear
44:15
beginning
20:23
behalf
29:5,8,11
belief
21:20
believe
13:10 19:13,13
  19:18 20:10
  20:11 21:2,19
  22:23 35:25
  37:13,16,18
  42:2 46:7
  55:3,18 56:9
believed
20:25
benefit
33:10 35:8,11
  45:9,25 46:10
  49:19 50:18
  51:17,24,25
  53:23 56:5
benefits
32:18 35:19
  45:13 54:6
  55:2,6
benefitting
36:1 38:8 55:4
best
5:6
better
13:23 18:2,3,4
  35:8 41:22
  46:17,21
  48:14
beyond
45:1
big
12:19 24:25
  58:14
blank
58:7 59:5
bold
37:20
bottom
44:3,9 48:17
  49:24 50:22
  53:3
Box
2:12
break
4:24 41:14,16
  57:25 58:1
Brian

1:4 37:23 62:4
briefly
43:23
bring
10:9 51:18
Broadway
63:6
brought
8:13 9:21 10:18
  15:16 39:20

---

**C**

C
2:1
CA
63:7
calculated
44:24
California
1:2 2:13 57:4
  62:2
call
20:19
called
9:17 24:7,9
  25:10
calls
28:16
campaign
9:22 10:2
caption
36:1 37:19
car
10:22,24,25
  11:9,10,12,21
care
10:10
Carlton
2:16 14:8
case
5:9,13,20,22
  12:3,3,7,10
  12:13,24
  20:22 24:25
  25:6 29:1,4,8
  29:11,14 36:1
  37:19 42:17
  42:21 48:9
  55:5,6,21,22
  55:25 56:2,7
  56:8,9,10
cases
31:12
cause
1:20 12:17,18
cellular
57:4
Center
1:23
CENTRAL
1:2 62:2
certain
13:8 22:7 32:22
  33:3,5 47:18

53:17
**Certainly**
46:1
**Certificate**
3:3
**certificates**
31:24,24
**certification**
57:21 62:8
**Certified**
1:21 62:11
**certify**
62:12,16,22
**chain**
58:21
**change**
9:19 11:13,14
  46:14 55:2
**changed**
9:3
**changes**
35:3 62:19,19
**check**
58:25
**Chicago**
2:5
**chief**
48:20
**choose**
7:2
**Christopher**
23:15
**circumstances**
50:8
**City**
1:24
**Civil**
1:25 38:18,24
**claim**
33:23 53:4
**claims**
12:6,12 53:5
**clarification**
27:23
**clarify**
27:25
**class**
3:12 24:13,17
  24:20,24 30:3
  30:6,23 32:15
  32:19 33:23
  35:16 44:18
  45:1,14 46:4
  46:6,7,8,22
  46:24 47:2,10
  47:24 48:7
  50:2,2,8,25
  52:10,12 53:4
  53:15 54:7,16
  54:25 56:18
  57:21
**clear**
13:6 19:10,11
  21:14 34:2

**client**
25:15
**close**
17:13
**Columbia**
47:7
**come**
32:22 34:4 46:2
  51:18
**comfortable**
59:22
**comments**
35:2
**common**
30:19,22 35:24
**Commons**
1:23
**communications**
27:13 39:23
**company**
24:25
**Compared**
35:20
**compen-**
28:20
**compensated**
36:13
**Complaint**
3:9 37:3,11
**complaints**
25:5
**completion**
62:18,21
**complies**
59:20,23 60:2
**complimentary**
50:3
**compounds**
51:3,21
**concerning**
39:25
**concluded**
61:22
**conclusion**
57:1,6,7,8
**condition**
53:7
**conduct**
20:20
**conducted**
52:11
**connection**
5:9 29:14
**consider**
7:14
**consideration**
56:3
**considering**
8:18
**contact**
24:4,5 25:14
**contacted**
24:6
**contains**

62:19
**continuing**
31:17
**contract**
41:21,24
**control**
10:12
**convenience**
50:20
**conversation**
14:14,17 16:6
  16:12 25:11
  25:17 26:10
  26:15 27:21
  30:12
**conversations**
25:22
**Cooper**
48:21
**copies**
39:20 44:6
**copy**
39:17,19 40:16
  60:9 61:11,16
  61:18
**correct**
6:3,4,13,14
  12:4,5 15:6,7
  15:17 17:12
  21:4,4 22:1
  24:7 32:2
  33:21 34:18
  36:2 38:19,24
  39:8,15,16
  41:5 43:21
  44:11 45:20
  47:8,9,11
  48:18 50:11
  50:16 51:4,5
  51:10,13
  52:14 60:14
**correctly**
45:10 53:12
**corrosion-re...**
51:3,20
**cost**
50:1
**costs**
29:13 33:17
**counsel**
16:17 18:14
  20:18 24:15
  25:15,19
  27:13 29:23
  48:19 62:22
**counsel's**
28:22 29:22
**Counselor**
26:5
**country**
7:5
**County**
1:24
**course**
20:4

**court**
1:1,21 5:10
  19:7 20:19
  42:22 54:5
  57:9,13,16
  58:19 61:6
  62:1
**cover**
34:7,7
**coverage**
44:19,22 45:14
  45:19 48:3
**covered**
48:3 49:2 54:12
  54:16
**CRC**
51:2,6
**Creamer**
2:11,12 16:16
  16:20 18:14
  18:21,25
  19:19 20:16
  23:1,3,17
  24:4,4,14
  25:10,12,19
  25:22 26:1,6
  26:9,13,17,20
  27:6,7,12,19
  28:4,11,16
  29:15,20 30:7
  30:18 42:18
  55:10,14,23
  56:12 60:25
  61:2,4,8,11
  61:13,15
**create**
39:3
**CSR**
63:5
**custody**
58:22

─────────────
      **D**
**D'AURIA**
2:7 8:24 33:15
  36:19 59:10
  59:13,16
  60:17 61:17
**Dallas**
1:24,24 6:18,24
  61:10
**damage'**
45:8
**Darrell**
23:10,12
**date**
17:6 44:23,25
  45:2,2 53:10
  62:18 63:5
**dated**
57:12
**day**
1:20 63:1
**days**
17:8,10,13 50:7

62:18
**dealer**
11:11,18,24
  50:5 52:11,13
  52:18,19
**dealers**
48:25 51:1
**dealership**
6:22 10:9 50:6
**dealing**
31:12
**decide**
14:3 17:19
**decided**
22:15
**defect**
25:1
**defendant**
2:10 42:21
**defines**
51:6
**definition**
47:10
**department**
32:17
**deponent**
62:17,17,20
**deposed**
4:10,13,15
**deposition**
1:9,17 4:20,25
  9:11 38:18
  59:17 61:12
  62:9,13,18,21
**depositions**
34:4
**DESCRIPTION**
3:8
**Diego**
63:7
**directed**
23:4
**disagree**
25:16 52:18
**disconnected**
60:21
**discussed**
45:15 48:4
**disputes**
52:10
**distributed**
47:5
**District**
1:1 47:6 62:1
**Divorce**
42:23
**document**
18:16 36:25
  37:3,7,8,10
  37:12,16
  38:11,17
  39:11,14,22
  43:5,9,12,14
  43:20,24 44:2

Georgia Gay Whittington-Hopkins                                      April 12, 2017

56:15,17,20
56:23 58:22
59:14 60:7
**documents**
12:9 39:23 40:4
40:10
**doing**
20:23 38:20,21
**draw**
39:10 44:1 46:9
46:23 48:11
49:21 50:21
52:8 53:2
56:22
**drivable**
7:24,25
**drive**
8:2
**driver's**
10:12
**duly**
4:2
**duration**
44:22

---
**E**
---
**E**
2:1,1
**e-mail**
34:22,24
**e.schork@bar...**
2:5
**earlier**
18:10 19:14
20:10,12 21:3
21:18 22:13
38:6 49:8
**early**
9:6
**easier**
48:13
**education**
31:17
**effect**
57:17
**either**
10:1 21:7
**eligible**
33:3 45:8,19
46:10 48:2
50:8 53:4
55:1
**employed**
32:4 62:22
**employee**
39:24
**ensure**
52:17
**entered**
27:14
**entities**
47:3
**entitled**
38:17 43:12

56:17
**entry**
45:3 47:4
**ERICH**
2:3
**Escalade**
7:20
**establish**
58:21
**ET**
1:4 62:4
**evaluation**
51:2
**evening**
61:19
**evidently**
22:8
**exactly**
20:2 25:25
**EXAMINATION**
3:5 4:3
**example**
45:17
**excellent**
7:16
**exceptional**
50:8
**excuse**
13:2 16:16
**Exhibit**
3:9,10,11,12,14
3:15 36:25
37:1 38:13,14
39:12,15 43:3
43:4 56:15,16
60:4,5,7,8
**exhibits**
3:7,8 43:11
58:19 61:21
**expect**
33:20 36:13,16
**expenses**
53:6,18
**expensive**
33:20,22 49:11
49:15
**Expiration**
63:5
**explain**
10:6 13:21
41:22 46:19
**explained**
59:16
**extremely**
49:10,11

---
**F**
---
**fair**
13:20,22 14:12
17:4,24 18:1
19:16,18
21:21
**fall**
47:10

**family**
24:1
**far**
21:8 25:14
60:22
**fax**
34:22
**federal**
1:25 5:9 31:4
32:1,7,16
42:22
**feel**
59:4
**file**
24:22 29:11
**filed**
5:14,15,17
18:15 25:5
29:4,7 33:23
34:10,17
40:13 42:17
42:21
**final**
44:23,23 45:3,3
**financially**
62:23
**find**
17:18,20
**findings**
52:10
**fine**
5:2 40:8 59:1
**finish**
20:19 22:8
**first**
4:2 14:14,17
16:6 23:3,5
25:11 34:12
37:19 38:22
39:17 44:25
45:2,18 47:1
**five**
42:12
**fixed**
55:18
**fixing**
10:8
**flood**
45:8
**floor**
10:11
**following**
28:12 44:23
62:12
**follows**
4:2
**foregoing**
62:13
**form**
18:23 19:1
33:15 43:7,9
43:13
**found**
15:11

**fourth**
39:10
**frame**
22:8 33:4,9,9
33:18 40:1
44:10,17,18
45:4 48:2
49:9 50:6,9
50:14,23
51:19,22
52:11,14,18
53:6,16
**frames**
33:5,14 44:20
51:1
**FRCP**
62:16
**free**
32:23 33:4,9
**friend**
15:19
**friends**
14:5,7 15:23
24:1
**front**
60:10
**full**
58:24
**further**
13:9 19:22 27:8
28:5 60:16
61:4 62:16,22
62:23

---
**G**
---
**G-a-y**
4:7
**G-e-o-r-g-i-a**
4:7
**Gail**
1:21 61:6 62:11
63:4
**Gay**
1:10,17 3:4 4:1
4:7 62:9,13
**general**
14:24 15:1
48:19
**generally**
12:13 15:9 16:8
54:21
**Georgia**
1:10,17 3:4 4:1
4:7 62:9,13
**getting**
29:1 31:22
**girl**
7:5
**give**
5:6
**given**
50:16 62:15
63:1
**giving**

19:3
**gizmo**
60:20
**glasses**
37:5
**go**
18:19 19:24
21:10 22:18
48:8,12 52:19
55:15 59:7
**goes**
25:23 29:15
**going**
4:17 18:22 19:3
19:4,20 24:10
25:12 27:7,17
27:25 28:5,18
28:21 29:10
29:21 34:15
36:24 38:12
39:5 41:13
43:2,15,17
44:13,13 47:1
48:9 49:25
56:1,14 58:7
58:16,18,21
60:6
**good**
4:5 7:14 24:24
33:10 39:7
51:24
**gotten**
10:7
**granted**
54:2,5,25
**ground**
34:6,7
**guess**
35:24
**guys**
14:18 17:17
40:9

---
**H**
---
**H-o-p-k-i-n-s**
4:9
**hair**
9:7
**hand**
36:24 38:12
56:14 58:7
60:6 63:1
**handed**
37:2
**handle**
30:1
**happen**
12:18 16:14,17
22:9 54:2
58:18
**happens**
34:3 58:22
**headquarters**
32:3
**hear**

23:25
high
51:10,16
Hopkins
4:5,8,11 58:2
hour
41:14 60:24
Hughes
2:16 9:2,5,8,12
14:14 14:8,9
14:13 15:14
15:19 16:1,18
17:1,9,15,20
22:14 23:6,17
Huh-uh
11:7
hundred
7:10
hyphen
4:8
hypothetical
55:11,13,14,24

I
identified
19:12
Illinois
2:5
important
49:10,12 51:25
52:22 53:21
improper
18:24 20:21
55:10,14,23
inappropriate
25:20
include
46:22
incomplete
55:24
incorporated
57:5
incurred
53:6,9
INDEX
3:1
indicated
62:14
individual
23:9,14
individuals
16:2 33:7 35:19
38:1,3,9 55:8
57:18
influence
5:4
information
4:22 25:14
28:17
initial
45:6 53:10
initially
23:3
Initiated

9:24
Inspect
48:8
inspected
40:7 46:3 51:1
52:18 55:17
inspection
32:23 33:4,4
40:5 44:10,17
44:18,21 45:4
45:5,6 48:3
49:18 50:7,24
50:24 52:11
52:14
inspections
39:25 45:7 49:1
49:9
instance
1:18
instruct
27:18,25 28:5
28:18
instructed
59:14
instructing
26:4 29:18
instruction
29:22
insurance
50:4
interested
62:24
Internet
5:25 6:8,9
15:11 37:9,14
43:17
interrupt
6:21 9:10 21:10
introduced
58:20 60:4
invade
26:2 28:17 30:9
investigation
18:6
involved
24:23 29:1
involvement
5:13 20:22
issue
10:8 13:2 18:8
18:9 19:14,17
29:25
issues
10:21 11:20
13:8 18:10,12
18:23 19:11
20:12 21:3,8
21:18,24 22:1
22:6 24:21

J
January
45:18,19
John

48:21
judgment
44:24 45:3
July
8:6
justify
51:19

K
kdauria@reed...
2:9
keep
55:3,25
Kelly
2:7 61:16
kind
12:20 26:24
27:20 40:6
knew
14:23 15:5,9
18:5,5 22:20
54:24
know
4:22,25 6:9,11
6:19 7:8 9:16
9:20 10:4,23
11:2,14 12:6
12:12,18,22
13:6 14:5,19
14:20,25
15:10 16:1,3
16:4,5 20:18
21:9,12,13,22
21:23,24
22:23 24:12
24:13 25:19
26:21 27:15
32:20,24,25
33:17 35:10
36:15,18,21
38:3 48:14
50:13 52:5
53:19 54:3,9
54:15,19,20
55:9 57:20
58:13
knowledge
10:25 11:6
21:25 26:23
30:19,22
known
18:6
knows
24:17 42:18

L
LaSalle
2:4
lasted
25:18
lasts
25:23
Law
2:12

lawyer
29:7 59:10,13
lawyers
29:4
learn
30:5
lease
47:6
leased
45:1 47:5
leave
58:18
legal
31:1,18,20
41:21,24
48:20
legally
30:20
length
43:15
let's
6:12 10:1 41:14
48:12 57:25
letter
10:7
letters
37:20
level
53:17
Lexington
2:8
license
41:20,23
limited
9:22 10:2
listed
35:25 37:23
51:7
Litivate
63:6
little
41:22 60:20
loaner
50:3,15 52:5
located
51:2
long
25:10,17,22
26:9 27:21
30:9 36:4,6
43:7,9,13
longer
44:24
look
10:24 11:8,12
40:25 43:2
looked
37:16
looking
43:23 51:13
59:18,19
looks
37:9 60:23
lot

7:9 33:19
love
7:7 36:18,23

M
ma'am
18:20 19:24
28:13 30:7,16
37:4 56:25
59:3 61:15
maintenance
8:13 9:20 11:25
major
8:16,18
management
31:5,16
March
6:6 14:15,16
17:7 34:15
56:24,24
marked
36:25 37:1
38:13,14 43:3
43:4,12 45:8
56:15,16 60:5
60:7,8
married
23:23
mats
10:11
mean
5:15,16,16 6:21
8:19 13:21,24
14:15 18:3,4
21:4,10 30:21
30:22 35:14
41:23 42:19
42:20 44:2
45:24 46:14
46:18 49:8,18
51:24 58:16
means
47:2,17
meant
27:24
medications
5:4
member
45:1 46:7 47:24
48:7 50:2
52:12
members
32:19 44:18
45:14 46:4,22
50:2,9,25
53:4,15 54:7
54:16 55:1
mentioned
20:10
met
42:4
Michael
2:11,12 23:1
60:18 61:1
miles

7:8
million
54:12,25 55:7
mind
9:10
mine
56:19
minute
16:16
minutes
26:8,14
missed
24:14
model
6:15 7:21 47:17
models
47:18
month
14:15
morning
4:5
Motor
1:6 40:13 48:20
  62:6

**N**

N
2:1
name
4:6 23:13,16
  58:8
named
23:10,14
names
14:7 35:16
  37:20,25
nature
25:14,23,24
necessary
31:11 45:7 49:1
need
4:21,24 9:9
  17:21 20:18
  34:7 35:10
  37:4 61:11,16
needed
14:11 17:23
  23:20
needs
50:14
neither
62:22
never
11:14,17 42:7
New
2:9,9
nice
41:15
North
2:4 48:20
northern
51:12
note
29:24

noted
35:13,15
notice
10:19 21:18
  43:8,9,13
  53:10
notified
19:14 20:12
  21:3,6,7
number
44:5 48:12 51:6
numbered
1:19 44:4

**O**

oath
41:18 58:3
  62:15
object
16:11,19 17:2
  19:4,20 22:15
  25:12 26:1
  27:7 30:6,22
  46:15
objected
12:2 30:2
objecting
22:18
objection
3:12 5:14,15,18
  14:1,4 18:15
  19:22 20:6
  23:10,15,18
  24:2 25:25
  27:11 28:16
  29:9,15 30:7
  30:18 33:15
  34:9,17,22
  36:14,17
  40:13,17,20
  40:23 41:10
  42:9 54:1,5
  54:24 55:3,10
  55:19,21,23
  56:6,12,18,19
  56:25
objections
18:22,24 19:1
  57:10
objective
13:25 40:17
objector
2:14 35:5 57:8
  61:8
offer
44:17 45:5
offered
45:13
offering
22:11
offers
32:19
officer
48:20
offices

1:22 2:12
Oh
4:16 23:25 57:2
oil
9:19 11:14
okay
4:10,17,19,22
  4:23 5:2,3,8
  5:12,15,17,22
  5:24 6:2,9,17
  6:21,25 7:2
  7:23 8:12 9:5
  9:9,12,13,14
  9:15,25 10:6
  10:11,18,21
  10:24 11:11
  11:16,23
  12:15,20 13:6
  13:11,21 14:3
  14:9,13,17,22
  15:1 16:11,22
  16:25 17:11
  17:13,14,17
  17:22,25
  18:12 19:10
  19:17 20:1
  21:5,8,14
  22:3,22,25
  23:2,9 24:19
  25:16 26:11
  27:7 28:7,15
  28:16,21 29:4
  29:10,13 30:5
  31:13 32:1,6
  34:8 35:2,22
  36:7,9 37:15
  38:11 39:5,6
  39:7,10,13,14
  40:4,8,11,22
  41:4,8,12
  42:3,3 43:2
  43:20 44:1,8
  44:9,12,14
  45:12 46:5,9
  46:12,18
  47:21 48:1,2
  48:11 49:4,8
  49:21,25
  50:20 51:15
  52:16,24 53:2
  53:3,12,14,23
  54:1 55:5,20
  56:14,22 57:2
  57:11,16,20
  58:6,23,24
  59:6,8,24
  61:1,9,14
once
36:6
opinion
52:21
ORAL
1:9
order
44:23 45:3 47:4
organizations

47:3
Originally
46:21
out-of-pocket
53:6
outcome
62:24
outside
10:24 30:11
overnight
50:6
owned
8:14,17 45:1
  47:5,21
owner
18:5 21:5 45:17
owners
32:22 33:3
  35:10 51:17
owns
18:7

**P**

P
2:1,1,3 48:21
page
3:2,8 37:19
  38:16,22
  39:10,11 44:1
  44:2,3,10
  46:23 48:12
  48:17 49:22
  50:22 52:9
  53:3 56:23,25
  60:10 62:19
paid
53:5,15
Palmer
23:10,12
paper
58:7,9 59:5
paragraph
44:14,16 45:15
  48:4 49:2,25
  50:22,23 52:8
  52:9,17 53:3
paralegal
31:15,16
part
47:1
particular
24:22
parties
62:22
parts
13:4 22:7 36:8
  36:9
party
42:17 62:17,21
paying
28:15 29:13
payment
26:25
pending

5:1,9
people
24:21 35:9,12
  35:13,15 55:3
  55:17 56:4
perforation
40:1 44:21 53:8
period
53:5
person
42:5,7
personally
38:4
persons
47:3
phone
30:11 60:20
phonetic
23:15
piece
58:7 59:5
place
62:14
placed
62:15
plainly
11:1
plaintiff
1:19 2:6 42:21
plaintiffs
12:12 13:7
  35:25 37:20
  38:7
please
4:5,6 10:9
  16:25 30:14
  42:19 61:13
PO
2:12
point
4:24
poorly
19:13 20:11
  21:2,17
portion
19:8 30:17
Posed
4:14
position
31:8
possession
41:9,11
possessions
47:8
possibly
12:17 21:6 22:7
preliminary
47:4
prepared
34:13
PRESENT
2:15
Preston
1:23,23

Georgia Gay Whittington-Hopkins                                              April 12, 2017

pretty
28:2 30:19
   43:20 49:12
prevent
51:21
previously
13:11 21:1
   42:10 48:4
   49:5 53:5,15
prior
16:21 29:1
   34:17 53:9
privilege
26:2,3 28:18
   29:16
privileged
25:13 27:17
   29:25
privileges
27:14
probably
14:11 17:18,19
problem
12:18,19 35:9
problems
18:17 55:18
Procedure
1:25
proceeding
62:23
Proceedings
61:22
produce
41:5
produced
1:18 60:10
producing
40:18
professional
31:24 41:20
program
31:5,17 44:10
   44:17,19 45:4
   50:7,24 52:12
promised
29:2
proof
50:4
Proposed
3:12 56:18
prospective
44:19,22 45:14
   45:19 48:3
protected
26:2
protocol
44:22 45:5
   50:25
provide
4:21 44:19 49:1
providing
33:7
provision
53:14

Puerto
47:7
pump
8:22,25 9:6,17
pumps
9:3
purchase
6:17 8:5
purchased
6:23,25 18:7
   47:5
purposes
47:2,12,16
pursuant
1:25 9:21 45:4
   50:6,10,23
   52:11 62:16
put
11:13 58:11,14
   58:14

─────────────
        Q
─────────────
question
5:1,1 13:19
   16:24 18:17
   18:25 19:2,5
   19:6,20,21,25
   20:14 21:14
   25:17 26:2,7
   26:12 27:25
   28:3,8,12,24
   29:19 30:8,13
   30:15 34:5
question-by-...
28:8
questions
4:18 19:23
   20:20,21 27:8
   39:1,2 58:5
   60:16,17 61:3
   61:5

─────────────
        R
─────────────
R
2:1
read
5:24,25 6:2,5
   12:8,9 13:12
   14:12 15:12
   16:15 17:3,5
   17:11,14 19:8
   19:22 21:12
   22:3 30:17
   34:25 36:4,6
   36:7,11 44:13
   44:14 45:10
   45:21 47:1
   48:4 50:1
   52:9 53:12
   57:3,7,22
reading
39:4 43:24
really
11:2 24:12 42:1
   56:2 59:4

reason
5:5 15:25 41:3
reasons
20:4,5 62:19
recall
9:25 10:3,14,15
   10:19 14:13
   17:22 23:13
   23:16 26:13
   37:11 42:25
   43:23
receipt
62:18
receive
34:21,22 36:16
   41:20 51:20
received
10:19 21:18
   38:15 41:23
record
4:6 29:24 39:3
   44:14 46:20
   47:15 50:1
   58:12,20 61:7
   61:9 62:15
Reed
2:8 48:21
refer
18:16 22:21,25
   23:2 40:12
   44:2
refers
40:12
refrain
18:22
regarding
14:14 20:21
   23:10,15,18
   24:2 27:8
   40:1
regular
8:13 9:19,20
reimbursed
53:9,18
reject
57:9,13
rejects
57:16
related
10:15 25:17
   62:22
relates
12:24 40:12
relating
10:19 12:9,16
   25:1 36:17
   40:19,23 41:9
relationship
25:23 27:9
remain
50:5
remember
6:22,25 34:14
   36:9
rep

41:25
repair
39:25
repairs
8:16 40:1
repeat
16:25 19:6 20:2
   30:14,15
repeatedly
19:2
replace
33:18
replaced
9:16 50:15
   53:16
replacement
33:9 44:10,17
   44:18,20 45:4
   49:18 50:7,10
   50:24 51:20
   52:12 53:6
replacements
49:1
reported
62:14
reporter
1:22 8:25 19:7
   58:19 61:6,7
   61:9,14,16,20
   62:11
Reporter's
3:3 62:8
Reporting
63:6
representative
39:24 41:21
represented
14:11
request
39:14,22 40:11
   50:2,16
requested
19:8 30:17
   39:17 62:17
   62:20
required
50:5
requirements
57:21
research
31:11,18
respect
8:12
respectfully
57:8
responsibili...
31:10
responsible
29:13 55:16
   56:4
responsive
40:4,15
restate
42:19

result
52:19
retained
26:16 27:16
retention
26:19
retire
32:6,9
retired
32:5,11
returned
62:18,19
reveals
33:5
review
25:5
reviewed
25:7 37:13
reviewing
37:11
Rico
47:7
right
7:15 9:14 10:22
   13:9,12 16:9
   18:21 20:20
   22:1,16 33:14
   38:9,20,20
   42:7 47:22
   49:6,13,15,19
   51:24,25
   52:22 56:18
   56:20 57:14
   57:18 60:11
   60:12
road
1:23 33:13
   51:10,16
room
9:10
Rule
62:16
Rules
1:25
rust
10:16,21,25
   11:20 12:14
   12:16,17,20
   12:22,24 13:2
   13:8 22:6
   33:5,13 40:1
   40:5 44:21
   51:19,21 53:7
   53:16
rusted
13:4 33:8,13
RV
8:1,3

─────────────
        S
─────────────
S
2:1
sake
50:20

sale
47:6
sales
1:6 41:21,25
  62:6
salt
51:10,16
Salvage
45:7
San
63:7
satisfies
53:7
saw
34:17,19 41:6
saying
10:5 26:25
says
10:8 39:11 40:6
  44:10 46:4
  47:2,12 50:1
  50:17 52:10
  52:15
scanning
43:25,25
Schork
2:3 3:5 4:4 9:9
  9:13,18 16:18
  16:22,23
  18:21 19:5,6
  19:10,25
  20:18,24
  24:16,19
  25:16,21,24
  26:4,7,12,15
  27:10,16,23
  28:7,12,19,21
  29:18,21,24
  30:2,15,21
  33:17 36:21
  36:24 37:2
  38:17 41:13
  41:17 42:20
  43:5 55:12,20
  55:25 56:14
  56:17 57:25
  58:2 59:15,16
  59:18 60:3,6
  60:9,16,18,22
  61:1,3,18,21
search
40:22,24
second
3:9 22:14 37:3
  37:4,10 39:22
  44:15 52:13
  52:21 56:22
  56:24
see
34:12,19 37:21
  46:24 48:18
  48:22,23
  50:12 53:10
  53:11 54:1
seeking

35:6,7
seen
34:9 37:7 43:5
  56:20
September
7:1
Sequoia
47:19
serve
41:24
served
39:7
serves
52:17 53:15
service
9:22 10:2 39:25
services
41:21,24
settlement
3:11,13 5:24
  6:3,5,7 12:2
  12:8 13:12,15
  14:14,20,23
  15:6,14,24
  16:9,12,19
  17:2,3,5,11
  17:14,24,25
  18:13,18
  19:12,16,18
  20:7,10,25
  21:13,16,20
  22:3,4,11,15
  22:16,19
  23:19 25:7
  30:23 32:19
  32:21 33:2
  34:9 35:5,11
  35:18 36:2,4
  38:8 43:13
  45:13 46:15
  47:2,12,17
  48:19 50:10
  50:14 51:16
  51:17 53:17
  54:13,16 55:7
  56:18 57:9,14
  57:16
seven
50:7
severely
33:13
shape
7:14
shop
39:25
short
41:14 52:9
  57:25
Shorthand
62:11
shoya@yahoo.com
2:13
side
10:12
sign

34:20 58:8,13
  58:17 59:14
signature
3:14 58:24
  59:19,25
  62:17,19
signatures
48:24
signed
27:3,4,5 48:19
  59:9
significant
49:18 50:18
significantly
33:8
signing
59:4
simple
20:21 28:2
simply
28:9
situation
24:22
six
32:12,13
Smith
2:8 48:22
smog
9:15
sold
35:20
somebody
22:23 50:14
  52:17
somewhat
39:2
sorry
4:12 9:9 21:10
  23:25 24:14
  36:19 49:12
sort
9:8
speak
9:11 17:15 23:6
  23:9,14,23
  24:1
speakerphone
60:23
speaking
18:22
specialized
31:1,20
spell
4:6
spoke
15:13 17:8
  22:14 23:5,18
  38:6
spoken
15:23 16:1
Spurgeon
1:21 62:11 63:4
standard
44:21 53:8

start
10:1 20:23 28:5
starting
25:13
starts
57:7
state
1:22,24 4:6
  21:15 25:25
  41:24 42:22
  51:2 62:12
stated
6:2 12:1 13:11
  20:15 21:1
  22:13
states
1:1 30:20 38:22
  39:14 44:16
  47:6,7 50:23
  51:7,9,9,12
  51:16 53:4
  62:1
stay
9:10
stenographic...
62:14
step
6:12
Street
2:4
Strike
13:2
styled
1:19
subject
44:20,25 45:6
  47:5,16 50:9
  50:25 51:17
  52:13 53:8
submit
53:5
subpoena
3:10 38:18,22
  39:8
suffering
12:24
suggest
16:11,18 17:20
suggested
17:1
suit
24:22
Suite
1:23 2:4 63:7
sure
11:13 13:9 15:2
  15:4 25:2
  34:1,2,6
  39:20 43:18
  43:19 50:19
  52:1,23 58:15
  60:1
SUV
7:20
switch

10:11,12
sworn
4:2

─────────

T
Tacomas
47:17
take
6:12 10:10
  11:12 26:10
  29:21,23 36:5
  41:14 52:12
  56:3 57:25
  58:19
taken
1:19 11:8 41:16
  58:1 62:23
talk
10:2 14:9,18
  17:17 23:20
  30:10
talked
14:6 15:13
  27:22 30:10
  49:8 57:14
talking
9:2,4,25 12:20
  14:24 15:1
  16:7 26:25
  27:1,2 38:9
telephone
2:14
Telephonically
42:6
tell
5:16 13:16,17
  20:1 26:24
  60:22
tends
26:2 28:17 30:9
terms
13:14 22:4
  50:10
territories
47:8
testified
4:2
Testify
38:18,24
testimony
5:6 16:21 41:8
  62:15
Texas
1:22,24 6:20
  41:24 62:12
  63:5
Thank
39:21 61:14,15
Thanks
61:21
therefor
62:20
thing
7:4 9:15 24:25

LITIVATE REPORTING + TRIAL SERVICES   |   877.771.3312   |   www.litivate.com

Georgia Gay Whittington-Hopkins

April 12, 2017

39:17 42:25
**things**
27:22 30:10
**think**
9:1,17 10:21
14:12 16:20
17:3,21,23,24
17:25 18:14
18:14,15,16
22:1 24:24
28:1,19 29:25
30:24 35:11
40:16 42:2,18
45:24,25
48:12 55:12
61:19
**thinking**
35:24
**thinks**
18:17
**third**
19:17
**thought**
17:10 20:16
21:1,16,17,20
33:25 38:7
**thousand**
7:10
**time**
4:20 7:3 15:13
17:22 22:14
22:14 26:6
36:6 47:3
61:10 62:14
**timeline**
17:12
**times**
36:7,8,11
**tires**
8:20 9:19 11:13
**title**
3:15 8:7 39:18
41:7 60:10
**titled**
37:3,10
**titles**
45:8
**today**
4:17 5:6,8 12:4
20:5 34:3
40:19 52:3,6
52:25 53:24
58:19 60:11
**today's**
4:25
**told**
11:18 16:7 31:9
55:5
**tomorrow**
61:19
**top**
39:11 48:12
49:24
**totaled**
7:4

**totally**
18:24 20:20
25:21
**tow**
8:1
**Toyota**
1:6 6:13,15,24
8:8 9:24 10:7
11:11,18,24
12:24 13:8
14:5 15:24
16:2 18:5,6
19:14 20:11
21:3,5 25:1
29:11 32:22
33:3,8 35:17
36:17 39:18
39:24 40:2,13
44:16 45:5
47:17,18 48:8
48:9,20,22,25
48:25 50:3,5
50:15 51:1
52:10,13,18
52:19 62:6
**Toyotas**
35:20
**trade**
7:4
**training**
31:1,21
**transcript**
39:4 62:15,19
**truck**
36:18,22,23
**trucks**
22:6
**true**
16:10 18:11
51:11 62:15
**trying**
20:5 27:12,20
39:3
**Tundra**
6:16 7:2 8:8,12
10:9 12:24
45:17 47:22
**Tundras**
47:18
**Twenty-five**
31:4
**twice**
34:5
**two**
19:11 21:25

**U**

**Uh-huh**
14:2,21 20:8
46:25 49:14
51:8
**unaware**
52:2
**undercoating**
22:8

**undergoing**
50:9
**underside**
11:8,12,20
**understand**
4:21 5:8,17,20
12:1 13:7
20:6 32:21
33:2 40:8
41:4,17 45:12
45:22 46:18
47:16,19,25
48:5 49:2,5
50:13 51:15
51:22 52:16
53:14 54:4,11
58:2
**understanding**
5:12 12:15,23
13:1,3,14
22:4,10 24:10
24:20 26:16
29:10,12
32:18 35:18
35:23 54:5
57:17
**understands**
39:4
**unfair**
21:1,16 30:25
**unintentionally**
34:4
**United**
1:1 30:20 47:7
62:1
**unlimited**
9:23 10:5
**unsafe**
33:12
**USA**
1:6 40:13 62:6
**use**
18:23 44:25
45:2 51:10,16
58:25

**V**

**v**
40:13
**valuable**
45:24,25
**vehicle**
6:13,23 7:3,6,8
7:14 8:1,13
8:17 9:21
10:16,18
12:18 18:7,10
19:15 20:13
21:4,19 32:23
33:18 39:18
39:24 40:2
44:25 45:1,6
45:18 46:3
47:22 48:9
50:3,4,15

51:2,17,18
52:13 53:16
53:17
**vehicle's**
33:5 50:25
51:22
**vehicles**
7:17,19,23
12:24 13:8
32:22 33:3,8
33:9,13,22
35:9 44:20
45:7,7 47:5
47:16,19 50:9
52:5 53:8
54:12 55:17
**verify**
59:19
**versus**
35:16
**visible**
11:1
**voluminous**
43:20
**voluntarily**
10:8
**VS**
1:5 62:5

**W**

**W-h-i-t-t-i-...**
4:8
**Wait**
16:16
**want**
17:12 19:11
20:2 34:6
37:15 39:19
40:8 46:11,12
46:15 55:16
56:4,6 57:4,5
58:11,11,24
59:2
**wanted**
34:2
**Warner**
1:4 12:3 37:23
40:13 62:4
**wasn't**
21:6 34:1
**water**
8:22,25 9:6
**way**
35:8 45:21
**we'll**
10:10
**we're**
10:8 12:3 19:10
19:21 20:4,5
20:21,22
21:14 34:2
38:11,20,21
59:18,19 61:9
**we've**
27:13,14 41:13

**weaken**
22:7
**weigh**
59:11
**weird**
59:4
**weren't**
18:9
**West**
63:6
**Whittington**
4:8
**WHITTINGTON-...**
1:10,18 3:4 4:1
62:9,14
**widowed**
23:24
**withdraw**
56:6
**witness**
1:18 9:1,4,6
26:5,11 27:18
28:1 29:19
36:23 37:2
41:15 59:12
59:20,23 60:2
60:19 62:14
62:15
**witness's**
29:22
**word**
46:24
**words**
5:22
**work**
32:15
**worked**
32:1 42:10,12
**Working**
31:14
**wouldn't**
5:5 55:16
**write**
17:6 35:8 58:8
58:25
**written**
13:23 18:2,3,4
19:13 20:11
21:2,17 27:2
28:9 40:11,13
40:19 41:5,9
46:17,21
50:12

**X**

**x**
58:14 59:21
62:20

**Y**

**yeah**
18:25 26:1 27:5
32:13 33:22
44:7 51:15

LITIVATE REPORTING + TRIAL SERVICES   |   877.771.3312   |   www.litivate.com

Georgia Gay Whittington-Hopkins                                    April 12, 2017

59:15,18
**year**
6:6 7:21 45:2
 47:17
**years**
31:4 32:2,12,13
 42:12 44:24
 45:2
**York**
2:9,9

---
**Z**
---

---
**0**
---
**07**
47:18,21,21
**08**
47:18

---
**1**
---
**1**
3:9 36:25 37:1
 53:3
**1.4**
54:12
**1.5**
54:12
**10**
44:1,2,3
**10:19**
41:16
**10:29**
41:16
**10:52**
58:1
**10:55**
58:1
**1000**
63:7
**10022**
2:9
**11**
49:22,23,24
 50:22
**11:00**
61:10
**11:05**
1:21 61:22
**12**
1:10 44:24 45:2
 62:9
**12/31/10**
32:10
**12/31/17**
63:5
**12th**
1:20
**13th**
63:1
**14**
49:24
**15**
26:8,14
**1718**

63:5
17743
2:12

---
**2**
---
**2**
3:2,10 38:13,14
 49:25 56:24
 56:24
**2.5**
54:16,25 55:7
**2:15-CV-02171**
62:5
**2:15-CV-0217...**
1:5
**200,000**
7:12
**2000**
8:6
**2005**
47:17
**2007**
6:16 7:1 8:7,12
 18:7 45:17,18
**2010**
47:18
**2011**
8:6
**2013**
7:22
**2017**
1:10,20 17:7
 34:16 62:9
 63:1
**2019**
45:20
**23rd**
34:15
**25**
32:2

---
**3**
---
**3**
3:11 43:3,4
 50:22
**3-**
8:21
**3/24/17**
57:12
**30**
62:18
**30(f)(1)**
62:17
**300**
1:23
**37**
3:9
**38**
3:10

---
**4**
---
**4**
3:5,12 52:8
 56:15,16

400
8:21
43
3:11
46
48:17
4600
2:4
48
48:15
49
48:13,15

---
**5**
---
**5**
3:14 46:23 60:4
 60:5
**50**
47:6 48:15
**501**
63:6
**56**
3:12
**599**
2:8

---
**6**
---
**6**
3:15 60:7,8
**60**
3:14,15
**60602**
2:5
**619.233.2030**
63:8
**62**
3:3

---
**7**
---
**7**
56:25

---
**8**
---
**8117**
1:23
**82101**
63:7

---
**9**
---
**9:32**
1:20
**92817**
2:13

Page 9