

Transcript of the Testimony of:

# Cemil Hope

Warner

v.

Toyota Motor Sales, USA, Inc.

April 12, 2017

Volume I

P: 877.771.3312 | F: 877.561.5538 | litivate.com

Cemil Hope                                                    April 12, 2017

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3                        - - -

 4   BRIAN WARNER, et al.,            )
                                      )
 5                    Plaintiffs,     )
                                      )
 6        vs.                         )  No. 2:15-cv-02171-
                                      )      FMO-(FFMx)
 7   TOYOTA MOTOR SALES, U.S.A., Inc., )
                                      )
 8                    Defendants.     )
     ----------------------------------

 9

10

11

12

13              DEPOSITION OF CEMIL HOPE

14                 NOVATO, CALIFORNIA

15                  APRIL 12, 2017

16

17

18

19

20

21

22   REPORTED BY:  MICHELLE D. BARBANTE, CSR
                   Certified Shorthand Reporter
23                 License No. 12601

24

25
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                          April 12, 2017

```
 1                   A P P E A R A N C E S:

 2

 3    FOR THE PLAINTIFFS:

 4              THOMAS J. O'REARDON II, ESQ.
                BLOOD HURST & O'REARDON LLP
 5              701 B STREET, SUITE 1700
                SAN DIEGO, CALIFORNIA 92101
 6              619.338.1100
                619.338.1101 FAX
 7              TOREARDON@BHOLAW.COM

 8

 9    FOR THE DEFENDANT:

10              DAVID O. CHANG, ESQ.
                REED SMITH LLP
11              101 SECOND STREET, SUITE 1800
                SAN FRANCISCO, CALIFORNIA 94105
12              415.659.5995
                415.391.8269 FAX
13              DCHANG@REEDSMITH.COM

14

15    FOR THE OBJECTOR CEMIL HOPE:

16              BRADLEY D. SALTER, ESQ.
                SALTER LAW
17              (PRESENT BY TELEPHONE)
                24 MALIALANI PLACE
18              LAHAINA, HAWAII 96761
                808.298.7873
19              808.669.0800 FAX
                BRAD@SALTERLAW.COM

20

21

22

23

24

25
```

Page 2

Cemil Hope                                                                    April 12, 2017

```
  1                         I N D E X

  2                 INDEX OF EXAMINATIONS

  3

  4   Examination by Mr. O'Reardon  ..................4, 96

  5   Examination by Mr. Chang  ........................77

  6   Examination by Mr. Salter ........................95

  7

  8

  9              EXHIBITS MARKED FOR IDENTIFICATION

 10   No.                 Description                 Page

 11   Exhibit 1      Document entitled Warner v.  ..........6
                     Toyota Motor Sales, U.S.A., Inc.
 12                  Case No. 2:15-cv-02171-FMO-
                     (FFMx)(C.D. Cal.)
 13
      Exhibit 2      Subpoena to Testify at a ...........30
 14                  Deposition in a Civil Trial

 15   Exhibit 3      Class Action Settlement ............35

 16   Exhibit 4      Representation agreement ...........50
                     between Cemil Hope and Bradley D.
 17                  Salter, Esq.

 18   Exhibit 5      Objection ..........................60

 19

 20            (Exhibits attached to the transcript.)

 21

 22

 23

 24

 25
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

```
 1          NOVATO, CALIFORNIA; WEDNESDAY, APRIL 12, 2017;

 2                          8:59 A.M.

 3

 4                         CEMIL HOPE,

 5               having first been duly sworn, was

 6               examined and testified as follows:

 7

 8                        EXAMINATION

 9   BY MR. O'REARDON:

10        Q.   Good morning, Mr. Hope.  We met briefly off

11   the record.  My name is Tommy O'Reardon.  I represent

12   the plaintiffs in a class in two lawsuits against

13   Toyota.  One's in California, and one's in Arkansas.

14             Mr. Salter is appearing by phone today from

15   his home or his office in Hawaii.  Also present is

16   counsel for Toyota, David Chang, correct?

17             MR. CHANG:  Yes.

18   BY MR. O'REARDON:

19        Q.   You might be familiar with these rules.  Your

20   attorney might have gone through them with you, but I'll

21   just go through them real quick.

22             You understand you're giving testimony under

23   oath here, today?

24        A.   Mm-hm.  Yes.

25        Q.   And you understand you are to testify
```

Cemil Hope                                            April 12, 2017

1   truthfully and to the best of your ability?

2        A.   Yes.

3        Q.   Is there any reason, medical or otherwise,

4   that you can't give your best testimony?

5        A.   Nope.

6        Q.   Have you had your deposition taken before?

7        A.   No.

8        Q.   The court reporter is going to be transcribing

9   my questions and your answers.  She has a very difficult

10  job, so one of the ways we can help make it easier for

11  her is to try not to talk over one another.  Fair

12  enough?

13       A.   Sure.

14       Q.   You'll be anticipating the end of my questions

15  before I finish them, I guarantee you that.  Just give

16  me the opportunity to finish my question, and I'll give

17  you the opportunity to finish your answer, but let's try

18  not to talk over one another.

19       A.   Sure.

20       Q.   It's also important, because she's

21  transcribing everything we say, that you answer audibly

22  if the question calls for a "yes" or "no."  Rather than

23  a head nod, if you can say "yes" or "no," please.

24       A.   Yes.

25       Q.   If at any point you want to take a break, by

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                April 12, 2017

1    all means, let's do that.

2         A.   Sure.

3         Q.   At the very least, we'll take a break about

4    once an hour.  The one exception is, if a question is

5    pending, just go ahead and answer that question, and

6    then we can take a break afterwards, fair enough?

7         A.   Yes.

8         Q.   At times your attorney will be making various

9    objections.  Unless he specifically instructs you not to

10   answer, he's just making them for the record, and you

11   can go ahead and answer after he's done making his

12   objections.  Fair enough?

13        A.   Yes.

14        Q.   Please state and spell your full name for the

15   record?

16        A.   Cemil Sume Hope, C-e-m-i-l.  Middle name Sume,

17   S-u-m-e.  Last name Hope, H-u -- H-o-p-e.

18        Q.   And the first thing I'm going to have you do

19   is, I've got a preprinted form here with First Name,

20   Last Name, Address, City, State, ZIP, Dated and

21   Signature.  I'll just have you fill it out, and we'll

22   mark this as Exhibit 1 to the deposition.

23             (Exhibit 1 was marked for identification.)

24   BY MR. O'REARDON:

25        Q.   Great.  Thank you.

Cemil Hope                                                                  April 12, 2017

```
 1              Mr. Hope, have you gone, ever, by any other
 2    name?
 3        A.   Not first name, no.
 4        Q.   Are you married?
 5        A.   I am.
 6        Q.   Okay.  What's your wife -- wife's name?
 7        A.   Jennifer.
 8        Q.   Who is your current employer?
 9        A.   I'm self-employed.
10        Q.   Okay.  What's the name of your business?
11        A.   Hopebuilt.
12        Q.   Is that one or two words?
13        A.   One word.
14        Q.   And what does Hopebuilt do?
15        A.   We manufacture casework and cabinetry.
16    Millwork.
17        Q.   Are you the sole owner of that business?
18        A.   Well, no.  I was, but we just incorporated,
19    and now I'm the president, so I guess technically I'm
20    not self-employed anymore.  I have to remember that.
21    It's just recent, so --
22        Q.   Are there any co-owners of Hopebuilt?
23        A.   Yes.
24        Q.   Okay.  Who else is an owner?
25        A.   Mark Morrison.
```

Cemil Hope                                                                April 12, 2017

1          Q.    Anyone else?

2          A.    Um...

3          Q.    Other than yourself?

4          A.    No.

5          Q.    What is your office address?

6          A.    429 1st Street, Petaluma, California 94952.

7          Q.    Do you own any other businesses other than

8    Hopebuilt?

9          A.    No.

10         Q.    For how long have you had Hopebuilt,

11   approximately?

12         A.    Well, in its current form, as a corporation,

13   it's been three months.

14         Q.    And then prior to that, before it was

15   incorporated, when you were still the owner of it before

16   it was incorporated?

17         A.    Well, it was Hope Builders & Cabinetry prior,

18   and that was for about 15 years.

19         Q.    And what is your approximate annual salary?

20         A.    Approximate would be between 80- and 100,000.

21         Q.    Do you own a Toyota vehicle?

22         A.    I do.

23         Q.    What Toyota vehicle do you own?

24         A.    2009 Toyota Tacoma.

25         Q.    Do you own any other Toyota vehicles?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                    April 12, 2017

```
 1        A.    Not currently.

 2        Q.    Is it your name listed on the title?

 3        A.    True.

 4        Q.    Is your wife also listed on the title?

 5        A.    I don't believe so.

 6        Q.    When did you buy your 2009 Toyota Tacoma?

 7        A.    We bought it in 2012 I believe.

 8        Q.    Where did you buy it from?

 9        A.    Toyota Marin.

10        Q.    Do you remember approximately what you paid

11   for the 2009 Tacoma that you own?

12        A.    About 22,000, before tax and license and all

13   that.

14        Q.    Other than the 2009 Tacoma that you currently

15   own, have you ever owned, pardon me, any other Toyota

16   vehicles?

17        A.    Yes.

18        Q.    What other Toyotas have you owned?

19        A.    I think that would be a long list.  I've had

20   probably at least half a dozen prior.

21        Q.    What models?

22        A.    Mostly Tacoma.  Or I would say trucks.  I

23   don't know.  They weren't always called Tacomas, but

24   yeah, either, you know, a pickup or Tacoma and -- I'm

25   just trying to think of -- yeah, for a short period, a
```

Cemil Hope                                                    April 12, 2017

1    Prius.  Yeah, I think that's pretty much it.  We had a
2    Scion, but technically maybe not a Toyota.
3         Q.   Did any of those other Toyota vehicles, are
4    you sure that any of them were Tacomas?
5         A.   Yeah, two of them.
6         Q.   Okay.  Do you know what year they were?
7         A.   I think the first one would have been a --
8    probably a -- a 2000, like, either a '99 or 2000, just a
9    king cab.  And the second one would have been a 2001, I
10   believe, crew cab, a four-door.  The first year it came
11   out.
12        Q.   How old were you when you got your first
13   Toyota, approximately?
14        A.   Twenty-four.
15        Q.   Okay.  How old are you now?
16        A.   Forty-six.
17        Q.   Back to your 2009 -- strike that.
18             Have you owned a Toyota Tundra?
19        A.   Nope.
20        Q.   Toyota Sequoia.  Have you owned a Toyota
21   Sequoia?
22        A.   No.
23        Q.   Back to your 2009 Tacoma.  Approximately how
24   many miles were on it when you purchased it?
25        A.   Almost 100,000.

Cemil Hope                                                    April 12, 2017

1       Q.    Approximately how many miles are on your
2    2009 Tacoma today?
3       A.    I believe it's 140,000.
4       Q.    Is it your practice to bring it in for
5    scheduled maintenance?
6       A.    Not scheduled, per se, but I would say
7    routine.
8       Q.    Since the time you've owned the 2009 Tacoma,
9    you brought it in approximately 2012, how many times
10   have you brought it in for maintenance would you say?
11      A.    I honestly couldn't tell you.
12      Q.    Have you brought it in at all for maintenance?
13      A.    Yeah.  Yeah.  I would -- that I remember,
14   twice.
15      Q.    Was that particular issues that caused you to
16   bring it in or was it just routine scheduled
17   maintenance?
18      A.    Yeah, one was -- I know that one was
19   scheduled, and the other was -- was a recall of the, I
20   believe the leaf spring recall, and, you know, they gave
21   it a -- an inspection as well at the time.  That was
22   more recent.
23      Q.    Did the fix for that -- strike that.
24            What -- what Toyota did with respect to that
25   recall for the leaf spring you believe, do you believe

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                        April 12, 2017

1   that fixed whatever the issue was?

2       A.   In theory, so they said, so I trusted that.

3       Q.   You don't have any reason to disbelieve them,

4   right?

5       A.   No.  Not in that case, no.

6       Q.   Who typically changes the oil on your car; do

7   you do it yourself or do you take it somewhere?

8       A.   I usually take it to a Chevron.  I don't know

9   if it's called Oil Changers or -- you know, basically a

10  drive-through oil change.

11      Q.   So you don't bring it in to the Toyota dealer

12  to change the oil?

13      A.   Not for an oil change, no.

14      Q.   You've owned about six Toyotas.  Fair to say

15  that you like Toyota in general?

16      A.   Yes.

17      Q.   You've been happy with your other Toyotas and

18  that's why you continue to buy Toyota, I assume?

19      A.   Extremely, yes.

20      Q.   So why did you buy -- other than just being

21  happy with Toyota in general, why did you buy the

22  2009 Tacoma?

23      A.   Well, in that moment, we actually went to the

24  dealership to buy a different car, and that car had just

25  come on the lot.  It was a trade-in, I believe, and it

Cemil Hope                                                    April 12, 2017

 1   was -- it looked like a nice truck for a decent price,
 2   so in that moment, I -- you know, I didn't go with the
 3   intention to buy it, but was happy I did.
 4       Q.   Were you planning to buy another Tacoma?
 5       A.   Not that day, no.
 6       Q.   Did you have an intention on buying a
 7   particular model when you went to the dealer that day?
 8       A.   We were looking at used vehicles, and in
 9   particular we had gone that day, I forget what the make
10   or model was, but to look at a different car, not even a
11   Toyota.  I don't think.
12       Q.   What do you believe your role is in this case?
13       A.   I believe for me the -- the general word is
14   fairness, a fair settlement, and yeah, that -- that's
15   -- that basically sums it up.
16       Q.   What do you mean by a fair settlement?
17       A.   I -- this settlement, the way it's structured,
18   seems very broad and very vague.  And I have the
19   intention of selling my truck at some point in the
20   not-too-distant future, I intended to prior to this, and
21   I -- it's very unclear to me that -- what -- how this
22   would in this case benefit me or help me in some -- in
23   -- in some way, and not hinder me in the sale of my
24   truck.  And yeah, so that's -- that's generally what I
25   mean by that.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                    April 12, 2017

1          Q.    Okay.   Anything else that you mean by a fair

2     settlement?

3          A.    Not in the moment, no.

4          Q.    Why do you intend to sell your Tacoma?

5          A.    Well, I -- it's not serving me in the way that

6     it has in the past.  I just -- it's -- it's too small,

7     basically too limiting.  I mean, I'd be looking at

8     something other than a truck, basically.

9          Q.    Any other reason other than it's too small

10    that you intend to sell your 2009 Tacoma?

11         A.    And I'm looking -- I'd be looking for

12    something that's more fuel efficient.

13         Q.    Any other reason why you intend to sell your

14    Tacoma?

15         A.    Nope.  Or no.

16         Q.    Nope works.

17               When did you decide you wanted to sell your

18    Tacoma?

19         A.    I think probably started thinking about it

20    last year around September.  September/October.

21         Q.    September or October of 2016?

22         A.    Correct.

23         Q.    And was there an event that triggered this

24    thought that you might sell your Tacoma?

25         A.    Purchasing another vehicle for my wife.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                    April 12, 2017

1          MR. O'REARDON:  Let's go off the record.

2          (Recess taken.)

3          THE WITNESS:  So I think I was --

4    BY MR. O'REARDON:

5          Q.  So I was -- sorry.  So what I was asking you,

6    if there was something in September or October of 2016

7    that caused you to think you might sell your Tacoma?

8          A.  Yeah, we purchased the second Mercedes

9    Sprinter that we -- I have another one that I've had for

10   about ten years, and we purchased a second one for the

11   family, and it's -- yeah, it's just very spacious and

12   appropriate for the kind of work I do, so --

13         Q.  So you currently own, between you and your

14   wife, two Mercedes Sprinters and a Toyota Tacoma.  Any

15   other cars?

16         A.  Yes.  We have a Mazda3, 2014.

17         Q.  What year are the Sprinters?

18         A.  2006.  And technically it's a Dodge Sprinter,

19   because in that year, it was sold as a Dodge.

20         Q.  Oh.

21         A.  So it's a 2006, and then the other is a

22   2016 Mercedes.

23         Q.  So there are four cars between you and your

24   wife; is that right?

25         A.  Yeah.  Technically, the other Sprinter is for

Cemil Hope                                                          April 12, 2017

1    work, so it stays at the shop, so it's a work vehicle.

2    So we have three vehicles at home.

3         Q.   Is there a reason you haven't tried to sell

4    your Tacoma since you had in your mind that you wanted

5    to in September 2016 or so?

6         A.   Yeah, I just wasn't -- I'm not ready yet.  You

7    know, if I -- say when I get another vehicle, it will

8    probably be more towards the end of the year.

9         Q.   And you said it's unclear how this settlement

10   would help and not hinder you in selling your Toyota.

11   What do you mean by that?

12        A.   Well, I -- I guess when I first saw the

13   settlement, you know, the first thing that occurred to

14   me was, you know -- you know, if, for whatever reason,

15   it's deemed, you know, not worthy or -- of a, you know,

16   of a replacement or, you know, whatever the condition

17   is, I'm not sure.  But, you know, if that were the case,

18   and then I, you know, was to sell it or try to sell it

19   and this came up, you know, would that be a negative?

20             Would somebody say, "Well, you know, how do

21   you know it shouldn't have been replaced," or -- so it

22   just -- it felt very -- yeah, it just felt like, you

23   know, if that were the case that, you know, and this was

24   settled and maybe I wouldn't have any repercussion.

25   Maybe I couldn't -- what if I lost money on the sale?

Cemil Hope                                                          April 12, 2017

1    You know, so that -- you know, just those questions came

2    up.  And I wasn't, I guess, prepared to just sit with

3    that.  You know, accept that.

4         Q.   What do you think the odds are that you'll try

5    to sell your Tacoma within the next year?

6         A.   I would say they're very high.  I would say at

7    least 80 to 90 percent.

8         Q.   Do you know what the Kelley Blue Book value is

9    on your Tacoma right now?

10        A.   It varied depending on condition, but I've

11   only looked it up maybe once awhile back, and I think

12   it's somewhere in the range, depending on condition, 16

13   to even 20 plus.

14        Q.   If you listed it today, would you know what to

15   list it for?

16        A.   I wouldn't say exactly.  I mean, I would have

17   to -- it's been -- like I said, it's been awhile.  I

18   think I first looked at that or only looked at that once

19   maybe four or five months ago, and to be honest, I just

20   don't remember what the parameters were.  And so, I

21   mean, I would say, you know, probably minimum starting

22   would be 18, 19, something like that.

23        Q.   What do you believe the settlement provides?

24        A.   I'm sorry?

25        Q.   Do you know what the settlement provides for

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                        April 12, 2017

1   class members in this case?

2        A.   That wasn't clear.

3        Q.   Do you know anything that the settlement

4   provides for class members?

5        A.   I do.  Well, I mean, from what I read, there

6   was, I guess, recall or warranty replacement of frame

7   and inspection and replacement.  I wasn't aware of any

8   specific dollar amounts.

9        Q.   What do you mean by "specific dollar amounts"?

10       A.   That I saw in the settlement, it didn't seem

11  that there was a specific -- well, there wasn't -- it

12  wasn't clear to me that there was any -- I don't know

13  how to say it -- any, I guess, compensation for what all

14  of this might entail.

15            And again, like, if there was -- you know, if

16  I couldn't get the value of the vehicle, for whatever

17  reason, you know, it -- it just -- it was too -- it felt

18  too broad and too vague.  There wasn't enough, I guess,

19  specificity in terms of, you know, monetary value.  And

20  I'm not sure what that would be.

21       Q.   That was going to be my next question.  What

22  do you think the settlement should provide?

23       A.   Well, I -- I mean, that might be a per-case

24  basis, and that was part of the -- the feeling of this

25  wasn't fair in that it seemed too -- it was so

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                  April 12, 2017

1   specific -- well, it was specific to the replacement,

2   but there didn't seem to be, that I could tell, an

3   indication of some other value or otherwise.  I'm kind

4   of -- I'm not exactly sure how to phrase it, so the gist

5   of it is that I don't want to lose money, and it wasn't

6   clear to me that that wouldn't happen.

7       Q.   And by "lose money," you mean lose money on

8   the eventual of your Tacoma?

9       A.   Correct.

10      Q.   When you try to sell your Tacoma eventually?

11      A.   Correct.

12      Q.   And if you didn't lose any money on your

13  eventual sale of your Tacoma, would you have any

14  complaints about the settlement?

15      A.   Well, I mean, on a broader scale, it seemed

16  that the settlement was, I don't know, preemptive on

17  some level in that it didn't seem that it would allow --

18  like, if I didn't find this out when I did, it seemed

19  that if the settlement was accepted, that there may be

20  people that wouldn't have the same recourse if -- after

21  the settlement.

22      Q.   What do you mean by that?

23      A.   It seemed that it exclude -- well, that it was

24  very -- like, that it was very broad; that it -- that if

25  it indeed was settled, that -- that I guess just that,

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                     April 12, 2017

1   that it seemed that it would exempt people from having

2   any future recourse.

3        Q.   Recourse from what is what I don't understand.

4        A.   Well, the same kind of thing that I'm going to

5   possibly contend with, you know, that if they didn't

6   know that this was something that was happening, and

7   then they, at some point, went to, you know, sell their

8   vehicle or something, you know, similar, like what

9   -- what sort of recourse would they have?  You know, it

10  seemed that was making Toyota, you know, not liable for

11  that, in a sense, in the future.  And that, to me,

12  didn't seem fair on a broad level, not just for myself.

13       Q.   And so what you're talking about is -- is the

14  possibility that the -- the nature of the frame might

15  negatively impact the resale value; did I get that

16  right?

17       A.   For me specifically, yes.

18       Q.   Okay.

19       A.   And how it might affect others later.  I don't

20  know if it's just resale, but, yeah, I mean there could

21  be other -- other issues that I'm not aware of that

22  could negatively impact, you know, other people.

23       Q.   Do you have any rust on your Tacoma?

24       A.   I'm not aware of that, meaning I haven't seen

25  any.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                                April 12, 2017

1       Q.   Okay.   Nobody's told you you've got rust on

2   your Tacoma?

3       A.   No.

4       Q.   Do you intend to bring your Tacoma in to get

5   it inspected under the settlement?

6       A.   I do, yes.

7       Q.   Why are you going to do that?

8       A.   Well, so that I can find out if -- obviously

9   if it's -- if there's any current or expected issues

10  with it.

11      Q.   Do you know what particular portions of the

12  Toyota vehicles are subject to the rust that's at issue

13  in this case?

14      A.   From my understanding it's just -- it's the

15  entire frame.

16      Q.   Under what situations do you think class

17  members should be entitled to a replacement frame?

18      A.   I don't know.   That's, I think, too specific

19  for me to answer.

20      Q.   Do you think there should be a sizable hole in

21  the frame before they get an entirely new frame, or do

22  you have any thoughts on that?

23      A.   I haven't really thought about it.   I think,

24  you know, as a -- as a -- you know, as a builder, you

25  know, being in the profession that I'm in, I -- I don't

Cemil Hope                                                          April 12, 2017

1    necessarily look at things as -- like I don't see -- if

2    there's a problem with something -- I mean, obviously if

3    there's a gaping hole in a foundation or something, then

4    I -- that's obvious.  But I also look at conditions that

5    would -- that would create a problem, future problems,

6    and I try and build things that -- knowing what those

7    future problems could be or future issues.  So I think,

8    you know, from -- from my perspective, that there could

9    be an issue is enough to warrant concern.

10       Q.   And by "could be an issue," what do you mean?

11   A one percent chance?  A 90 percent chance?

12       A.   Well, I don't know if there's a percentage so

13   much as just that if the -- if the conditions are such

14   that an issue could arise, meaning if it was that the

15   frame wasn't protected properly, if it wasn't

16   manufactured properly, if it wasn't the proper steel or

17   the proper, whatever, then that could -- there's a

18   future potential for issue.

19           And I don't know what the percentage is, but,

20   you know, if it wasn't done correctly, there's a much

21   higher propensity for an issue later, and that's why I

22   was making the analogy to building.  Like if I build it

23   correctly in the beginning, the chances of something

24   happening are far less than if I built it incorrectly.

25       Q.   And when you, as a builder, built cabinets

Cemil Hope                                              April 12, 2017

 1    let's say, you don't warrant them forever, do you?
 2         A.   No.
 3         Q.   Are you a -- you're not a metallurgist, are
 4    you?
 5         A.   No.  I've worked with metal, and I know some
 6    of the properties of metal, but I'm not by any means an
 7    metallurgist.
 8         Q.   Or expert in metallurgy?
 9         A.   No.
10         Q.   Are there any things about the settlement that
11    you do like?
12         A.   It's sometimes difficult to cut through all
13    the legalese to find the specifics of what is -- what I
14    dislike or like.  I wasn't necessarily reading it or
15    looking at it to find out what I -- what I disliked,
16    but, you know, I guess the -- the dislikes became -- or
17    were -- became more evident than the likes.  I -- so off
18    the top of my head, I can't -- I can't really say what I
19    -- what I liked about it.  I do like that it was being
20    brought to light.
21         Q.   That the -- that the issue was being brought
22    to light?
23         A.   Correct.
24         Q.   You'd agree providing for inspections is a
25    good thing, right?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                            April 12, 2017

1           A.    I agree that is good thing, yes.

2           Q.    And providing replacement frames, if there's

3      an issue with holes in the frame, that's a good thing,

4      right?

5           A.    Yes, it's a good thing to replace the frames.

6      I -- I think one of the things I take issue with on some

7      level around frame replacement is, you know, same thing

8      I would say, again, if I made analogy to building, it's

9      taking apart something I built to replace the innards

10     and then putting it back together.  To me it's -- it's

11     not -- it's different than building it in the beginning

12     from the ground up.  You -- just not everything goes

13     back together the same always.

14              So, you know, the frame replacement, while

15     it's a good thing, I -- I don't know personally if I

16     would feel at ease with the frame replacement if I were

17     going to keep the vehicle.  It just -- yeah, it's just

18     on a very practical level, you know.  And again, I don't

19     -- I don't know vehicles the same way I know building,

20     but it's just not an ideal way to approach something is

21     to have to take it all apart and then replace one part

22     and put it all back together, so --

23          Q.    Under the settlement, do you know if they're

24     replacing just the rusted part or if they're replacing

25     the entire frame?

Cemil Hope                                                April 12, 2017

1      A.   That wasn't clear to me, or at least I -- I

2   didn't deduce that after reading it.

3      Q.   If the entire frame was being replaced under

4   the settlement, would that change your opinion?  I

5   assume so, but maybe to what degree?

6      A.   Yeah.  I mean, I -- I think that that would be

7   the right thing to do would be to, yeah, not just piece

8   it together, but, yeah, to replace the entire frame.

9      Q.   When you bought your 2009 Tacoma, did you

10  check out the undercarriage for rust?

11     A.   I didn't.

12     Q.   So in your mind, what are ways that the

13  settlement should be improved?

14     A.   Well, I mean, on -- I don't know if I can

15  specifically say what I would do to improve it, but I

16  know that the objection that Mr. Salter prepared

17  was indicative of I think those things that needed

18  attention within the settlement, and maybe by bringing

19  those things to light, it would, by default, improve the

20  settlement.

21     Q.   What do you mean by "those things"?

22     A.   The objections.

23     Q.   But what -- what in the objections?

24     A.   Well, I think the -- the first objection was

25  relating to what I had stated prior in terms of the

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                April 12, 2017

```
 1   -- the -- maybe the possible inability for people to
 2   bring -- to -- to hold Toyota responsible in the future,
 3   that this was, again, very broad, and I think exempt
 4   them, in my opinion, very broadly, and so that was
 5   -- that's one piece.
 6           And the other objection was the seemingly
 7   disproportionate fees that would be accepted by those in
 8   this case.  That did not seem proportionate to, in the
 9   moment, what damages were incurred by Toyota.  So, you
10   know, I'm all for people getting paid their fair value
11   and what something is worth, but it -- it just seemed
12   disproportionate.
13      Q.    Anything else?
14      A.    Yeah.  Again, the -- no.  At least not that I
15   can think of in the moment.
16      Q.    The first one was, in your mind, the inability
17   of class members to hold Toyota responsible in the
18   future, and by that, again, you mean for rust issues?
19      A.    Correct.
20      Q.    -- right?
21           How far in the future should, in your mind,
22   class members have the right to hold Toyota responsible?
23      A.    Well --
24      Q.    I mean, it's a 30-year-old car.  I assume you
25   don't think --
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                              April 12, 2017

1       A.    Yeah.

2       Q.    -- that that's a gripe?

3       A.    No.  I mean, you know, mine is I'd say less

4  than ten years old, so, you know, as a builder, you

5  know, I -- I'm responsible for -- for my product for

6  minimum ten years.  I mean, I think I take greater

7  personal responsibility and -- and -- you know, with my

8  products, but that's a statute of limitation as far as,

9  you know, something on a personal level.

10            But, yeah, I think -- I don't know what that

11  time frame would be, but it seems that, from what I can

12  understand, again, not understanding all the legalese,

13  but it seems as though, if one doesn't opt out of the

14  settlement, that they are, on some level, opting in.

15  And to not know about the settlement and not to be able

16  to opt out for a future issue seems -- again, seems to

17  be -- again, I guess too broad.

18            Like I would -- it would just be really, you

19  know, a huge bummer if I were to have found out about

20  this later, and, by default, was included in this and

21  -- and then had issues or, again, loss of, you know, the

22  ability to settle for the value, blah, blah, blah.

23  Like, granted, "blah, blah, blah" wasn't maybe

24  appropriate terminology, but, you know, there's lots of

25  obviously things that could -- could happen.

Cemil Hope                                                   April 12, 2017

1            And it was, you know, kind of a bit disturbing

2     to see that that was -- from my understanding -- that

3     people wouldn't have future recourse, you know, for a

4     legitimate issue.

5            Q.   So your Tacoma is eight years old, right?

6     Around eight years old?

7            A.   Yeah, I guess seven to eight, yeah.

8            Q.   And so you -- you think people should have at

9     least eight years in order to hold Toyota responsible

10    for the frame, right?

11           A.   I don't know if eight years --

12                MR. SALTER:  Objection.  I don't think

13    that's -- I didn't hear that in his response.

14                MR. O'REARDON:  It was a question, yeah.

15    Sorry.

16    BY MR. O'REARDON:

17           Q.   So do you think class members should have at

18    least eight years from the time their vehicle was

19    manufactured in order to hold Toyota responsible for the

20    frames?

21           A.   The number eight doesn't -- isn't necessarily

22    something that I would say.  Yeah, again, I don't have a

23    specific number, but I would say, yes, at least eight,

24    because that's where I'm at right now.

25           Q.   Right.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                    April 12, 2017

1          A.    But, yeah, I -- I don't know the specific
2     number.
3          Q.    How about ten years; is that reasonable?
4          A.    Ten years seems -- seems reasonable.  Again,
5     based on my own experience of warranty and
6     responsibility, but --
7          Q.    Eleven years, does that seem reasonable?
8          A.    I don't know anything -- anything over ten.
9     Maybe, you know, I think it would have to be very
10    specific.  Ten seems reasonable.
11         Q.    So maybe the outer limit is 12, so anything
12    over 12 is where it doesn't seem as reasonable to be
13    able to hold Toyota responsible for the frames; is that
14    fair?
15         A.    Yeah, that sounds fair.  I mean, from my own
16    experience.
17              MR. SALTER:  I'm sorry, would you repeat that
18    question for me, please.  I'm trying to --
19              MR. O'REARDON:  The reporter can read it back.
20              (Record read by the reporter.)
21              MR. SALTER:  So I -- just to be clear, I --
22    Tommy, you -- the settlement calls for free up to
23    12 years, so are you asking -- I can't -- I can't really
24    understand.  Are you asking him if that's enough
25    coverage or should it be more or is that -- is that the

Cemil Hope                                                    April 12, 2017

1   way this question is going?

2             MR. O'REARDON:  You can -- you can ask

3   questions at the end if you'd like.  I'm sort of on to

4   the next topic now.

5             MR. SALTER:  Okay.  Okay.

6   BY MR. O'REARDON:

7        Q.   So your Mercedes Sprinters, did you check

8   them, the underside, for rust?

9        A.   No, I haven't checked the underside for rust.

10       Q.   The Mazda3 that your family owns, did you

11  check the underside of that for rust?

12       A.   No.  I'd hope there's none after two years.

13            MR. O'REARDON:  I'm going to have you mark as

14  Exhibit 2 the subpoena for today's deposition.

15            (Exhibit 2 was marked for identification.)

16  BY MR. O'REARDON:

17       Q.   You can take a look.  It's Exhibit 2 in front

18  of you.

19       A.   Mm-hm.

20       Q.   It's the signed subpoena to appear at today's

21  deposition.

22       A.   Mm-hm.

23       Q.   Have you seen this document before?

24       A.   I have it right here.

25       Q.   And then the very last page of Exhibit 2, it's

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                        April 12, 2017

1    something you probably have not seen.  It's called a
2    "Proof of Service."
3         A.    Mm-hm.
4         Q.    It says that on March 29, 2017, in the
5    morning, you were served with a copy of this subpoena.
6    Does that sound right?
7         A.    It seems appropriate, yeah, it seems --
8         Q.    That was a Wednesday.
9         A.    Yeah.  I don't know the exact day, but --
10        Q.    And you were served with the subpoena at your
11   office address on 1st Street; is that right?
12        A.    Correct.
13        Q.    All right.  If you turn to the third -- it's
14   the third page of this document.  It's the document
15   request.
16        A.    Mm-hm.
17        Q.    We're on Exhibit 2.  Document Request 1 seeks
18   a copy of the title to your Toyota vehicle.  Do you see
19   that?
20        A.    I do see that.
21        Q.    Did you bring a copy of your title today?
22        A.    No.  Actually, I totally forgot it.  I
23   intended to, but I went into my office this morning with
24   that intention and didn't get it.
25        Q.    So you had reviewed these document requests

Cemil Hope                                          April 12, 2017

```
 1    prior to the deposition?
 2          A.   I did, yeah, and -- yeah.  Sorry.
 3          Q.   Number 2 is, "All documents and communications
 4    between you and any employee or representative of Toyota
 5    or any vehicle service or repair shop concerning any
 6    inspections or repairs regarding frame rust or
 7    perforation on your Toyota Vehicle(s).  These include
 8    service orders, invoices, pictures, complaints to
 9    Toyota, responses from Toyota, and related
10    correspondence and communications, if there are any."
11    Do you see that request?
12          A.   Yes.  And I don't have any.
13          Q.   Have you ever had any responsive documents?
14          A.   No, not -- not pertaining to the frame.
15          Q.   Number 3, the Document Request No. 3, is, "The
16    written agreement(s) which refers or relates to your
17    written objection filed in Warner versus Toyota Motor
18    Sales, Case 15 dash 2171."  Do you see that request?
19          A.   I do.
20          Q.   Did you bring any responsive documents to
21    that?
22          A.   I'm not sure what responsive means, but, I
23    mean, I have the objection printed out.
24          Q.   Do you have a retainer agreement between you
25    and Mr. Salter?
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                      April 12, 2017

```
 1         A.   Oh, yes, which I have on my iPad.

 2         Q.   Okay.

 3              MR. SALTER:  I take it that retainer agreement

 4    is, you know, privileged.

 5              MR. O'REARDON:  Yeah.  In California

 6    -- California is somewhat unique.  There's a California

 7    Business and Professions Code that actually says it's

 8    not privileged, but in other states I would give it to

 9    you.  Perhaps in Hawaii it's privileged.

10              MR. SALTER:  Yeah.  I can provide that for

11    you.

12              MR. O'REARDON:  Okay.  Great.

13              MR. SALTER:  And I will, Tommy.

14              MR. O'REARDON:  During the break, if Mr. Hope

15    emails it to you, can you forward that along to me or

16    can I ask him to email it to me directly?

17              MR. SALTER:  Sure.

18              MR. O'REARDON:  Okay.  Thank you.

19    BY MR. O'REARDON:

20         Q.   Other than a copy of the subpoena, a copy of

21    the written objection, what other documents did you

22    bring with you today to the deposition?

23         A.   I just have the settlement printed out or the

24    settlement -- proposed settlement.  Those are the only

25    three documents that I have.
```

LITIVATE REPORTING + TRIAL SERVICES I 877.771.3312 I litivate.com

Cemil Hope                                                          April 12, 2017

1          Q.    So you have the --

2          A.    The -- yeah, the objection, the settlement and

3     the subpoena.

4          Q.    Okay.  So we'll just -- we'll mark those --

5     we'll take a break here in five minutes and we'll just

6     mark those as exhibits.

7          A.    Okay.

8          Q.    You know, this is a good time to take a break.

9     Let's take ten minutes right now.

10         A.    Cool.

11               (Recess taken.)

12    BY MR. O'REARDON:

13         Q.    What is a class action, if you know?

14         A.    My understanding, it's when a number of

15    people, maybe one or more, two or more maybe, I -- I

16    wouldn't know how to say it.  Just in laymen's terms,

17    when a group of people file a suit against a company or

18    otherwise for -- for a settlement in regards to what

19    they see maybe as -- as wrongful doing.

20         Q.    How did you first hear about this case?

21         A.    I honestly don't know exactly how it came to

22    me.  I mean, it -- I may have seen it on Facebook or

23    something.  Yeah, I don't remember the exact point to

24    which I saw it.  Yes, I honestly don't remember.

25         Q.    Do you remember whether it was a conversation

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                April 12, 2017

1   with someone that was your first --

2        A.   No, I don't --

3        Q.   -- experience with the settlement?

4        A.   No, it wasn't a conversation.  Yeah, I

5   -- yeah, I wouldn't -- I honestly don't know.  I mean, I

6   have memory of seeing it -- you know, seeing something

7   come up on maybe on a Facebook feed.  I don't know if it

8   was specifically somebody sending it to me or if it just

9   came up, you know, in terms of like somebody sharing it

10  because they knew I had a Toyota.  I'm not sure.

11            MR. O'REARDON:  Let's go ahead and mark as

12  Exhibit 3 this document here.

13            (Exhibit 3 was marked for identification.)

14  BY MR. O'REARDON:

15       Q.   You've got Exhibit 3 in front of you.  It's

16  one of the documents you brought with you here today,

17  right?

18       A.   Mm-hm.  Yes.

19       Q.   What's your understanding of what Exhibit 3

20  is?

21       A.   This is the proposed settlement, specifically

22  for the frame of the Tacoma or Tundra or Sequoia.

23       Q.   How did you get a copy of this document here,

24  Exhibit 3?  Was it mailed to you?

25       A.   I want to say I just pulled it up.  Yeah.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                              April 12, 2017

1    Yeah, I know that I went specifically to a link for

2    this, so I'm assuming I just pulled it up online.

3        Q.   All right.  Do you recall whether this

4    document was mailed to you, a hard copy of this document

5    was mailed to you?

6        A.   No, I don't think a hard copy was mailed to

7    me.  Not that I recall.

8        Q.   All right.  Do you call receiving a shorter

9    version of what appears in Exhibit 3 through the mail?

10       A.   Mm-mm.  No.  I just remember hitting a link to

11   this, and then pulling it up.  And, like, link being,

12   like, specifically to this document.  Yeah, so I don't

13   know if it was on that feed or -- yeah, I honestly don't

14   know.  But I know it was a specific like -- it wasn't

15   like this document was emailed to me.  This -- I

16   definitely -- that wasn't the case.

17       Q.   Okay.  Or mailed to you?  You don't believe

18   that was the case, either, that it was mailed to you?

19       A.   No.  No.  I didn't -- this -- the physical

20   document was -- I don't know if it was this link, like

21   to the actual frame settlement, that I pulled it up,

22   but, yeah, it was definitely a link specifically to this

23   document.  Like whether it was a, like, a splash page

24   that, you know, like an ad or something, I don't know

25   what it was, but it went right to this.

Cemil Hope                                                        April 12, 2017

1          Q.    All right.  Did you see this document before

2     or after you first spoke with Mr. Salter about this

3     case?

4          A.    I saw it before.

5          Q.    Exhibit 3, for the record, is a copy of the

6     long form class notice.  Have you reviewed what's in

7     Exhibit 3?

8          A.    I did read it, yes.  I mean, to the best of my

9     ability, meaning, you know, I didn't -- I don't

10    understand all of the, again, legalese, but there's

11    not -- it's not heavy with legalese, but I did read

12    through it, yes.

13         Q.    Are there any portions of what's in Exhibit 3

14    that you don't understand?

15              (Pause in the proceedings.)

16              THE WITNESS:  I don't know that there's --

17    yeah, I don't think there's anything in here that --

18    yeah, it's -- I guess to be more specific in terms of --

19    I mean, I wouldn't say that there's anything in here

20    that I don't understand, but I may not -- like I

21    -- while I can read it and get it, there isn't -- I

22    don't necessarily know like -- like the -- how all of

23    this would pertain to me, I guess, if that makes sense.

24    Yeah, I don't know if I've phrased that correctly.

25    BY MR. O'REARDON:

Cemil Hope                                                    April 12, 2017

1          Q.    That's okay.   What do you mean by how it would
2      pertain to you?
3          A.    That's what I mean.   I -- I guess, you know,
4      in, like, I understand the process, but I don't
5      necessarily -- you know, I don't know if -- I guess, I
6      just don't know, like -- yeah, I don't know if I said
7      that correctly.
8              I don't know if it's a question not really
9      pertaining to me, but -- I guess, you know -- well, I
10     guess what I mean is, I don't -- I don't understand the
11     whole process of what this entails, you know.   That's
12     why I have, you know, Brad representing me, because I --
13     you know, there's -- I don't know what my -- my -- the
14     -- my specific rights would be within this, and -- and I
15     think that's -- that was part of the thing.   The general
16     feeling from this is -- when I say "fairness," like
17     that's -- that's why I contacted Brad, because it
18     just -- it didn't feel like -- I wasn't sure that my
19     rights would be fulfilled or covered within this.
20             And so when you say "understand," like, yes, I
21     understand it for the most part, but I don't understand
22     exactly how it pertains to my situation and what my
23     rights would be so that I just wanted to be sure that I
24     wasn't relinquishing anything by just letting this
25     happen.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                    April 12, 2017

1       Q.    Now if you don't believe that settlement is

2   fair, why didn't you opt out of the settlement?

3       A.    For the same reason that I would -- that I

4   stated earlier about -- so maybe I opt out, but what

5   about the person that didn't opt out?  And so I'm -- you

6   know, I'm thinking of this, not just as an individual

7   thing, but I -- you know, I wouldn't want -- I

8   wouldn't -- because for the same reason I wouldn't want

9   my -- like to relinquish my rights by not knowing about

10  it is the same reason that I wouldn't want that for

11  somebody else.

12          Because I've been pretty loyal to Toyota, you

13  know, 20 years.  I mean, pretty much everybody in my

14  family has Toyota trucks and, you know, I -- I have

15  quite a -- I mean, 50 people in my circle, you know, who

16  have trucks, Toyota trucks, so is it my responsibility

17  to tell all of them?  And if they don't find out, maybe

18  they're adversely affected in the future.  So I -- you

19  know, it's -- it's not out of spite to Toyota.  I just

20  want to be sure that the people in my circle, or greater

21  that I don't know about, aren't left in the lurches, you

22  know, so --

23          And again, that's why I stated, like

24  specifically, this settlement, adversely, positively

25  affecting me, I don't totally know.  But I do know that

Cemil Hope                                        April 12, 2017

 1   what didn't feel fair or sit right with me is that, if
 2   those people out, you know, in the periphery, even my
 3   family, didn't know about this, like, you know, I
 4   wouldn't want to see them affected adversely.
 5            You know, and again, I don't know what that
 6   means in total.  Like I -- maybe it's -- it's different
 7   for each individual.  But this -- from what I can
 8   understand, this is -- once this settlement is accepted,
 9   if they didn't opt out, then what?  You know, so that's
10   -- that's my laymen's concern.  And it's why, you know,
11   at the end of the day, I felt compelled to, you know.
12            Yeah, it's definitely not out of spite,
13   because, like I said, I mean, I've had pretty much a
14   lifelong relationship with Toyota, and, you know,
15   they've -- their vehicles have served me well and my
16   family, so I don't -- you know, it's -- it's not a --
17   like nothing -- nothing against Toyota.  I just, you
18   know, something about this just specifically didn't feel
19   -- feel fair, and so --
20       Q.   All right.  And that something that didn't
21   feel fair we've already talked about, right, the
22   inability to hold Toyota accountable in the future?
23       A.   Yeah.  Not forever.  Like you said, not
24   30 years.  But, I don't know, you mentioned 12 years,
25   which I think is stated in the settlement and -- or

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                    April 12, 2017

1    somewhere, but, you know, maybe 12 years, maybe 15 tops.
2    I don't know.  I know that, because of the longevity of
3    Toyotas in general, like they run and run and run, and
4    that's why I've had them, and it's why, you know, the
5    two vehicles I mainly use, the Sprinter and the Toyota,
6    are to me equal.  Like they -- you know, my Sprinter,
7    ten years, basic service, no issues.  Same with most of
8    my Toyotas.
9          So, to me, the frame, the body, should, on
10   some level, match their ability to run.  And, you know,
11   I think 15 years sounds, you know, for, in my being,
12   sounds normal, fair.  You know, I said maybe --
13   obviously we're at eight.  Ten sounds like a minimum.
14   You mentioned 12 and -- yeah, so, I mean, I -- and I
15   don't know, at the end of the day, what other people
16   think is fair, what's right, but I -- I think -- you
17   know, and it's not for me just the length of time, but
18   also within, even if it's a shorter length of time, it
19   seems like that's being -- people's ability to resolve
20   this issue within a finite period of time seems limited
21   on some level, from what I can understand.
22         Again, you know, it's not that I don't
23   understand this, but I don't know all the specifics that
24   would apply to me and other people.
25         Q.   And we talked about earlier the ability to

Cemil Hope                                                          April 12, 2017

1   have your car inspected.  That's a good thing, right?

2       A.   Absolutely.

3       Q.   And the ability to get a replacement frame,

4   that's certainly a benefit, right?

5       A.   Yes.  And to that effect, you know, you asked

6   me earlier if I was a metallurgist or if I knew metal,

7   and while I don't, I don't know that Toyota dealerships

8   are either.  I'm not saying they don't have the

9   facilities or the tools to know their vehicles, but one

10  thing in the settlement was, in regards to Toyota

11  inspecting it, and if -- and if need be, a second Toyota

12  dealership inspecting it.  I would beg to suggest that

13  there be an independent party.

14      Q.   Why is that?

15      A.   Well, it's my feeling that, with something

16  like this, Toyota may not be impartial to suggesting a

17  frame replacement if it was costly.  And I'm not saying

18  that it would solely be based on a third-party

19  assessment, but, you know, for the same reason I

20  wouldn't -- I mean, it's not that I don't trust them to

21  fix my car.  They built it; they can fix it.  I -- I

22  don't know what basis they would be inspecting and

23  suggesting for replacement or not.  And I'm not saying

24  that it would be a faulty assessment, but I do think on

25  some level it might be biased.

Cemil Hope                                                    April 12, 2017

1      Q.   Do you think it would be a good thing if there
2  was objective criteria for when the frame should be
3  replaced or not?
4      A.   Definitely.
5      Q.   That would help counteract that bias?
6      A.   I think so.  I mean, yeah, truly.  Same as
7  when you go to a smog station, they can't do anything.
8  They just plug it in.  Test it.  The report goes to the
9  state.  They can't modify it or do anything.  That's a
10  very specific assessment, and I think that this should
11  have a standard that could be biased.
12      Q.   The settlement's provision to provide class
13  members with a loaner vehicle while their frame is being
14  replaced, you would agree that's a good thing, right?
15      A.   Yeah.  It seems like there's a limitation on
16  that, and it suggests that it would be in good faith or
17  goodwill or something to that effect.  Who judges that?
18  You know, "We tried, but we couldn't find one, so you're
19  out for a week or two maybe."  That didn't seem fair
20  either.  That it should be an absolute that that's
21  offered and provided.
22      Q.   Do you think Toyota is going to do that?
23      A.   I don't know.  Not for me to say.  I would
24  hope they did -- or do.  I do know that in -- in the
25  services that I've had performed at Toyota, they haven't

Cemil Hope                                                                April 12, 2017

```
 1   always been willing to do that, even for a basic
 2   service.  Or maybe not available.  And if something
 3   wasn't available, and somebody had to rent a car or find
 4   alternate means, it didn't sit quite right either.
 5        Q.   So assuming that they do provide the loaner
 6   vehicle, that is a benefit, right?
 7        A.   Sure.  Oh, I think it was -- I don't know if a
 8   benefit.  I think it should be a prerequisite.
 9        Q.   It's a good thing under the circumstances to
10   give the customer a loaner vehicle if they're replacing
11   their frame, right?
12        A.   Absolutely.
13        Q.   Corrosion resistant compound treatment, do you
14   know if that's a benefit provided under the settlement?
15        A.   I did see that --
16        Q.   CRC --
17        A.   Yeah.
18        Q.   -- is the acronym.
19        A.   Acronym, yeah, I did see that.  And yes, while
20   I looked at that, I didn't -- I don't remember the
21   -- all the -- I was reading through it, kind of trying
22   to gather what that -- that was in total, and -- and but
23   I did see that, yes.
24        Q.   Would you agree to withdraw your objection if
25   you knew that the objection was going to hold up all
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                          April 12, 2017

1   these various benefits for everyone in the class?

2              MR. SALTER:  Objection.  I -- I think you're

3   asking him for a legal opinion here, and I don't think

4   that's fair.

5   BY MR. O'REARDON:

6      Q.   Yeah, I'm not asking from a legal perspective.

7   I'm asking your personal opinion.

8      A.   I would be reluctant to offer my personal

9   opinion on that question, just because I think that's a

10  fairly loaded question.  I'm not saying that I wouldn't

11  be willing, if I felt that, you know, that all the

12  criteria were met and that I, as well -- I mean,

13  personally, not to put myself solely above the other,

14  you know, people in the class action, but if I trusted

15  that -- that I would be taken care of and that I

16  wouldn't be at a loss and that on some level others

17  could be -- I -- I don't know if guaranteed is the right

18  word, because, I mean, there's so many individual things

19  that can happen.  I think that people, too, can abuse

20  it, so I think that would have to be deemed appropriate.

21             But that I -- you know, I just want to be sure

22  that -- you know, that the same as my needs would

23  need -- you know, would need to be met, that others

24  could be similarly met.  And so if the class action, you

25  know, accounts for that, whatever form that takes, I

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                              April 12, 2017

1    would say that's a good thing.

2        Q.   So we talked generally about -- about what you

3    think -- I think what you think your needs are.  How

4    would the settlement be specifically fixed in your mind

5    to account for these needs?

6        A.   There would probably be lots of legalese that

7    I wouldn't understand to do that.  But, you know, on a

8    very simplistic way, I would -- you know, I -- yeah, I

9    guess, you know, the things that I stated, like those

10   concerns, obviously that would just need to be framed,

11   no pun intended.  The requirements would be framed in

12   such a way that, you know, the people were given the

13   protection I think they were due.

14            That they -- I think the thing is for me,

15   like, I put my trust in Toyota.  I have for a long time.

16   This is the first time I felt on some level that -- that

17   they're -- and again, that's where, like, the general

18   feeling of fairness comes in.  Like, I haven't ever felt

19   that I've been treated unfairly with a vehicle that I've

20   had through Toyota, and this is the first time I've kind

21   of felt that like -- it just didn't feel -- it doesn't

22   generally feel like they're really looking out for the

23   interests of all involved.  And there's a lot of people

24   who this would affect, and it seems like this is sort of

25   a -- you know, in reading it, that there's some need to

Cemil Hope                                                April 12, 2017

1    like almost sweep it under the rug quickly, and that

2    didn't feel right.

3          And I kind of felt like on some level I would

4    expect more from Toyota, given, you know, their presence

5    in the marketplace and just, you know, the loyalty

6    that's been established by so many people.  So I -- I

7    don't know if that -- you know, that's -- that's just

8    kind of speaking from my -- from more of a personal

9    point of view.  Like I would just want to be sure that

10   Toyota takes care of all those people that have placed

11   their faith in Toyota, which is, you know, again, like,

12   every person I know in the trades around me drives a

13   Toyota, you know, Tacoma, Tundra.

14         And so when I think of myself being affected,

15   I think of all them, you know.  I think of, you know,

16   the self-employed guy who's, you know, just, you know,

17   doing the best he can, you know, to run his business and

18   take care of his family.  I mean, I don't know, again,

19   like if there's any other implications beyond the

20   ability to sell or, you know, lower resale or whatever,

21   but if there's any, you know, safety issues for them and

22   their family.

23         So I just want to be sure that -- that if

24   something were to happen that, you know, affected

25   their -- you know, their life, their family, that it

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                    April 12, 2017

1    wouldn't be discounted because, you know, "Oops, this
2    was already settled.  You were already allowed this.
3    You know, you gave up your rights when you didn't opt
4    out."  Well, I didn't know about it to opt out.  Well,
5    then what?
6              So this -- so, again, this is just -- I'm
7    speaking sort of broadly about how -- where the fairness
8    issue, why I keep saying, well, it didn't feel fair.  I
9    mean, that's just -- that's just, again, my perspective
10   as, I believe, a very loyal Toyota -- you know, this
11   isn't the first truck I've owned, you know.
12             So, yeah, I mean I guess -- you know, so when
13   you asked me, like, would I -- would I be willing to
14   withdraw the -- the objection if these were met, well, I
15   mean, I'm -- this is me.  You know, these are some of
16   the things that I see and would hope to see in the
17   settlement.  But, you know, I would want to be sure that
18   those were things that the -- that represented others as
19   well, you know, like -- and it seems to me they would,
20   but -- so the reason I'm reluctant to say that I would
21   withdraw it is I would want to be sure that, you know,
22   that these things are, you know, just things that other
23   people would -- would agree with.
24        Q.   Do you know any other class members?
25        A.   Not personally, no.

LITIVATE REPORTING + TRIAL SERVICES I 877.771.3312 I litivate.com

Cemil Hope                                                   April 12, 2017

1        Q.    If -- if a copy of Exhibit 3, that's the class

2   notice, was mailed to over 90 percent of class members,

3   you would agree that that's a good thing, right?

4        A.    Yes, I would agree that's a good thing.

5        Q.    I mean, that gives them the -- what you were

6   talking about earlier -- the opportunity to know that

7   you can opt out if you want from the settlement?

8        A.    Yeah.  But I think that's the thing, that I

9   don't -- I had to find this.  You know, I mean, Toyota

10  has all my information.  I didn't get anything in the

11  mail saying that this was happening.  You know, there

12  wasn't any recall notice.  There was nothing.  I mean,

13  I've gotten recall notices on various things for the

14  truck, and I've had them taken care of, but I wasn't

15  contacted by anybody.  I had to find this.  You know, it

16  had to come to me.  So that's really what I'm speaking

17  to is that, if they were contacted, if 90 percent were

18  given the opportunity, sure, that sounds great, but did

19  that happen or has it happened?  I don't know,

20  personally.

21       Q.    Other than this document, Exhibit 3, the class

22  notice, what other documents from the case have you

23  reviewed?

24       A.    That's it.  I mean, aside from, you know, our

25  objection.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                    April 12, 2017

```
 1              MR. O'REARDON:  Let's go ahead and mark
 2    Exhibit 4.
 3              (Exhibit 4 was marked for identification.)
 4    BY MR. O'REARDON:
 5       Q.   Exhibit 4 you've got in front of you.  It's --
 6    you forwarded me this document during the last break.
 7       A.   Yeah.
 8       Q.   It's the agreement between you and your
 9    attorney, Brad Salter, relating to representation in
10    this case, right?
11       A.   Yes.
12       Q.   If you could turn to the last page, please?
13       A.   Mm-hm.
14       Q.   Is that your signature there?
15       A.   It is indeed.
16       Q.   Is that an electronic signature or --
17       A.   It is.
18       Q.   -- hand signature?
19       A.   Yeah, electronic.
20       Q.   And then did you type in that date or did Mr.
21    -- or did someone else?
22       A.   I think I did, yeah.  I did on Dropbox.  I
23    mean, it was -- you know, obviously March 2017 was in
24    there because it was sent in March, assuming I would
25    sign it relatively soon.
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                    April 12, 2017

1        Q.    Other than the letter, Exhibit 4, do you have

2    any other written agreements about your representation

3    in this case?

4        A.    No.

5        Q.    So explain to me the process of, you found the

6    class notice and then you eventually contacted an

7    attorney.  Tell me how that happened?

8        A.    Yeah.  I saw the settlement.  A friend -- I'm

9    trying to just remember if I -- if I physically saw

10   anything in regards to pointing me towards Brad on -- on

11   any of those Facebook feeds or if it was a friend -- it

12   was a friend of a friend that mentioned Brad.  I'm just

13   trying to think if it was, like, via text or if it was

14   something that came just directly from Facebook.

15             Yeah, one way or the other, it was either

16   friend of a friend sending his name to me or seeing it

17   in a -- in a thread.  The same way, but basically, like,

18   you know, on a Facebook feed.  So it was either a text

19   or via, you know, just a -- like a back-and-forth on

20   Facebook.

21       Q.    All right.  Who's the friend of a friend?

22       A.    Um, I couldn't tell you.

23       Q.    Who's the mutual friend?

24       A.    I have several friends that have Toyotas that

25   -- that were on that thread, and that's why I'm

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                   April 12, 2017

 1  wondering if they send me a text separately.  Yeah, I
 2  -- I mean, I'm not going to give you specific names of
 3  all those people, because I don't know who it was.  I
 4  don't want to erroneously say who sent me that.  I just
 5  don't know.
 6      Q.   Okay.  But without you committing to it was
 7  that specific person, who all was on the thread?
 8      A.   I couldn't tell you.
 9      Q.   You can't name anyone that was on the thread?
10      A.   No.  I look at Facebook all the time.  I don't
11  know.  There's so many people that -- I have
12  400 friends.  I don't know, you know.  I mean, I'm not
13  comfortable saying it was this person or that person,
14  because I just don't know who was on that thread, so --
15      Q.   So it was Facebook, though, you think that was
16  the initial link to Mr. Salter?
17      A.   Yeah, it was -- it was definitely -- like,
18  this is where this all -- again, like, when I said,
19  like, that I saw the Facebook feed, I don't know if --
20  you know, I just -- I have no idea if people send me
21  something specifically, how it ends up on my feed, like
22  if someone forwards it to me, or if it just came up on
23  somebody else's feed.  So that's why I'm saying, like, I
24  don't know specifically in that context where it was
25  from.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                    April 12, 2017

1                   But, yeah, Facebook.  And then, you know, who

2       was on that feed?  I mean, I don't know.  Twenty people

3       who have Tacomas.  And, yeah, it just wouldn't be right

4       for me to say that I thought it was one person or

5       another person.  I just don't know.  So that -- that's

6       why I don't want to be specific, because it, you know,

7       just wouldn't be fair to either myself or them to say

8       that.

9           Q.    What -- what was on this Facebook feed?

10          A.    Yeah.  From what I remember, it was just --

11      you know, it was just alluding to this -- you know, to

12      this settlement and something in regards to frame.  And

13      so I followed it from there, and, you know, found more

14      information.

15                  And, yeah, I don't know if somebody else was

16      looking to -- like they said it was unfair and was

17      looking to file an objection.  I mean, I don't know if

18      "file the objection" is the wording that I was thinking

19      of then, but, yeah, I mean just, I think, alluding to

20      the fact that it didn't -- you know, that it didn't feel

21      fair.  And yeah, so, I mean, I think there was like --

22      if felt like there was other sentiment, you know, the

23      same way I felt.

24          Q.    And I'm still missing, though, how you --

25      eventually how you got to Mr. Salter?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                April 12, 2017

1     A.    Oh, yeah.  I -- I was just -- I think somebody
2  else -- maybe I -- I don't know if I mentioned something
3  about, you know, the -- the lack of -- the lack of
4  fairness around it, you know, or the settlement.  And,
5  yeah, I'm just trying to think of the specifics.  Yeah,
6  I mean somebody just basically -- somebody at some point
7  threw out his name and suggested that, you know, that he
8  had dealt with other, I don't know, class actions or
9  objections.  And, yeah, I don't know if there was a
10  number attached or just a name, but whether I looked it
11  up specifically and found him or whether there's a
12  number and I just called him.
13          Yeah, I'm just -- yeah, I'm -- I'm feeling
14  vague around that.  I just -- I think just because I
15  do -- you know, I look at so many things and I follow so
16  many threads and am calling so many people every day
17  within my business and otherwise that, yeah, just -- I'm
18  feeling a little bit like -- yeah, I don't know that I
19  can answer that specifically.
20     Q.    Do you know anyone that knows Mr. Salter?
21     A.    No.  Well, at least not -- I don't know.
22  They -- you know, the people that I was -- that I was
23  talking with, you know, threads, whatever, like I don't
24  know if they know him personally or not, but, you know,
25  alls I saw it was -- is -- I just saw it as a

Cemil Hope                                    April 12, 2017

1    suggestion, you know, or a person.  I didn't see, like,
2    that somebody knew him or was friends with him.  It
3    just -- to me it was just a name.
4         Q.   And what was the -- the tone of that message?
5    You know, contact Mr. Salter for what reason, things
6    along those lines?
7         A.   No, I don't think there was a specific -- at
8    least not that I remember -- a specific, "Oh, you should
9    call this guy," or whatever.  It just was -- yeah, it
10   just seemed like a suggestion, like, you know, "Hey, if
11   you're having any, you know, thoughts or issues about
12   this, you know, this guy has dealt with other class
13   action or, you know, objection," whatever.  So it just
14   seemed like -- it was very vague, you know.  It wasn't
15   like, "Oh, here's a number of all these guys.  You
16   should call this guy or do this.  He does this."  You
17   know, it was just -- it was just very general.  And I --
18   you know, and I wasn't going to go looking around, you
19   know, for different people that, you know, would do
20   this.  I just -- you know, it just seemed like path of
21   least resistance, you know, so --
22        Q.   Okay.  Do you still have that Facebook feed?
23   Unless it was deleted, right?
24        A.   I don't know, yeah.  To be honest, like,
25   Facebook is -- yeah, Facebook is very elusive you know.

LITIVATE REPORTING + TRIAL SERVICES I 877.771.3312 I litivate.com

Cemil Hope                                                      April 12, 2017

1    I'll go back looking at my own feeds trying to find

2    something that I did, it's gone.  So I just -- yeah, I

3    just -- all -- I take it in the moment, you know, like,

4    if I had to go back and look at something or find a

5    thread, like -- I don't know.  I wouldn't even know

6    where to start.  I'm electronically savvy on some -- on

7    some realms, you know, but Facebook is not one of those

8    places.

9         Q.   Do you go on Facebook every day?

10        A.   No, not every day.  I mean, sometimes I'll go

11   a week without, you know, doing anything.  It just

12   depends on how busy I am and where I am in the moment

13   and if I have something to say or something to see or --

14   I have somebody do my Facebook feed for my business.

15   You know, I just said I don't even want to think about

16   that.  You know, it's just posting things, and it's just

17   not my -- not my forte.

18        Q.   So the first contact with Mr. Salter, was it

19   by -- your first contact, was that by email?  Phone?  By

20   some other means?

21        A.   Yeah, I think it was just phone.  Like --

22   yeah, I think I just looked up, like, his name, number.

23   Yeah, I called him.  95 percent sure that was -- that

24   was the route.

25        Q.   Did he answer the phone?

Cemil Hope                                      April 12, 2017

1        A.    I don't remember.  I don't know if I left a

2    message or -- yeah, I honestly don't remember.  I have a

3    memory of leaving the message.  It could have been

4    another day, but I don't know if the first contact was

5    him answering or just leaving a message, yeah.

6        Q.    So the agreement, retainer agreement, is dated

7    March 25th.

8        A.    Mm-hm.

9        Q.    How much in advance of that was your first

10   call to Mr. Salter, would you approximate?

11       A.    Oh, I don't know.  It's all -- like the last

12   eight months, because I've been growing my business, and

13   it seems like a day, so, I mean, maybe a couple of

14   months.  But, yeah, I -- I honestly -- the last --

15   that's why I don't have a lot of recollection of these

16   details around contacting and where I saw it and who

17   said what, because I just -- I mean, things are moving a

18   million miles a minute for me right now, so I'm just --

19   I'm pretty much in the moment.  But, yeah, so I mean, I

20   don't know, like, maybe a couple of months, prior.

21   Maybe we were dialoguing for a while.

22       Q.    Other than Mr. Salter, have you spoken with

23   any other attorneys about this case?

24       A.    No.

25       Q.    Ever met him in person?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                April 12, 2017

1        A.    Nope.

2        Q.    Approximately how many phone calls would you

3   say you've had with him?

4        A.    I don't know.  A couple of dozen I guess.

5        Q.    A couple dozen?

6        A.    Yeah.  I mean, maybe.  Maybe -- maybe a dozen.

7   Maybe 15.  I don't know, but it just seems like, yeah,

8   we've talked quite a bit.

9        Q.    Do you know Randall Salter in Glendale?

10        A.    No.

11        Q.    Do you know anyone who's ever objected to a

12   settlement in a class action?

13        A.    Mm-mm.

14        Q.    Other than in this case, have you ever

15   received a notice of a class action that you're a part

16   of?

17        A.    You know, I think I've -- I don't know.  I've

18   gotten little notices in the mail saying that there were

19   class actions that I could have been involved in and

20   maybe submitted a, you know, a little form or something,

21   but, you know, then -- yeah, but, so, minimal.  I mean,

22   you know, it's like each person's awarded $3 for this,

23   you know, whatever, bank fee class action or something

24   like that.  But no, nothing significant.

25        Q.    Have you heard of Darrell Palmer?

Page 58

Cemil Hope                                                            April 12, 2017

```
 1        A.    Mm-mm.  No, I haven't.

 2        Q.    Chris Bandas?

 3        A.    No.

 4        Q.    Mike Kramer?

 5        A.    Nope.

 6        Q.    Gay Hopkins [phonetic]?

 7        A.    No.

 8        Q.    Matt Kurilich?

 9        A.    No.

10        Q.    Ted Frank?

11        A.    Nope.

12        Q.    Benjamin Nutley?

13        A.    No.

14        Q.    John Davis?

15        A.    Nope.

16        Q.    Kendrick Jan?

17        A.    No.

18        Q.    Ed Cochran?

19        A.    No.  I mean, if there's any of those names

20   that for a moment I might have stopped, like, I mean,

21   similar names, but no, none of those people I know,

22   or --

23        Q.    The only one where you stopped a little bit

24   was Mike Kramer.  Do you think -- does that name ring a

25   bell or no?
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                           April 12, 2017

1        A.    No.

2        Q.    No.

3        A.    No.   The Cochran, I mean, I just like for a

4    moment thought of somebody Cochran, but --

5        Q.    Johnnie Cochran, the attorney?

6        A.    Yeah.   I just like, yeah, or like Joe Smith.

7    Like, yeah, I don't know.   There's probably -- I know

8    maybe another Joe Smith, but no, none of those people

9    sound familiar.

10             (Exhibit 5 was marked for identification.)

11   BY MR. O'REARDON:

12       Q.    You've been handed Exhibit 5.   Do you

13   recognize this document?

14       A.    I do.

15       Q.    What is it?

16       A.    The objection.

17       Q.    Who wrote the objection?

18       A.    Brad Salter.

19       Q.    Do you make any edits to it?

20       A.    I didn't.

21       Q.    If you could turn to the second to last page

22   of Exhibit 5, the objection?

23       A.    (The witness complies.)

24       Q.    Is that your electronic signature there?

25       A.    Yes.

Cemil Hope                                                        April 12, 2017

1      Q.   Did you discuss the content of this objection

2    with Brad before you signed it?

3      A.   No, not before I signed it.  I mean, I read

4    it, and I didn't disagree with anything, so I signed it.

5    And we've since, you know, gone over some of the details

6    just in -- as I kind of was looking through it a little

7    bit more closely and trying to make, you know, a little

8    bit clearer sense of some of the, again, the legalese.

9    I -- yeah, I mean I had a few questions for him, but,

10   you know, nothing that was an objection to the

11   objection, per se.

12          Just a heads-up, because of the -- my coffee

13   and my water, I'm needing to go to the bathroom again,

14   but I'll --

15     Q.   Yeah, let me know.

16     A.   I can wait a few minutes.

17     Q.   All right.  If you turn to page four of your

18   objection.

19     A.   Mm-hm.

20     Q.   I'm looking at the bottom paragraph.  In the

21   last sentence, your objection says, "The Court should

22   deny the Settlement and require Plaintiffs to carve out

23   those individuals from the class definition."  Do you

24   see that?

25     A.   Mm-hm.

Cemil Hope                                                    April 12, 2017

1        Q.    How does that improve the settlement in your
2    mind to take people out of it?
3        A.    Well, I don't -- again, I'm -- I think -- I
4    trust Brad's wording in this and why he wrote this as
5    opposed to myself.  Why, specifically, they should be
6    carved out?  I mean, I think there's context above it
7    saying, you know, who those individuals are and why.  I
8    think it -- you know, it's defined in this, so I -- I
9    don't really want to add my own perspective on it.
10            I mean, it's not -- it's honestly not up to me
11    to -- to try and -- you know this wording better than I.
12    You can make better sense of it, meaning, it's not up to
13    me to try to explain the objection.  I don't want to try
14    and define it and my own words because, again, like I
15    don't -- I wouldn't do that justice.  I mean, I'd give
16    it my feelings in my own wording around it, but I'm not
17    going to try and define the legalese in here.
18        Q.    One of the two -- when I asked you for ways to
19    improve the settlement, you mentioned two things:  To
20    hold Toyota responsible in the future and also
21    disproportionate fees.  What did you mean by
22    disproportionate fees?
23        A.    Oh, I was speaking to the legal fees.  I mean,
24    $10 million to settle a case in which, you know, they're
25    having -- I mean, if you -- if -- they had -- if they

Cemil Hope                                              April 12, 2017

1   send out notices to 90 percent of the -- of the people

2   involved or should be involved in this class action, I

3   think those -- and the damage is paid out -- may, in

4   theory, be closer to the fees requested, the 10 million

5   dollars-ish for settling this case.

6            But if those -- if the damages paid out, you

7   know, seem very minimal given maybe the people that are

8   involved thus far in the class action and -- or could be

9   with some of the recall or the warranty issues.  But I

10  just -- I don't know.  That -- that $10 million out

11  -- you know, paid out to the lawyers seems -- seems

12  disproportionate.  And, you know, again, I stated that

13  I'm all for fair pay and I expect to be paid fairly for

14  my work, but it just seems disproportionate, as far as I

15  can tell.

16       Q.   In your own personal opinion, at what point

17  does it not become disproportionate?  So the value of

18  what's given to class members justifies the $10 million

19  fee, what's that?

20       A.   Oh, I -- I don't know how to base that.  You

21  know, again, I'm going off of like, kind of like scales.

22       Q.   Right.

23       A.   And I don't know where that sweet spot is

24  exactly.  You know, but I think it has to do, again,

25  with that, by default, opting in or opting out.  Like if

Cemil Hope                                                        April 12, 2017

 1    the people don't know about this, and they can't opt
 2    out, and they're, in essence, opting in for what might
 3    just be minimal reimbursement or, you know, handling of
 4    their vehicle, then that seems like those losses would
 5    be kept to a minimum on Toyota's side, in which case,
 6    you know, the lawyer's fees are -- I don't know, they
 7    just seem very high.
 8              And I just want to be sure that, you know, if
 9    somebody's going to be paid -- getting paid greatly,
10    that I want to make sure that the people who are most
11    affected aren't at a loss.  And if -- you know, and
12    again, I can't say what that is, because I don't know
13    how many people haven't laid claim and who won't because
14    of not knowing.
15              You know, the other things I've had warrantied
16    or dealt with on my truck is because of a notice I got.
17    Are the notices going to be sent out after the
18    settlement?  And if so, then that's just like -- it's
19    just very, I don't know if preemptive is the word, but
20    it just seems very imbalanced.
21        Q.    So --
22        A.    For lack of a better word.
23        Q.    We'll take a break in two minutes; is that
24    okay?
25        A.    Sure.  That's fine.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                          April 12, 2017

1          Q.    Exhibit 4, so back to that retainer agreement.

2          A.    Mm-hm.

3          Q.    At the top of the second to last page.

4          A.    (The witness complies.)

5          Q.    So do you see the part where it says

6     "50 percent of the incentive award"?

7          A.    Mm-hm.

8          Q.    And you signed this, so you believe that's a

9     fair deal with your attorney, right?

10         A.    Yeah.  I mean proportionately I do, yes.

11         Q.    So in this case -- in this case, to justify a

12    $10 million fee, would a reasonable proportion be if the

13    class got $20 million of value, then the attorneys get,

14    if I did this right, 50 percent of that?  Does that seem

15    fair?

16              MR. SALTER:  Objection.  It's just not

17    relevant to this discussion, I don't think, that

18    analogy, in my opinion.

19              THE WITNESS:  Yeah, and -- and to that effect,

20    I mean, I won't answer that specific question, because,

21    again, like I don't -- it's -- it's -- it's not up to me

22    to determine what that -- what those amounts are.  I

23    know that, you know, as far as legal fees, like, you

24    know, if I was getting -- yeah, I don't know.  I don't

25    want to get into the specifics of this, because, for me,

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                    April 12, 2017

1   it's -- it's just a -- I guess it feels -- it just feels

2   generally disproportionate, and I don't know what -- you

3   know, I'm not -- I know you compared it to this fee, but

4   for me personally, this feels -- it's much smaller.

5          So when you're talking about, you know, the

6   payout and the legal fees, it just feels like, for me,

7   as a layperson, in talking about, you know, feeling, you

8   know, that something's unfair, when I saw that, I was

9   like, "Okay.  Well, they're trying to get this settled,

10  it seems like fairly quickly, and maybe exempting other

11  people who have, you know, may have greater issue."

12          And -- and, you know, this just this isn't

13  just about the frame.  This isn't just about this

14  -- this is -- this for me, it feels like -- it just

15  feels like it's -- and maybe because I learned about it

16  a little later, I don't know, but it feels like a bit

17  rushed and it feels like that's trying to happen before.

18  Maybe other people have the ability to speak, and that

19  $10 million seems like a really nice fee to expedite

20  that process.

21          So, you know, I'm not going to say there's any

22  wrongdoing, but I just want to be sure that those

23  -- that -- that the people are represented fairly.  If

24  those -- if that's the fee that's going to be paid.  I'm

25  not saying that fee is -- is -- shouldn't be paid if

Cemil Hope                                                        April 12, 2017

1    people are represented fairly.

2              I don't -- I don't have -- I'm not questioning

3    anybody's ability to make a living and make money.   I

4    mean, I've heard of other settlements and lawyers

5    getting, you know, millions of dollars for a settlement,

6    so I don't have an objection to lawyers getting paid.

7    It's not -- it's not for me to judge.   What I want to be

8    sure of is that that fee that's being paid to the

9    lawyers represents the people.

10   BY MR. O'REARDON:

11             Q.   And so from your perspective, though, at what

12   point is it clear in your mind that a $10 million fee

13   would be proportionate to the value of what people get?

14   I mean, at some point -- I mean, we can think of an

15   absurd example right, where you have no doubt in your

16   mind.   A billion dollars.   If they got a billion dollars

17   of value, I doubt, right, that you would have any

18   criticism of attorneys getting 10 million, if the value

19   was a billion; is that fair?

20             A.   Well, I mean --

21             Q.   I know it's an absurd example, but --

22             A.   Well, you know, I don't know that it's totally

23   absurd, but it's -- it's -- again, I mean, I would want

24   to be sure that the monies that were -- I mean, maybe

25   the award was a billion, but with all that, was that

Cemil Hope                                                April 12, 2017

```
 1    just an award that was being allotted for the eventual
 2    reparations, or was that the actual monies amounts being
 3    paid out?  I mean, I don't -- at this point what I guess
 4    what I'm getting at is, I don't -- I don't -- you know,
 5    I don't know how many of the people -- like it took me
 6    awhile.
 7              Like I had -- like, I said, I had to kind of
 8    find this.  I mean, I didn't go looking for it, but it
 9    appeared, but it wasn't a letter from Toyota.  I feel
10    like I wasn't given the opportunity by Toyota to -- to
11    agree to this in a sense, you know.  And -- and I don't
12    know how -- what the right way to approach that is or if
13    there was something else that was done that I'm not
14    aware of, but it -- it just seems like, knowing how many
15    people I know in the world who have Toyotas and have
16    trucks, that it -- it just didn't seem like something
17    that was, like, that well known.
18              And if that's the case, then, you know, how
19    much is actually going to be -- how -- how are people
20    going to be compensated?  How -- how will this affect --
21    you know, like I said, too, it's not like just taking
22    your car in for a few days and getting the frame
23    replaced.  Like that seems relatively easy.
24              But what does that do to the psychology of
25    somebody you're selling it to when it's just like --
```

Cemil Hope                                                      April 12, 2017

```
 1    when you're like, "Oh, the frame was replaced, because
 2    of da da da?"  What does that do?  Does it say -- it
 3    probably would for me, on some level, make me kind of
 4    go, "Huh."  Like -- that's kind of a big thing, you
 5    know, to just take apart the whole car, replace the
 6    frame, da da da da.  Like, I don't -- I just don't know.
 7    I never dealt with it, so the psychology of that, like,
 8    how does that -- how does that play out?  And how would
 9    that affect somebody down the road?
10         Q.   So in your mind, class members should get cash
11    instead of a frame, or you just don't know?
12         A.   I don't know.  I don't have a specific like.
13    I just know that people should be given a bit more,
14    maybe time and understanding of this before sort of
15    pigeonholed into one outcome.
16         Q.   Okay.  So -- so time -- this is where I'm
17    confused.  So time before what though?
18         A.   Before settlement.  I mean, it seems like this
19    is kind of fast-tracking.
20         Q.   So what would be, in your mind, a fair amount
21    of time for people to be able to act?
22         A.   Well, it depends on what efforts were made on
23    Toyota's part to let those people know.  I mean, if I
24    felt like I had been given notice of this by Toyota and
25    this was, like -- and I don't know how that works.  I
```

Page 69

Cemil Hope                                                          April 12, 2017

```
1   don't know if that's done in a case like this.  But to
2   have to kind of, again, find it, and what if I didn't?
3   What if eventually I just had to go with the -- you
4   know, the generic outcome of this, and what if I didn't
5   feel, at that point, that it was fair?  Like, I would
6   have already opted in by not opting out.
7           So I feel like that -- again, when I say
8   pigeonholed, that's kind of what I feel like.  It's --
9   it's not really -- you know, the fact that I found some
10  -- you know, found it, and doing this is just to bring
11  to light some of these other concerns that I don't feel
12  like were addressed in the settlement.
13      Q.    So back to my example, the 90 percent thing.
14      A.    Mm-hm.
15      Q.    So let's assume 90 percent of class members
16  got -- got the notice of the settlement in the mail
17  before the objection deadline?
18      A.    Mm-hm.
19      Q.    In your mind, would that ameliorate your
20  timing --
21      A.    Yeah.
22      Q.    -- concern?
23      A.    Yeah, that feels -- definitely feels more
24  fair, absolutely.  And -- but, you know, and -- and I
25  feel like on some level the reason that wasn't done is
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                    April 12, 2017

1    because this was kind of, you know, trying to get
2    fast-tracked or settled before, you know, maybe more
3    people had a chance to, you know, voice their concerns
4    or opinions.  And hence, my objection.
5           You know, again, it's not to -- you know, this
6    isn't out of, you know, ill will or spite.  It's just
7    simply, like, I want to be sure that 20-plus years of
8    loyalty I've given to Toyota that they respect, you
9    know.
10          Q.   What do you personally hope to get out of this
11   objection?
12          A.   I don't have any perspective on that
13   whatsoever.  I don't have any intentions.  Definitely
14   don't have any intentions monetarily.  I -- you know, at
15   the end of the day, there's a few simple things.  I
16   mean, I'm going to be selling my truck at some point.  I
17   want to be sure that -- that I'm not taking a loss.
18          My time is very valuable.  You know, I charge
19   a hundred bucks an hour, you know, when I'm in the shop
20   or on site or whatever.  That adds up quick, you know.
21   If I have to deal with this in ways that I prefer not
22   to, that -- that's just my day.  Like, I have four kids,
23   I have a family, I have a business, you know, four
24   employees.  I don't -- I don't have time to burn, you
25   know.  And so I just want to be sure that -- just that

Cemil Hope                                                                April 12, 2017

1   on this -- on this car, this thing that I've invested,

2   you know, after tax, license, interest, blah, blah,

3   blah, you know, 35,000 in to, that I'm not giving that

4   away at some point, you know, I --

5           So having said that, I just want to feel like,

6   at the end of the day, that, you know, that if there is

7   any issues or if there's issues that people have when I

8   go to sell it, if it -- you know, the frame was or

9   wasn't replaced, then, you know, I just want to be sure

10  that that's not -- that I'm not compromising at that

11  point.  And that also other people don't have to

12  compromise, because they've put their faith in these

13  vehicles as well.

14      Q.   But so you -- for you, personally, though, how

15  would you fix the settlement to make sure you don't

16  compromise?

17      A.   I don't know that -- I mean, again, there's

18  some expression in the objection:  How -- what I would

19  do differently?  I've expressed a few things as far as

20  like the -- the -- going back to the fairness issue.

21  That, you know, that people have -- that know that

22  they're getting their vehicle inspected, that they know

23  and trust that -- you know, I've lost a little bit of

24  faith in that trust, just by kind of seeing how this is

25  -- you know was proposed and -- and going to be dealt

Cemil Hope                                                    April 12, 2017

1    with, so I would want to really trust that that was --
2    that my vehicle was seen objectively, and was, like, you
3    know held to a standard, a scientific standard.  Not
4    just a visual, like, "Oh, it looks good to me," you
5    know, but that I can trust that it was going to be the
6    same at every inspection point.  That it was going to be
7    a fair outcome.  So that -- that to me, you know,
8    feels -- I feel like I would want that to be addressed.
9            I don't know if there's maybe some cash value
10   that's assumed for the year of the car, the potential
11   difference in resale, yeah.  And then maybe some -- you
12   know, some of the time that it took people to, you know,
13   have to deal with this in terms of just the physicality,
14   you know, being without their vehicle for "X" amount of
15   time, driving a loaner, making sure that the loaner was
16   given, not, like a good-faith effort.  You know, so
17   there's just things that -- that -- you know, some
18   elements that feel, like, not well addressed.
19           And, you know, I -- at the end of the day,
20   it's not, you know, that I'm -- you know, the same thing
21   that's -- that's stated, you know, in this agreement,
22   that, you know, I -- I don't necessarily want to, you
23   know, put just my needs above the needs of all else, of
24   all others.  But, you know, I -- and I would need to
25   consult with Brad to, you know, get kind of his opinion

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                        April 12, 2017

1   on this as well.

2            But -- and, you know, but what -- I guess

3   what -- you know, I -- but I still -- you know, we're

4   all kind of selfish on some level.  I want to be sure

5   that -- that I'm taken care of in terms of my own

6   vehicle.  And that's kind of -- obviously that's an

7   important piece as well.  I'm not discounting that --

8   those needs of others, but, you know, I do want to be

9   sure that if -- you know, if -- yeah, I don't know.  I

10  think that's kind of --

11       Q.   And so you don't think getting a new frame on

12  your own vehicle would satisfy those own personal needs?

13       A.   I just -- I just don't know yet.  Like, I

14  don't know if that's -- and I say that because I don't

15  know -- you know, I just don't know the eventual outcome

16  of that in relation to selling my vehicle.  And if

17  somebody else has an objection to that, you know, to

18  like, "Oh, your frame was replaced?  No.  Sorry.  I'm

19  going to go get -- buy a vehicle year that doesn't have

20  anything to do with that," and blah, blah, blah, you

21  know.  Like -- I -- I just don't know what that outcome

22  might be, so I just want to -- I think that there's --

23  you know, I haven't really gotten too into this with

24  Brad, but I just want to be sure that -- that by, you

25  know, by accepting just that, that there's not something

Cemil Hope                                    April 12, 2017

1   else that I'm relinquishing, you know, and some eventual
2   loss.
3        Q.   What can be fixed about the settlement where
4   you would be willing to withdraw your objection if it
5   was fixed?
6        A.   I think I'd need to speak with Brad more about
7   that.
8        Q.   Do you have any personal opinions about that?
9        A.   I think I've expressed a fair amount of those.
10  I don't know if it's worth reiterating again.
11             MR. O'REARDON:  Let's go ahead and take a
12  break.
13             THE WITNESS:  Cool.
14             (Recess taken.)
15  BY MR. O'REARDON:
16       Q.   Your 2009 Tacoma, what cab model is it; do you
17  know?
18       A.   Four-door.
19       Q.   Do you know what the engine is on it?
20       A.   V6.
21       Q.   Do you know what liter?
22       A.   Hm, yeah, I'm not -- I'm drawing a blank right
23  now.  I did -- I do, but I can't remember.
24       Q.   Going back to the Facebook feed that
25  eventually got you to Brad.  Are you willing to tell me

Cemil Hope                                                    April 12, 2017

1    any of the names of anyone?  You can throw in the caveat
2    that you have no idea whether it was that specific
3    person that linked you with Brad.
4         A.    I just -- you know, again, like I have
5    friends on Facebook, and -- and I know they have
6    Toyotas, but were they anywhere in there?  I honestly
7    don't know.  Like when I go on -- I mean, I could have
8    been taken to a friend of a friend of a friend of a
9    friend via a feed, you know.  So I'm just saying, like,
10   I just couldn't do that.  I couldn't do that and know
11   that they had anything to do with it, you know.  So if
12   I -- I felt that that person did or a person that I know
13   that I'm friends with on Facebook that was part of that
14   feed, then yes.
15             But I could have started at their feed and
16   went to another feed and started talking to a -- or not
17   talking, but, you know, just like saw somebody else
18   posting, you know, it just goes so far that I just --
19   like I said, in good faith, I can't do that.  I just --
20   I might be saying something -- saying a name that hasn't
21   -- that had nothing to do with this at all, so I just
22   wouldn't want to get somebody involved that, you know,
23   that I wasn't absolutely sure was -- I could give you a
24   long list of people I know with Toyota Tacomas, though,
25   that should be involved in this, if they're not already.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                    April 12, 2017

1        Q.   Do you know for sure if they're class members
2   or not?
3        A.   I don't.
4        Q.   Do you know what makes somebody a class member
5   or not?
6        A.   Well, I mean, I would start with a Tacoma, and
7   I would start with -- you know, I have a general sense
8   of models and years based on body styles, because I've
9   had enough and seen enough.  But, I mean, I know, you
10  know, after reading the -- the years of the Sequoias and
11  the Tacomas and the Tundras that, you know, I could
12  easily reference that.  But, again, that's why I kind
13  of -- you know, I haven't made any kind of
14  broad-sweeping announcements about it, just because, you
15  know, I -- yeah, I don't know.  I guess that's not
16  something I typically do and have done and maybe even
17  will do, so.
18            MR. O'REARDON:  That's all I have for right
19  now.
20            MR. CHANG:  I have a couple of questions.
21            THE WITNESS:  Okay.
22                          EXAMINATION
23  BY MR. CHANG:
24       Q.   Can I call you "Chem-il," is it?
25       A.   "Ja-meal."

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                          April 12, 2017

1      Q.    "Ja-meal."  I'm David Chang.  I haven't had a

2    chance to speak very much at this deposition yet, but I

3    represent Toyota in this matter.  And I just have a

4    couple of follow-up questions about some of the things

5    that you've already been asked.

6          So generally speaking, we've asked you several

7    times about, you know, what would be a reasonable

8    settlement here, what could be added.  And I don't know

9    if I've quite understood it, so is there anything that

10   we or that Toyota could add that would satisfy you in

11   terms of the settlement that would make you withdraw

12   your objection?

13     A.    You -- well, I mean, obviously there's the

14   things specifically stated in the objection, but in

15   terms of, you know, withdrawing it, I mean, I think, you

16   know, I -- maybe I've been a bit vague, but it's because

17   I don't know specific -- specifically what -- like how

18   to word it or what -- you know, like how to approach

19   those subjects.  But, you know, and it's why I've been

20   vague saying just fair.

21          And there may be several things that define

22   what that is to me, but I just -- I guess I really want

23   to be sure that -- that people get an objective

24   inspection and that they are guaranteed an alternate

25   means of transportation while it's being dealt with;

Cemil Hope                                                    April 12, 2017

1   that if there is any kind of way to project, you know,

2   loss of value, you know -- which, again, I don't want

3   to -- you know, that's very broad -- but I don't want to

4   determine what would -- what would need to be, you know,

5   addressed or to be -- how to satisfy that.

6           But, you know, that was obviously one of my

7   first concerns, is like, you know, I'm going to sell my

8   truck in, you know, four or six months, whatever.  Like,

9   am I going to be -- you know, is it going to be an issue

10  if I trade it in?  Is it going to be an issue if I --

11  you know, whatever.  I just -- whatever that -- you

12  know, "Oh, well, you know, generally we're seeing a 15

13  or 20 percent, you know, loss of value," whatever.  I

14  don't know.  I'm just saying, like, if there's some way

15  of defining that and possibly compensating people for

16  that.

17      Q.   So basically you're saying you're looking for

18  an additional cash portion to this settlement?

19      A.   Is that what I'm looking for?  I -- again,

20  like I said before, I've not -- I haven't really thought

21  of that honestly.

22      Q.   Okay.

23      A.   I haven't been like, "Oh, what's that number

24  to me?  What do I -- do I want money?"  I don't know.  I

25  just want to like -- I want to just know that -- that if

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                        April 12, 2017

1   I sell that car, that, you know, that -- that I'm not
2   going to have any hassles.  But also that, you know, if
3   people that -- that haven't been notified of this, like
4   surely they will be.
5          And I'm not saying, you know, that that will
6   all be done prior to the settlement, but I just want to
7   be sure that if people are, you know, have to deal with,
8   you know, a warranty or a recall issue that -- you know,
9   that they're fairly dealt with, and it's not just kind
10  of a, "Oh, we're just going to replace your frame.  It's
11  no big deal."  Like, I don't know.
12         That to me it's, like, again, using the
13  analogy, like if I build a house, like, I don't want to
14  go replace the frame.  That's -- that's a -- that's a
15  really -- and maybe I have a different perspective on it
16  because replacing the frame of your house is really
17  difficult.  You know, maybe it's not such a big deal
18  with a vehicle.  I don't know.  I'm just not well-versed
19  in that.
20         But I just want to be sure that, you know, if
21  there's some legalese and some laymen's terms that, you
22  know, give people a little more protection, I guess, so
23  that, you know, if they do incur a loss, that, you know,
24  I mean I'm -- there's got to be some reasonable way to
25  determine that so it's not just some arbitrary, you

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                    April 12, 2017

```
 1    know, like, "Oh, you can" -- I don't know.  I just --
 2    you know, I -- and I know that part of the settlement
 3    is, you know, there's -- that you have to opt out in
 4    order to have, you know, future recourse basically.
 5         Q.   So what do you mean by that?  I think you've
 6    mentioned future recourse several times here.
 7         A.   Yeah.
 8         Q.   And you also --
 9         A.   I guess I just mean like -- I -- you know, I'm
10    just not a litigious person, so I don't think that,
11    like, "Oh, I'm going to sue that person."  I don't want
12    to be sued.  I don't want somebody to sue me, but -- but
13    in order to not do that, I have to be really sure what
14    I'm building and how I'm building it and the quality.
15    And, so, when I say "future recourse," I mean, you know,
16    if somebody has a legitimate claim that -- whether a
17    safety issue that, you know, the frame failed and
18    whatever that means, I don't know, but, you know.
19              And then to be kind of pushed into the
20    category of, like, "Well, we already settled that.  You
21    can't do anything in regards to" -- you know, if you
22    didn't opt out, you can't -- you don't have any future
23    recourse around, you know, something that comes up.  Not
24    just around monetary, like, you know, not being able to
25    sell it for full value or whatever.  But what if there's
```

Cemil Hope                                               April 12, 2017

1    a safety issue?  I mean, what if that, you know, that

2    comes up?  Is that addressed in a different class

3    action?  I don't know.

4           But I just know that I wouldn't want to be --

5    again, that pigeonhole comes up.  Like, I wouldn't want

6    to be kind of put into this category if I only have this

7    much recourse, "Oh, that -- you know, that was a -- that

8    was a safety recall or a whatever, and you were given

9    notice, so we only have -- we only have responsibility

10   within this little window."

11          Like, I just -- you know, again, I'm not a

12   lawyer.  I'm not -- I don't know -- I don't manufacture

13   cars, so I'm just looking at it from, you know, that

14   perspective of -- again, I mentioned it -- I've had, you

15   know, 20, 25 years of Toyota loyalty, so I -- I just

16   want to be sure that -- that I'm seen, and people are

17   seen, as, you know, as I think for what they are, like

18   pretty loyal Toyota customers, you know.

19       Q.   I just want to confirm.  So you bought -- you

20   said -- you testified that you brought your 2009 Toyota

21   Tacoma from Marin Toyota in 2012?

22       A.   Yes, I believe so.

23       Q.   I just want to confirm the dates here, because

24   I think that's different what your declaration says.  I

25   think your declaration says, on Exhibit 5, if you want

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                   April 12, 2017

```
 1   to take a look at it.
 2        A.   Right.  Yeah.  I did actually see that later.
 3   I didn't catch that earlier.
 4        Q.   So which -- I just want to confirm, since we
 5   are -- this is a court document.
 6        A.   Yes.
 7        Q.   And we are testifying -- you are testifying
 8   under oath.
 9        A.   Yep.
10        Q.   Which is the correct date?
11        A.   Yes.
12        Q.   Is it 2012, or is it 2014?
13        A.   It is 2012.
14        Q.   And you're 100 percent sure that it's 2012?
15        A.   Well, hold on a sec.  Let me think.  I gauged
16   off the birth of my children, because I know my wife was
17   pregnant with our -- with our three-year-old right now,
18   so that was early on, so it would have been -- so she
19   was born in '14, '15, she's going to be four, so
20   five years.  Yeah, so it had to have been -- yeah, it
21   had to have been 2012.
22        Q.   So you're saying this declaration is
23   incorrect?
24        A.   I am saying that.
25        Q.   Okay.
```

Cemil Hope                                                    April 12, 2017

1      A.   Yeah, and I just actually read this -- you

2   know, I read it over and over again, but I just last

3   night caught that and -- so, yes, it's not 2014.  It's

4   2012.

5      Q.   Okay.  The questions I had was, so when you

6   were seeking an attorney to represent you here, I just

7   want to go over that process again.

8      A.   Mm-hm.

9      Q.   How -- let's -- how many attorneys did you

10  contact before you settled on Mr. Salter?

11     A.   I didn't -- I just -- basically one call.

12  That's all.  I wasn't seeking -- like, I really

13  honestly, like, I didn't come from that perspective,

14  like, seeking an attorney.  Like, I was --

15     Q.   How did you find Mr. Salter's contact

16  information?

17     A.   Like I said, it was -- it was mentioned

18  somewhere, and that's why I'm just -- I'm trying to be

19  -- I'm not trying to be vague.  I'm -- I can't be that

20  specific, because, unfortunately, Facebook for me is not

21  that specific.  But somewhere in one of the threads that

22  I could have gone to -- you know, link, link, link, I

23  don't know -- somewhere his name came up, and I just --

24  again, path of least resistance.  I wasn't looking for

25  somebody, but felt compelled to, you know, have my voice

Cemil Hope                                            April 12, 2017

1    heard and made a call.

2        Q.   And you were the one that reached out,

3    correct?

4        A.   Yes.  Yeah.

5        Q.   And is there any particular reason why you

6    chose an attorney based in Hawaii?

7        A.   No.

8        Q.   Did you --

9        A.   The location didn't seem to matter.

10       Q.   Did you look into any attorneys in the

11   State of California?

12       A.   The what?

13       Q.   Did you look into any other attorneys --

14       A.   I didn't look into any other attorneys,

15   period, you know.  So this was just, like, again, saw a

16   name, made a call, didn't really -- yeah, I just didn't

17   really have any -- any thought process around locale or

18   -- or who would best, you know, fit this.  I just

19   reached out, had a conversation, seemed fine after

20   talking that we could work together.

21            And again, like I wasn't -- I just wanted to

22   just get a sense for what -- what this settlement meant,

23   what my rights were, you know, how some of these

24   concerns I had could be addressed.  And, you know, the

25   suggestion was an objection, and, you know, I -- I think

Cemil Hope                                                                April 12, 2017

1   for the most part, for me, it was just a way to say, you

2   know, my -- my concerns aren't fully addressed in this,

3   and -- and I think the concerns of others aren't fully

4   addressed and --

5        Q.   Were those the concerns of the other people in

6   that Facebook group that you were --

7        A.   No, I don't -- I honestly don't remember any

8   like -- any, like, discourse about, like, you know who

9   -- like who said what, like fair or unfair.  It just --

10       Q.   Well, can we take a step back?

11       A.   Sure, yeah.

12       Q.   So you've referenced this Facebook

13   conversation several times.  Can you describe for me the

14   parameters of the group who -- was it a group of

15   specific individuals talking about Toyota Tacoma trucks?

16       A.   So it had to do -- I mean, so, again, I

17   followed kind of -- I saw that there was -- I mean, you

18   know, when things come up on Facebook, they're just

19   like -- it's a visual.  You know, you see something,

20   Toyota, da da da da da, and that was -- you know, again,

21   like I don't -- like it's just too -- it's one of those

22   things that I don't -- I just don't, like, you know,

23   keep track of, like, what -- where I go on Facebook, I

24   think like most people don't.  So saw something, led me

25   to another -- maybe somebody's -- somebody's personal

Cemil Hope                                                April 12, 2017

 1  page or somebody's, you know -- or just kind of a
 2  generic link.
 3       Q.   Did you know the people -- any other persons
 4  in that Facebook group?
 5       A.   Not that -- yeah, again, that's what I was
 6  saying, like I don't recall who was -- who was saying
 7  anything at that point.  It was just, you know, maybe
 8  some comments.  And I don't know that it -- I don't -- I
 9  don't -- I just don't remember specifically that there
10  was anything, like, negative --
11       Q.   Was --
12       A.    -- per se.
13       Q.   Was there any -- was the group specifically
14  talking about litigation?
15       A.   No, I didn't -- no, I didn't -- not that I
16  remember.  There wasn't anything like -- that didn't say
17  the word litigation.
18       Q.   So the group was solely, was it just a Toyota
19  Tacoma aficionados group?
20       A.   That's why -- that's why I -- I'm trying to
21  be -- like when you asked me about names, like, I -- I
22  don't -- I just don't know.  Like, I didn't keep track
23  of, like -- you know, I think we've all done it, gone to
24  Facebook, we press one thing, it leads to another thing.
25  And then there's comments.  Maybe I'll press on a

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                      April 12, 2017

```
 1    comment and it will lead to something else.  Like I
 2    just -- that path, I don't remember.
 3         Q.   Well, I think it was just -- it's just
 4    uncommon for people to go to a Facebook group randomly
 5    that's discussing a certain topic and find a lead of an
 6    attorney without there being some discussion of
 7    litigation, right?
 8         A.   I mean, again, like, I'm not a litigious
 9    person.  I don't -- like, I don't see something and see
10    litigation.  So I didn't see words "litigation."  I
11    -- I -- I think the conversation was more -- that's why
12    I was saying, like, fairness, like the general --
13         Q.   Fairness about what?  Fairness about
14    litigation?
15         A.   Just about settlement.  No.
16         Q.   So is a settlement -- so then the settlement
17    is in regards to litigation, correct?
18         A.   Correct.
19         Q.   So there was discussion on the Facebook forum
20    about this current litigation, correct?
21         A.   About the settlement, yes.  So if you want to
22    refer to it as litigation, yes.
23         Q.   And that is how you got into contact with
24    Mr. Salter, then, correct?
25         A.   I -- yes, I saw his name, it came up, and it
```

Cemil Hope                                                    April 12, 2017

1   had to do with -- yeah, I don't -- I think probably --
2   you know, I'm -- I'm seeing that there was something
3   said about making sure that, you know, that -- that
4   one's --
5        Q.   So was it another person in that forum that
6   referred you to Mr. Salter, or was it Mr. Salter
7   himself?
8        A.   Not referred.  Don't -- I mean, that's what
9   I'm saying.  Don't tell me that anybody referred me to
10  anybody.  Nobody referred me.  I didn't ask.  Nobody
11  said, "Go talk to this person," whatever.  That wasn't
12  it.  It was, like, there was general talk, comments, and
13  then his name, like, so --
14       Q.   Were there any other attorney names that were
15  provided in that forum?
16       A.   No.  If there was, I may have called somebody
17  else.  But it was just -- it was a name and saying
18  something, you know, that this person has maybe been
19  involved with, you know, other -- you know, other
20  settlements as such, you know, whatever, the class
21  action.  It just was very vague.  And I just took that
22  as like kind of with a grain of salt.  Like I wasn't
23  looking.  I wasn't -- I knew that I had -- had concerns
24  that wanted to be expressed, so I just made a call.
25            And it wasn't -- you know, I wasn't like, "Oh,

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                      April 12, 2017

```
 1   I'm going to go do this because," you know.  Again, like
 2   that litigious piece, like, I -- I wasn't looking for
 3   anything.  I was -- I was specifically just wanting to
 4   talk to somebody about these -- the rights of people
 5   within the settlement.  I just --
 6        Q.   So --
 7        A.   -- wanted to be sure that those rights were
 8   being --
 9        Q.   So Mr. Hope, I'm assuming, just based on the
10   passion that you've testified today about, this is a
11   very important issue to you that you care a lot about,
12   correct?
13        A.   I don't know.  It's become a little bit more,
14   I guess, as I become more involved with it.  Like, I
15   wasn't passionate about it when I saw it.  I was just
16   concerned because I have a Tacoma and --
17        Q.   And would you say that you're pretty
18   researched on this issue here?  It seems like you read
19   about the Tacoma and read about this litigation quite a
20   bit.
21        A.   No.  I mean, just this, you know.  Just the
22   settlement offer.
23        Q.   Okay.
24        A.   And -- and my own experience in owning Toyotas
25   and what that means to me and what I would hope it
```

Cemil Hope                                        April 12, 2017

 1    -- how I would want to be treated in something like
 2    this, and how I hope others are treated.
 3           And it's, again, I may say fairness, because
 4    that's what I feel.  Like, I just want everybody, all
 5    the people that I know that have been super loyal to
 6    Toyota all these years, I just -- I don't want to see
 7    them adversely affected by this, you know, monetarily or
 8    otherwise, you know, safety wise.
 9           Like, I don't -- I don't know.  I know that if
10    -- if -- again, using this analogy of building.  Like if
11    I don't build something strong that -- and if I don't
12    secure it correctly, whatever that may be, and it could
13    be that I think I'm securing it correctly, but because
14    the substrate isn't strong enough, that there could be a
15    safety issue, and --
16       Q.   Well, it seems like you're a very -- you're a
17    very diligent person, right?
18       A.   I try to be.
19       Q.   So you've done your due diligence quite
20    frequently.  But it seems like -- but in picking an
21    attorney to represent an issue that you care so deeply
22    about --
23       A.   I didn't know then, you know what I'm saying?
24       Q.   -- you -- you just made one phone call?
25       A.   I don't -- I don't go out looking -- I don't

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

1   go out looking for an attorney, ever, you know.  I've

2   never done -- didn't -- wasn't passionate about this.  I

3   just wanted to make sure that my rights were seen and

4   taken care of.

5        I -- I don't shop around.  I know -- like,

6   with the Toyota, I don't go shopping around.  I just go

7   buy it.  Because that, like, to me seems like the right

8   thing.  It's -- I -- there's -- I trust that.  I trust

9   that I'm making a decision based on the right thing in

10  front of me.  You know, I'm not saying that I'm not --

11  that I don't do some due diligence and make sure that

12  I'm getting a good deal, whatever, but I -- you know, in

13  buying a car.  But I'm not -- like, I wasn't shopping

14  around.  I wasn't going and looking for somebody.  I

15  just -- you know, the name came up.  I'm like, "Oh, I'll

16  just give him a call.  I'll see if, you know, there's --

17  that he has -- if he has any thoughts about what this

18  means."  What -- if -- you know -- if -- if he feels,

19  like -- because, I don't know, objectively I felt

20  something, but maybe I'm just the only one.  I don't

21  know.

22       I'm not -- you know, I was kind of looking for

23  somebody to tell me, like if I'm maybe off-kilter, like,

24  feeling this, seeing this, or if there's some relevance

25  to what I'm thinking or feeling.  So he seemed to

Cemil Hope                                                  April 12, 2017

```
 1   acknowledge there's some relevance and, you know, here
 2   we are today.
 3            So passionate, I don't know.  I mean, I'm -- I
 4   don't know if I'm passionate about this.  I just, I
 5   care.  And I care about my own car, my own family's
 6   safety, so I just want to be sure that other people are
 7   -- are taken care of in that way and -- and respected.
 8   And I -- you know, I -- maybe this happens every day.  I
 9   don't know.  But, for me, like, this is -- it seems
10   significant enough.
11            If you -- you know, the leaf spring recall.
12   Oh, just a leaf spring.  Not that big of a deal.  The
13   frame, yeah, it's a pretty big deal.  I mean that, to
14   me, is like -- again, you know, from what I do, a frame,
15   the frame, is the most important part, the
16   foundation/the frame.  So this is -- seems to me a
17   bigger thing, and maybe people's lives are at stake, you
18   know.  I don't know.  But so I'm concerned.
19            You use the word "passionate."  No, I'm not
20   passionate.  If I was passionate, maybe I would have
21   called 20 different attorneys and found the person that
22   was going to give me the most money or whatever, but
23   that's not why I did this.  I just wanted to be sure
24   that -- that -- that my voice was heard, my objections
25   to the settlement, you know.
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                    April 12, 2017

1           And again, like, I think that for me this was
2     just a way of saying, "Hey, you know.  I don't want you
3     to determine my -- you know, by sort of closing the door
4     at some point fairly soon, that I have no recourse, if
5     -- if something happens later."
6           And what -- again, I know I've used the word
7     "recourse," and I've explained kind of what that means
8     to me.  It just -- it -- it just means having, you know,
9     some future rights that -- that aren't signed away too
10    quickly.
11       Q.   You mean future rights to sue, correct?
12       A.   If that -- I guess.  Again, having never sued
13    anybody --
14       Q.   Because the --
15       A.   -- so I don't know.
16       Q.   So when you say "preserve your rights," you're
17    referring to preserve the right to sue Toyota at a later
18    date, correct?
19       A.   No.  You're saying that.  I didn't say that.
20    I don't -- I don't know.  I just want to preserve my
21    rights.  I don't know.
22       Q.   Preserve what type of rights?
23       A.   I don't know.
24       Q.   Okay.
25       A.   I'm going to leave it at that.  I'm not going

LITIVATE REPORTING + TRIAL SERVICES I 877.771.3312 I litivate.com

Cemil Hope                                                    April 12, 2017

1    to -- I don't want you to put words in my mouth, so --

2                MR. CHANG:  Okay.  That's all I have.

3                MR. O'REARDON:  Brad, did you have any

4    questions?

5                MR. SALTER:  You know, just for clarification.

6    I want to let you guys know, I am licensed in the

7    State of California, and I do practice there, so I'm not

8    just a Hawaii lawyer.  So I just want to clarify that

9    for you, Toyota.

10                        EXAMINATION

11   BY MR. SALTER:

12       Q.   You know, Cemil, when you build a house, you

13   know, your foundation is -- you know, is that what

14   you -- you mentioned earlier, that's kind of the

15   important part of the house, right?

16       A.   Correct.

17       Q.   Should that last the life of -- you think that

18   should last the life of a home, if a home lasts for, you

19   know, 20, 30, 40, 50 years?

20                MR. O'REARDON:  Asked and answered.  Go ahead.

21                THE WITNESS:  Oh.  It is the life of the

22   house.  The frame is the life.  It shouldn't last a

23   life.  It actually determines the life.

24   BY MR. SALTER:

25       Q.   Right.  So with a car, you know, I think you

Cemil Hope                                                    April 12, 2017

1    were alluding to the fact that the frame, you know,

2    should -- one of the reasons you don't -- that you had

3    concerns about this is, if a vehicle lasts 15 or

4    20 years, should the frame last as long?  I mean, is

5    it -- to you, in your mind, you know, should the frame

6    last the life of the vehicle?

7              MR. O'REARDON:  Asked and answered.  Go ahead.

8              THE WITNESS:  Yeah.  And, to me, the frame is

9    the life of the vehicle.  If the frame isn't

10   structurally sound or is faulty, then there is no

11   vehicle, in my opinion.

12   BY MR. SALTER:

13       Q.   Okay.  And the other thing is you guys talked

14   about, you know, why didn't you opt out?  If you were to

15   have opted out of this claim, you know, do you think

16   that you would be able to afford an attorney to go out

17   and pursue this claim?

18       A.   Probably not.  Not individually.

19             MR. SALTER:  Okay.  Anyway, that's really all

20   I have, gentlemen.  You know, you guys covered pretty

21   much everything, so I don't have anything else.

22                    FURTHER EXAMINATION

23   BY MR. O'REARDON:

24       Q.   Have you heard the time "professional

25   objector"?

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                              April 12, 2017

```
 1        A.   No.
 2        Q.   Did you ever google the term "professional
 3   objector"?
 4        A.   No.
 5        Q.   Or serial objector.  Have you ever googled
 6   "serial objector"?
 7        A.   No.
 8        Q.   Have you ever heard the term "serial
 9   objector"?
10        A.   No.
11        Q.   Have you every heard of professional objectors
12   being referred to as remoras?
13        A.   No.  I don't know what that is.
14             MR. SALTER:  What was that word?
15             MR. O'REARDON:  Remoras.
16             MR. SALTER:  Okay.
17   BY MR. O'REARDON:
18        Q.   You mentioned maybe your lives are at stake
19   with the frame issue -- or safety is an issue?
20        A.   Yeah.  Safety, yeah.
21        Q.   So fixing the frames to prevent those safety
22   issues is a good thing, right?
23        A.   Fixing the frames, yeah, absolutely is a good
24   thing.
25             MR. O'REARDON:  And that's all I have.  Okay.
```

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                          April 12, 2017

 1   So the transcript is going to be provided on an

 2   expedited basis.

 3           Brad, if I could ask that we'll provide you

 4   with a copy of this, and you could sign or not sign

 5   within two days?

 6           MR. SALTER:  Sure.

 7           MR. O'REARDON:  And then if you don't sign,

 8   obviously it will be deemed, you know, read and no

 9   changes are necessary.

10           So what we're talking about, Mr. Hope, is that

11   you'll have an opportunity to read through the

12   transcript, make any corrections that you believe are

13   necessary.

14           THE WITNESS:  Okay.

15           MR. O'REARDON:  Just keep in mind that we're

16   also allowed to comment on the nature of the changes, so

17   if all of a sudden an answer goes from "yes" to "no," or

18   something substantive is changed, we're always -- it's

19   our right to make comments on those changes.  But you'll

20   have an opportunity to read through it.  I'm sure it's

21   high on your list of to-dos and wants to read through

22   the transcript.  But we'll ask for a copy back within

23   two days of when we get the transcript from the

24   reporter.

25           THE WITNESS:  Okay.

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                    April 12, 2017

 1              MR. O'REARDON:  Fair enough, Mr. Salter?

 2              MR. SALTER:  Excellent.  Yes.

 3              MR. O'REARDON:  All right.  Thank you again,

 4     everyone, for your time.

 5              MR. CHANG:  Thank you.

 6              MR. SALTER:  All right, gentlemen.  Thank you.

 7              THE REPORTER:  Would everyone like a copy of

 8     the transcript?

 9              MR. SALTER:  No, thank you.  Not at this time.

10              MR. O'REARDON:  I'll just get an expedited

11     version.

12              MR. CHANG:  Yeah, I'll get one, too.

13              (Ending time:  11:55 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Cemil Hope                                                          April 12, 2017

1                      DECLARATION UNDER PENALTY OF PERJURY

2

3          I, Cemil Hope, do hereby certify under penalty of

4    perjury that I have read the foregoing transcript of my

5    deposition taken on April 12, 2017; that I have made

6    such corrections as appear noted herein in ink,

7    initialed by me; that my testimony as contained herein,

8    as corrected, is true and correct.

9

10         DATED this _____ day of _____, 2017,

11   at _____, California.

12

13

14

15

16                      _____

17                                      Cemil Hope

18

19

20

21

22

23

24

25

Cemil Hope                                                    April 12, 2017

```
 1                    CORRECTION CERTIFICATE

 2

 3        I, Cemil Hope, do hereby certify that I have read

 4   the foregoing statement and that, to the best of my

 5   knowledge, said statement is true and accurate (with the

 6   exception of the following changes listed below):

 7   PAGE      LINE       CHANGE TESTIMONY TO READ AS FOLLOWS:

 8   _____     _____      _____

 9   _____     _____      _____

10   _____     _____      _____

11   _____     _____      _____

12   _____     _____      _____

13   _____     _____      _____

14   _____     _____      _____

15   _____     _____      _____

16   _____     _____      _____

17   _____     _____      _____

18   _____     _____      _____

19   _____     _____      _____

20   _____     _____      _____

21   _____     _____      _____

22   _____     _____      _____

23

24                            _____
                                     Cemil Hope
25
```

LITIVATE REPORTING + TRIAL SERVICES I 877.771.3312 I litivate.com

Cemil Hope                                                    April 12, 2017

1                      REPORTER CERTIFICATE

2           I, MICHELLE D. BARBANTE, Certified Shorthand

3    Reporter, Certificate No. 12601, for the State of

4    California, hereby certify that CEMIL HOPE was by me

5    duly sworn/affirmed to testify to the truth, the whole

6    truth and nothing but the truth in the within-entitled

7    cause; that said deposition was taken at the time and

8    place herein named; that the deposition is a true record

9    of the witness's testimony as reported to the best of my

10   ability by me, a duly certified shorthand reporter and a

11   disinterested person, and was thereafter transcribed

12   under my direction into typewriting by computer; that

13   request:  [ X ] was  [  ] was not

14   made to read and correct said deposition.

15          I further certify that I am not interested in

16   the outcome of said action, nor connected with, nor

17   related to any of the parties in said action, nor to

18   their respective counsel.

19          IN WITNESS WHEREOF, I have hereunto set my

20   hand this 14th day of April, 2017.

21          *Michelle Barbante*

22   _____
            MICHELLE D. BARBANTE
23          Certified Shorthand Reporter #12601

24

25

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope

April 12, 2017

---

**Exhibits**

001-CH

002-CH

003-CH

004-CH

005-CH

---

**$**

**$10**
62:24 63:10,18
65:12 66:19
67:12

**$20**
65:13

**$3**
58:22

---

**1**

**1**
6:22,23 31:17

**10**
63:4 67:18

**100**
83:14

**100,000**
8:20 10:25

**11:55**
99:13

**12**
4:1 29:11,12,23
40:24 41:1,14

**14**
83:19

**140,000**
11:3

**15**
8:18 32:18 41:1,
11 58:7 79:12
83:19 96:3

**16**
17:12

**18**
17:22

**19**
17:22

**1st**
8:6 31:11

---

**2**

**2**
30:14,15,17,25
31:17 32:3

**20**
17:13 39:13
79:13 82:15
93:21 95:19
96:4

**20-plus**
71:7

**2000**
10:8

**2001**
10:9

**2006**
15:18,21

**2009**
8:24 9:6,11,14
10:17,23 11:2,8
12:22 14:10
25:9 75:16
82:20

**2012**
9:7 11:9 82:21
83:12,13,14,21
84:4

**2014**
15:16 83:12
84:3

**2016**
14:21 15:6,22
16:5

**2017**
4:1 31:4 50:23

**2171**
32:18

**22,000**
9:12

**25**
82:15

**25th**
57:7

**29**
31:4

---

**3**

**3**
32:15 35:12,13,
15,19,24 36:9
37:5,7,13 49:1,
21

**30**
40:24 95:19

**30-year-old**
26:24

**35,000**
72:3

---

**4**

**4**
50:2,3,5 51:1
65:1

**40**
95:19

**400**
52:12

**429**
8:6

---

**5**

**5**
60:10,12,22
82:25

**50**
39:15 65:6,14
95:19

---

**8**

**80**

**17:7**

**80-**
8:20

**8:59**
4:2

---

**9**

**90**
17:7 22:11 49:2,
17 63:1 70:13,
15

**94952**
8:6

**95**
56:23

**99**
10:8

---

**A**

**a.m.**
4:2 99:13

**ability**
5:1 27:22 37:9
41:10,19,25
42:3 47:20
66:18 67:3

**absolute**
43:20

**absolutely**
42:2 44:12
70:24 76:23
97:23

**absurd**
67:15,21,23

**abuse**
45:19

**accept**
17:3

**accepted**
19:19 26:7 40:8

**accepting**
74:25

**account**

**46:5**

**accountable**
40:22

**accounts**
45:25

**acknowledge**
93:1

**acronym**
44:18,19

**act**
69:21

**action**
34:13 45:14,24
55:13 58:12,15,
23 63:2,8 82:3
89:21

**actions**
54:8 58:19

**actual**
36:21 68:2

**ad**
36:24

**add**
62:9 78:10

**added**
78:8

**additional**
79:18

**address**
6:20 8:5 31:11

**addressed**
70:12 73:8,18
79:5 82:2 85:24
86:2,4

**adds**
71:20

**advance**
57:9

**adversely**
39:18,24 40:4
91:7

**affect**

Cemil Hope

April 12, 2017

20:19 46:24
68:20 69:9

**affected**
39:18 40:4
47:14,24 64:11
91:7

**affecting**
39:25

**afford**
96:16

**aficionados**
87:19

**agree**
23:24 24:1
43:14 44:24
48:23 49:3,4
68:11

**agreement**
32:24 33:3 50:8
57:6 65:1 73:21

**agreement(s)**
32:16

**agreements**
51:2

**ahead**
6:5,11 35:11
50:1 75:11
95:20 96:7

**allotted**
68:1

**allowed**
48:2 98:16

**alls**
54:25

**alluding**
53:11,19 96:1

**alternate**
44:4 78:24

**ameliorate**
70:19

**amount**
69:20 73:14
75:9

**amounts**
18:8,9 65:22
68:2

**analogy**
22:22 24:8
65:18 80:13
91:10

**announcements**
77:14

**annual**
8:19

**answering**
57:5

**answers**
5:9

**anticipating**
5:14

**anybody's**
67:3

**anymore**
7:20

**appeared**
68:9

**appearing**
4:14

**appears**
36:9

**apply**
41:24

**approach**
24:20 68:12
78:18

**approximate**
8:19,20 57:10

**approximately**
8:11 9:10 10:13,
23 11:1,9 58:2

**APRIL**
4:1

**arbitrary**
80:25

**arise**

22:14

**Arkansas**
4:13

**assessment**
42:19,24 43:10

**assume**
12:18 25:5
26:24 70:15

**assumed**
73:10

**assuming**
36:2 44:5 50:24
90:9

**attached**
54:10

**attention**
25:18

**attorney**
4:20 6:8 50:9
51:7 60:5 65:9
84:6,14 85:6
88:6 89:14
91:21 92:1
96:16

**attorneys**
57:23 65:13
67:18 84:9
85:10,13,14
93:21

**audibly**
5:21

**award**
65:6 67:25 68:1

**awarded**
58:22

**aware**
18:7 20:21,24
68:14

**awhile**
17:11,17 68:6

———————————
**B**

**back**

10:17,23 17:11
24:10,13,22
29:19 56:1,4
65:1 70:13
72:20 75:24
86:10 98:22

**back-and-forth**
51:19

**Bandas**
59:2

**bank**
58:23

**base**
63:20

**based**
29:5 42:18 77:8
85:6 90:9 92:9

**basic**
41:7 44:1

**basically**
12:9 13:15 14:7,
8 51:17 54:6
79:17 81:4
84:11

**basis**
18:24 42:22
98:2

**bathroom**
61:13

**beg**
42:12

**beginning**
22:23 24:11

**bell**
59:25

**benefit**
13:22 42:4 44:6,
8,14

**benefits**
45:1

**Benjamin**
59:12

**bias**

43:5

**biased**
42:25 43:11

**big**
69:4 80:11,17
93:12,13

**bigger**
93:17

**billion**
67:16,19,25

**birth**
83:16

**bit**
28:1 54:18 58:8
59:23 61:7,8
66:16 69:13
72:23 78:16
90:13,20

**blah**
27:22,23 72:2,3
74:20

**blank**
75:22

**Blue**
17:8

**body**
41:9 77:8

**Book**
17:8

**born**
83:19

**bottom**
61:20

**bought**
9:7 25:9 82:19

**Brad**
38:12,17 50:9
51:10,12 60:18
61:2 73:25
74:24 75:6,25
76:3 95:3 98:3

**Brad's**
62:4

Page 2

Cemil Hope                                                                                    April 12, 2017

**break**
5:25 6:3,6 33:14
34:5,8 50:6
64:23 75:12

**briefly**
4:10

**bring**
11:4,16 12:11
21:4 26:2 31:21
32:20 33:22
70:10

**bringing**
25:18

**broad**
13:18 18:18
19:24 20:12
26:3 27:17 79:3

**broad-sweeping**
77:14

**broader**
19:15

**broadly**
26:4 48:7

**brought**
11:9,10,12
23:20,21 35:16
82:20

**bucks**
71:19

**build**
22:6,22 80:13
91:11 95:12

**builder**
21:24 22:25
27:4

**Builders**
8:17

**building**
22:22 24:8,11,
19 81:14 91:10

**built**
22:24,25 24:9
42:21

**bummer**
27:19

**burn**
71:24

**business**
7:10,17 33:7
47:17 54:17
56:14 57:12
71:23

**businesses**
8:7

**busy**
56:12

**buy**
9:6,8 12:18,20,
21,24 13:3,4
74:19 92:7

**buying**
13:6 92:13

—————————
**C**

**C-E-M-I-L**
6:16

**cab**
10:9,10 75:16

**cabinetry**
7:15 8:17

**cabinets**
22:25

**California**
4:1,13 8:6 33:5,
6 85:11 95:7

**call**
36:8 55:9,16
57:10 77:24
84:11 85:1,16
89:24 91:24
92:16

**called**
9:23 12:9 31:1
54:12 56:23
89:16 93:21

**calling**
54:16

**calls**
5:22 29:22 58:2

**car**
12:6,24 13:10
26:24 42:1,21
44:3 68:22 69:5
72:1 73:10 80:1
92:13 93:5
95:25

**care**
45:15 47:10,18
49:14 74:5
90:11 91:21
92:4 93:5,7

**cars**
15:15,23 82:13

**carve**
61:22

**carved**
62:6

**case**
12:5 13:12,22
16:17,23 18:1
21:13 26:8
32:18 34:20
36:16,18 37:3
49:22 50:10
51:3 57:23
58:14 62:24
63:5 64:5 65:11
68:18 70:1

**casework**
7:15

**cash**
69:10 73:9
79:18

**catch**
83:3

**category**
81:20 82:6

**caught**
84:3

**caused**
11:15 15:7

**caveat**
76:1

**Cemil**
4:4 6:16 95:12

**chance**
22:11 71:3 78:2

**chances**
22:23

**Chang**
4:16,17 77:20,
23 78:1 95:2
99:5,12

**change**
12:10,12,13
25:4

**changed**
98:18

**Changers**
12:9

**charge**
71:18

**check**
25:10 30:7,11

**checked**
30:9

**Chem-il**
77:24

**Chevron**
12:8

**children**
83:16

**chose**
85:6

**Chris**
59:2

**circle**
39:15,20

**circumstances**
44:9

**City**
6:20

**claim**
64:13 81:16
96:15,17

**clarification**
95:5

**clarify**
95:8

**class**
4:12 18:1,4
21:16 26:17,22
28:17 34:13
37:6 43:12 45:1,
14,24 48:24
49:1,2,21 51:6
54:8 55:12
58:12,15,19,23
61:23 63:2,8,18
65:13 69:10
70:15 77:1,4
82:2 89:20

**clear**
18:2,12 19:6
25:1 29:21
67:12

**clearer**
61:8

**closely**
61:7

**closer**
63:4

**closing**
94:3

**co-owners**
7:22

**Cochran**
59:18 60:3,4,5

**Code**
33:7

**coffee**
61:12

**comfortable**
52:13

**comment**
88:1 98:16

Page 3

Cemil Hope

April 12, 2017

comments
87:8,25 89:12
98:19

committing
52:6

communications
32:3,10

company
34:17

compared
66:3

compelled
40:11 84:25

compensated
68:20

compensating
79:15

compensation
18:13

complaints
19:14 32:8

complies
60:23 65:4

compound
44:13

compromise
72:12,16

compromising
72:10

concern
22:9 40:10
70:22

concerned
90:16 93:18

concerns
46:10 70:11
71:3 79:7 85:24
86:2,3,5 89:23
96:3

condition
16:16 17:10,12

conditions

22:4,13

confirm
82:19,23 83:4

confused
69:17

consult
73:25

contact
55:5 56:18,19
57:4 84:10,15
88:23

contacted
38:17 49:15,17
51:6

contacting
57:16

contend
20:5

content
61:1

context
52:24 62:6

continue
12:18

conversation
34:25 35:4
85:19 86:13
88:11

Cool
34:10 75:13

copy
31:5,18,21
33:20 35:23
36:4,6 37:5 49:1
98:4,22 99:7

corporation
8:12

correct
4:16 14:22 19:9,
11 23:23 26:19
31:12 83:10
85:3 88:17,18,
20,24 90:12

94:11,18 95:16

corrections
98:12

correctly
22:20,23 37:24
38:7 91:12,13

correspondence
32:10

Corrosion
44:13

costly
42:17

counsel
4:16

counteract
43:5

couple
57:13,20 58:4,5
77:20 78:4

court
5:8 61:21 83:5

coverage
29:25

covered
38:19 96:20

CRC
44:16

create
22:5

crew
10:10

criteria
43:2 45:12

criticism
67:18

current
7:8 8:12 21:9
88:20

customer
44:10

customers
82:18

cut
23:12

------------------

D

da
69:2,6 86:20

damage
63:3

damages
26:9 63:6

Darrell
58:25

dash
32:18

date
50:20 83:10
94:18

dated
6:20 57:6

dates
82:23

David
4:16 78:1

Davis
59:14

day
13:5,7,9 31:9
40:11 41:15
54:16 56:9,10
57:4,13 71:15,
22 72:6 73:19
93:8

days
68:22 98:5,23

deadline
70:17

deal
65:9 71:21
73:13 80:7,11,
17 92:12 93:12,
13

dealer
12:11 13:7

dealership
12:24 42:12

dealerships
42:7

dealt
54:8 55:12
64:16 69:7
72:25 78:25
80:9

decent
13:1

decide
14:17

decision
92:9

declaration
82:24,25 83:22

deduce
25:2

deemed
16:15 45:20
98:8

deeply
91:21

default
25:19 27:20
63:25

define
62:14,17 78:21

defined
62:8

defining
79:15

definition
61:23

degree
25:5

deleted
55:23

deny
61:22

depending
98:1

Cemil Hope

April 12, 2017

17:10,12

**depends**
56:12 69:22

**deposition**
5:6 6:22 30:14, 21 32:1 33:22 78:2

**describe**
86:13

**details**
57:16 61:5

**determine**
65:22 79:4 80:25 94:3

**determines**
95:23

**dialoguing**
57:21

**difference**
73:11

**differently**
72:19

**difficult**
5:9 23:12 80:17

**diligence**
91:19 92:11

**diligent**
91:17

**directly**
33:16 51:14

**disagree**
61:4

**disbelieve**
12:3

**discounted**
48:1

**discounting**
74:7

**discourse**
86:8

**discuss**
61:1

**discussing**
88:5

**discussion**
65:17 88:6,19

**dislike**
23:14

**disliked**
23:15

**dislikes**
23:16

**disproportionate**
26:7,12 62:21, 22 63:12,14,17 66:2

**disturbing**
28:1

**document**
30:23 31:14,17, 25 32:15 35:12, 23 36:4,12,15, 20,23 37:1 49:21 50:6 60:13 83:5

**documents**
32:3,13,20 33:21,25 35:16 49:22

**Dodge**
15:18,19

**dollar**
18:8,9

**dollars**
67:5,16

**dollars-ish**
63:5

**door**
94:3

**doubt**
67:15,17

**dozen**
9:20 58:4,5,6

**drawing**
75:22

**drive-through**
12:10

**drives**
47:12

**driving**
73:15

**Dropbox**
50:22

**due**
46:13 91:19 92:11

**duly**
4:5

---

**E**

**earlier**
39:4 41:25 42:6 49:6 83:3 95:14

**early**
83:18

**ease**
24:16

**easier**
5:10

**easily**
77:12

**easy**
68:23

**Ed**
59:18

**edits**
60:19

**effect**
42:5 43:17 65:19

**efficient**
14:12

**effort**
73:16

**efforts**
69:22

**electronic**

50:16,19 60:24

**electronically**
56:6

**elements**
73:18

**Eleven**
29:7

**else's**
52:23

**elusive**
55:25

**email**
33:16 56:19

**emailed**
36:15

**emails**
33:15

**employee**
32:4

**employees**
71:24

**employer**
7:8

**end**
5:14 16:8 30:3 40:11 41:15 71:15 72:6 73:19

**ending**
99:13

**ends**
52:21

**engine**
75:19

**entail**
18:14

**entails**
38:11

**entire**
21:15 24:25 25:3,8

**entitled**
21:17

**equal**
41:6

**erroneously**
52:4

**essence**
64:2

**established**
47:6

**event**
14:23

**eventual**
19:8,13 68:1 74:15 75:1

**eventually**
19:10 51:6 53:25 70:3 75:25

**evident**
23:17

**exact**
31:9 34:23

**EXAMINATION**
4:8 77:22 95:10 96:22

**examined**
4:6

**Excellent**
99:2

**exception**
6:4

**exclude**
19:23

**exempt**
20:1 26:3

**exempting**
66:10

**exhibit**
6:22,23 30:14, 15,17,25 31:17 35:12,13,15,19,

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Cemil Hope                                                                                    April 12, 2017

24 36:9 37:5,7,
13 49:1,21 50:2,
3,5 51:1 60:10,
12,22 65:1
82:25

**exhibits**
34:6

**expect**
47:4 63:13

**expected**
21:9

**expedite**
66:19

**expedited**
98:2 99:10

**experience**
29:5,16 35:3
90:24

**expert**
23:8

**explain**
51:5 62:13

**explained**
94:7

**expressed**
72:19 75:9
89:24

**expression**
72:18

**Extremely**
12:19

_____

**F**

**Facebook**
34:22 35:7
51:11,14,18,20
52:10,15,19
53:1,9 55:22,25
56:7,9,14 75:24
76:5,13 84:20
86:6,12,18,23
87:4,24 88:4,19

**facilities**
42:9

**fact**
53:20 70:9 96:1

**failed**
81:17

**fair**
5:11 6:6,12
12:14 13:14,16
14:1 18:25
20:12 26:10
29:14,15 39:2
40:1,19,21
41:12,16 43:19
45:4 48:8 53:7,
21 63:13 65:9,
15 67:19 69:20
70:5,24 73:7
75:9 78:20 86:9
99:1

**fairly**
45:10 63:13
66:10,23 67:1
80:9 94:4

**fairness**
13:14 38:16
46:18 48:7 54:4
72:20 88:12,13
91:3

**faith**
43:16 47:11
72:12,24 76:19

**familiar**
4:19 60:9

**family**
15:11 30:10
39:14 40:3,16
47:18,22,25
71:23

**family's**
93:5

**fast-tracked**
71:2

**fast-tracking**
69:19

**faulty**
42:24 96:10

**fee**
58:23 63:19
65:12 66:3,19,
24,25 67:8,12

**feed**
35:7 36:13
51:18 52:19,21,
23 53:2,9 55:22
56:14 75:24
76:9,14,15,16

**feeds**
51:11 56:1

**feel**
24:16 38:18
40:1,18,19,21
46:21,22 47:2
48:8 53:20 68:9
70:5,7,8,11,25
72:5 73:8,18
91:4

**feeling**
18:24 38:16
42:15 46:18
54:13,18 66:7
92:24,25

**feelings**
62:16

**feels**
66:1,4,6,14,15,
16,17 70:23
73:8 92:18

**fees**
26:7 62:21,22,
23 63:4 64:6
65:23 66:6

**felt**
16:22 18:17
40:11 45:11
46:16,18,21
47:3 53:22,23
69:24 76:12
84:25 92:19

**file**
34:17 53:17,18

**filed**
32:17

**fill**
6:21

**find**
19:18 21:8
23:13,15 39:17
43:18 44:3 49:9,
15 56:1,4 68:8
70:2 84:15 88:5

**fine**
64:25 85:19

**finish**
5:15,16,17

**finite**
41:20

**fit**
85:18

**fix**
11:23 42:21
72:15

**fixed**
12:1 46:4 75:3,5

**fixing**
97:21,23

**follow**
54:15

**follow-up**
78:4

**forever**
23:1 40:23

**forget**
13:9

**forgot**
31:22

**form**
6:19 8:12 37:6
45:25 58:20

**forte**
56:17

**Forty-six**
10:16

**forum**
88:19 89:5,15

**forward**
33:15

**forwarded**
50:6

**forwards**
52:22

**found**
27:19 51:5
53:13 54:11
70:9,10 93:21

**foundation**
22:3 95:13

**foundation/the**
93:16

**four-door**
10:10 75:18

**frame**
18:6 20:14
21:15,17,21
22:15 24:3,7,14,
16,25 25:3,8
27:11 28:10
32:6,14 35:22
36:21 41:9 42:3,
17 43:2,13
44:11 53:12
66:13 68:22
69:1,6,11 72:8
74:11,18 80:10,
14,16 81:17
93:13,14,15,16
95:22 96:1,4,5,
8,9 97:19

**framed**
46:10,11

**frames**
24:2,5 28:20
29:13 97:21,23

**Frank**
59:10

**free**
29:22

**frequently**
91:20

Cemil Hope

April 12, 2017

**friend**
51:8,11,12,16,
21,23 76:8,9

**friends**
51:24 52:12
55:2 76:5,13

**front**
30:17 35:15
50:5 92:10

**fuel**
14:12

**fulfilled**
38:19

**full**
6:14 81:25

**fully**
86:2,3

**future**
13:20 20:2,11
22:5,7,18 26:2,
18,21 27:16
28:3 39:18
40:22 62:20
81:4,6,15,22
94:9,11

---

**G**

**gaping**
22:3

**gather**
44:22

**gauged**
83:15

**gave**
11:20 48:3

**Gay**
59:6

**general**
12:15,21 13:13
38:15 41:3
46:17 55:17
77:7 88:12
89:12

**generally**

13:24 46:2,22
66:2 78:6 79:12

**generic**
70:4 87:2

**gentlemen**
96:20 99:6

**gist**
19:4

**give**
5:4,15,16 33:8
44:10 52:2
62:15 76:23
80:22 92:16
93:22

**giving**
4:22 72:3

**Glendale**
58:9

**good**
4:10 23:25 24:1,
3,5,15 34:8 42:1
43:1,14,16 44:9
46:1 49:3,4 73:4
76:19 92:12
97:22,23

**good-faith**
73:16

**goodwill**
43:17

**google**
97:2

**googled**
97:5

**grain**
89:22

**granted**
27:23

**great**
6:25 33:12
49:18

**greater**
27:6 39:20
66:11

**greatly**
64:9

**gripe**
27:2

**ground**
24:12

**group**
34:17 86:6,14
87:4,13,18,19
88:4

**growing**
57:12

**guarantee**
5:15

**guaranteed**
45:17 78:24

**guess**
7:19 16:12 17:2
18:6,13,18
19:25 23:16
27:17 28:7
37:18,23 38:3,5,
9,10 46:9 48:12
58:4 66:1 68:3
74:2 77:15
78:22 80:22
81:9 90:14
94:12

**guy**
47:16 55:9,12,
16

**guys**
55:15 95:6
96:13,20

---

**H**

**H-O-P-E**
6:17

**H-U**
6:17

**half**
9:20

**hand**
50:18

**handed**
60:12

**handling**
64:3

**happen**
19:6 27:25
38:25 45:19
47:24 49:19
66:17

**happened**
49:19 51:7

**happening**
20:6 22:24
49:11

**happy**
12:17,21 13:3

**hard**
36:4,6

**hassles**
80:2

**Hawaii**
4:15 33:9 85:6
95:8

**head**
5:23 23:18

**heads-up**
61:12

**hear**
28:13 34:20

**heard**
58:25 67:4 85:1
93:24 96:24
97:8,11

**heavy**
37:11

**held**
73:3

**Hey**
55:10 94:2

**high**
17:6 64:7 98:21

**higher**

22:21

**hinder**
13:23 16:10

**hitting**
36:10

**Hm**
75:22

**hold**
26:2,17,22 28:9,
19 29:13 40:22
44:25 62:20
83:15

**hole**
21:20 22:3

**holes**
24:3

**home**
4:15 16:2 95:18

**honest**
17:19 55:24

**honestly**
11:11 34:21,24
35:5 36:13 57:2,
14 62:10 76:6
79:21 84:13
86:7

**hope**
4:4,10 6:16,17
7:1 8:17 30:12
33:14 43:24
48:16 71:10
90:9,25 91:2
98:10

**Hopebuilt**
7:11,14,22 8:8,
10

**Hopkins**
59:6

**hour**
6:4 71:19

**house**
80:13,16 95:12,
15,22

Cemil Hope

April 12, 2017

huge
27:19

hundred
71:19

**I**

idea
52:20 76:2

ideal
24:20

identification
6:23 30:15
35:13 50:3
60:10

ill
71:6

imbalanced
64:20

impact
20:15,22

impartial
42:16

implications
47:19

important
5:20 74:7 90:11
93:15 95:15

improve
25:15,19 62:1,
19

improved
25:13

inability
26:1,16 40:22

incentive
65:6

include
32:7

included
27:20

incorporated
7:18 8:15,16

incorrect
83:23

incorrectly
22:24

incur
80:23

incurred
26:9

independent
42:13

indication
19:3

indicative
25:17

individual
39:6 40:7 45:18

individually
96:18

individuals
61:23 62:7
86:15

information
49:10 53:14
84:16

initial
52:16

innards
24:9

inspected
21:5 42:1 72:22

inspecting
42:11,12,22

inspection
11:21 18:7 73:6
78:24

inspections
23:24 32:6

instructs
6:9

intend
14:4,10,13 21:4

intended
13:20 31:23
46:11

intention
13:3,6,19 31:24

intentions
71:13,14

interest
72:2

interests
46:23

invested
72:1

invoices
32:8

involved
46:23 58:19
63:2,8 76:22,25
89:19 90:14

ipad
33:1

issue
12:1 21:12 22:9,
10,14,18,21
23:21 24:3,6
27:16 28:4
41:20 48:8
66:11 72:20
79:9,10 80:8
81:17 82:1
90:11,18 91:15,
21 97:19

issues
11:15 20:21
21:9 22:7 26:18
27:21 41:7
47:21 55:11
63:9 72:7 97:22

**J**

Ja-meal
77:25 78:1

Jan
59:16

Jennifer
7:7

job
5:10

Joe
60:6,8

John
59:14

Johnnie
60:5

judge
67:7

judges
43:17

justice
62:15

justifies
63:18

justify
65:11

**K**

Kelley
17:8

Kendrick
59:16

kids
71:22

kind
15:12 19:3 20:4
28:1 44:21
46:20 47:3,8
61:6 63:21 68:7
69:3,4,19 70:2,8
71:1 72:24
73:25 74:4,6,10
77:12,13 79:1
80:9 81:19 82:6
86:17 87:1
89:22 92:22
94:7 95:14

king
10:9

knew
35:10 42:6
44:25 55:2
89:23

knowing
22:6 39:9 64:14
68:14

Kramer
59:4,24

Kurilich
59:8

**L**

lack
54:3 64:22

laid
64:13

lasts
95:18 96:3

lawsuits
4:12

lawyer
82:12 95:8

lawyer's
64:6

lawyers
63:11 67:4,6,9

laymen's
34:16 40:10
80:21

layperson
66:7

lead
88:1,5

leads
87:24

leaf
11:20,25 93:11,
12

learned
66:15

leave

Cemil Hope

April 12, 2017

94:25

**leaving**
57:3,5

**led**
86:24

**left**
39:21 57:1

**legal**
45:3,6 62:23
65:23 66:6

**legalese**
23:13 27:12
37:10,11 46:6
61:8 62:17
80:21

**legitimate**
28:4 81:16

**length**
41:17,18

**letter**
51:1 68:9

**letting**
38:24

**level**
19:17 20:12
24:7,18 27:9,14
41:10,21 42:25
45:16 46:16
47:3 69:3 70:25
74:4

**liable**
20:10

**license**
9:12 72:2

**licensed**
95:6

**life**
47:25 95:17,18,
21,22,23 96:6,9

**lifelong**
40:14

**light**
23:20,22 25:19

70:11

**likes**
23:17

**limit**
29:11

**limitation**
27:8 43:15

**limited**
41:20

**limiting**
14:7

**lines**
55:6

**link**
36:1,10,11,20,
22 52:16 84:22
87:2

**linked**
76:3

**list**
9:19 17:15
76:24 98:21

**listed**
9:2,4 17:14

**liter**
75:21

**litigation**
87:14,17 88:7,
10,14,17,20,22
90:19

**litigious**
81:10 88:8 90:2

**lives**
93:17 97:18

**living**
67:3

**loaded**
45:10

**loaner**
43:13 44:5,10
73:15

**locale**

85:17

**location**
85:9

**long**
8:10 9:19 37:6
46:15 76:24
96:4

**longevity**
41:2

**looked**
13:1 17:11,18
44:20 54:10
56:22

**lose**
19:5,7,12

**loss**
27:21 45:16
64:11 71:17
75:2 79:2,13
80:23

**losses**
64:4

**lost**
16:25 72:23

**lot**
12:25 46:23
57:15 90:11

**lots**
27:24 46:6

**lower**
47:20

**loyal**
39:12 48:10
82:18 91:5

**loyalty**
47:5 71:8 82:15

**lurches**
39:21

_____

**M**

**made**
24:8 69:22
77:13 85:1,16

89:24 91:24

**mail**
36:9 49:11
58:18 70:16

**mailed**
35:24 36:4,5,6,
17,18 49:2

**maintenance**
11:5,10,12,17

**make**
5:10 13:9 60:19
61:7 62:12
64:10 67:3 69:3
72:15 78:11
92:3,11 98:12,
19

**makes**
37:23 77:4

**making**
6:8,10,11 20:10
22:22 73:15
89:3 92:9

**manufacture**
7:15 82:12

**manufactured**
22:16 28:19

**March**
31:4 50:23,24
57:7

**Marin**
9:9 82:21

**mark**
6:22 7:25 30:13
34:4,6 35:11
50:1

**marked**
6:23 30:15
35:13 50:3
60:10

**marketplace**
47:5

**married**
7:4

**match**
41:10

**Matt**
59:8

**matter**
78:3 85:9

**Mazda3**
15:16 30:10

**meaning**
20:24 22:14
37:9 62:12

**means**
6:1 23:6 32:22
40:6 44:4 56:20
78:25 81:18
90:25 92:18
94:7,8

**meant**
85:22

**medical**
5:3

**member**
77:4

**members**
18:1,4 21:17
26:17,22 28:17
43:13 48:24
49:2 63:18
69:10 70:15
77:1

**memory**
35:6 57:3

**mentioned**
40:24 41:14
51:12 54:2
62:19 81:6
82:14 84:17
95:14 97:18

**Mercedes**
15:8,14,22 30:7

**message**
55:4 57:2,3,5

**met**
4:10 45:12,23,

Cemil Hope                                                                          April 12, 2017

24 48:14 57:25

**metal**
23:5,6 42:6

**metallurgist**
23:3,7 42:6

**metallurgy**
23:8

**Middle**
6:16

**Mike**
59:4,24

**miles**
10:24 11:1
57:18

**million**
57:18 62:24
63:4,10,18
65:12,13 66:19
67:12,18

**millions**
67:5

**Millwork**
7:16

**mind**
16:4 25:12
26:16,21 46:4
62:2 67:12,16
69:10,20 70:19
96:5 98:15

**mine**
27:3

**minimal**
58:21 63:7 64:3

**minimum**
17:21 27:6
41:13 64:5

**minute**
57:18

**minutes**
34:5,9 61:16
64:23

**missing**
53:24

**Mm-hm**
4:24 30:19,22
31:3,16 35:18
50:13 57:8
61:19,25 65:2,7
70:14,18 84:8

**Mm-mm**
36:10 58:13
59:1

**model**
13:7,10 75:16

**models**
9:21 77:8

**modify**
43:9

**moment**
12:23 13:2 14:3
26:9,15 56:3,12
57:19 59:20
60:4

**monetarily**
71:14 91:7

**monetary**
18:19 81:24

**money**
16:25 19:5,7,12
67:3 79:24
93:22

**monies**
67:24 68:2

**months**
8:13 17:19
57:12,14,20
79:8

**morning**
4:10 31:5,23

**Morrison**
7:25

**Motor**
32:17

**mouth**
95:1

**moving**

57:17

**mutual**
51:23

---

**N**

**names**
52:2 59:19,21
76:1 87:21
89:14

**nature**
20:14 98:16

**necessarily**
22:1 23:14
28:21 37:22
38:5 73:22

**needed**
25:17

**needing**
61:13

**negative**
16:19 87:10

**negatively**
20:15,22

**nice**
13:1 66:19

**night**
84:3

**Nobody's**
21:1

**nod**
5:23

**normal**
41:12

**not-too-distant**
13:20

**notice**
37:6 49:2,12,22
51:6 58:15
64:16 69:24
70:16 82:9

**notices**
49:13 58:18
63:1 64:17

**notified**
80:3

**NOVATO**
4:1

**number**
28:21,23 29:2
32:3,15 34:14
54:10,12 55:15
56:22 79:23

**Nutley**
59:12

---

**O**

**O'REARDON**
4:9,11,18 6:24
15:1,4 28:14,16
29:19 30:2,6,13,
16 33:5,12,14,
18,19 34:12
35:11,14 37:25
45:5 50:1,4
60:11 67:10
75:11,15 77:18
95:3,20 96:7,23
97:15,17,25
98:7,15 99:1,3,
10

**oath**
4:23 83:8

**objected**
58:11

**objection**
25:16,24 26:6
28:12 32:17,23
33:21 34:2
44:24,25 45:2
48:14 49:25
53:17,18 55:13
60:16,17,22
61:1,10,11,18,
21 62:13 65:16
67:6 70:17 71:4,
11 72:18 74:17
75:4 78:12,14
85:25

**objections**
6:9,12 25:22,23

54:9 93:24

**objective**
43:2 78:23

**objectively**
73:2 92:19

**objector**
96:25 97:3,5,6,9

**objectors**
97:11

**obvious**
22:4

**occurred**
16:13

**October**
14:21 15:6

**odds**
17:4

**off-kilter**
92:23

**offer**
45:8 90:22

**offered**
43:21

**office**
4:15 8:5 31:11,
23

**oil**
12:6,9,10,12,13

**one's**
4:13 89:4

**online**
36:2

**Oops**
48:1

**opinion**
25:4 26:4 45:3,
7,9 63:16 65:18
73:25 96:11

**opinions**
71:4 75:8

**opportunity**
5:16,17 49:6,18

Cemil Hope                                                                    April 12, 2017

68:10 98:11,20

**opposed**
62:5

**opt**
27:13,16 39:2,4, 5 40:9 48:3,4 49:7 64:1 81:3, 22 96:14

**opted**
70:6 96:15

**opting**
27:14 63:25 64:2 70:6

**order**
28:9,19 81:4,13

**orders**
32:8

**outcome**
69:15 70:4 73:7 74:15,21

**outer**
29:11

**owned**
9:15,18 10:18, 20 11:8 12:14 48:11

**owner**
7:17,24 8:15

**owning**
90:24

**owns**
30:10

_____

**P**

**paid**
9:10 26:10 63:3, 6,11,13 64:9 66:24,25 67:6,8 68:3

**Palmer**
58:25

**paragraph**
61:20

**parameters**
17:20 86:14

**pardon**
9:15

**part**
18:24 24:21,24 38:15,21 58:15 65:5 69:23 76:13 81:2 86:1 93:15 95:15

**party**
42:13

**passion**
90:10

**passionate**
90:15 92:2 93:3, 4,19,20

**past**
14:6

**path**
55:20 84:24 88:2

**pause**
37:15

**pay**
63:13

**payout**
66:6

**pending**
6:5

**people**
19:20 20:1,22 26:1,10 28:3,8 34:15,17 39:15, 20 40:2 41:15, 24 45:14,19 46:12,23 47:6, 10 48:23 52:3, 11,20 53:2 54:16,22 55:19 59:21 60:8 62:2 63:1,7 64:1,10, 13 66:11,18,23 67:1,9,13 68:5, 15,19 69:13,21,

23 71:3 72:7,11, 21 73:12 76:24 78:23 79:15 80:3,7,22 82:16 86:5,24 87:3 88:4 90:4 91:5 93:6

**people's**
41:19 93:17

**per-case**
18:23

**percent**
17:7 22:11 49:2, 17 56:23 63:1 65:6,14 70:13, 15 79:13 83:14

**percentage**
22:12,19

**perforation**
32:7

**performed**
43:25

**period**
9:25 41:20 85:15

**periphery**
40:2

**person**
39:5 47:12 52:7, 13 53:4,5 55:1 57:25 76:3,12 81:10,11 88:9 89:5,11,18 91:17 93:21

**person's**
58:22

**personal**
27:7,9 45:7,8 47:8 63:16 74:12 75:8 86:25

**personally**
24:15 45:13 48:25 49:20 54:24 66:4

71:10 72:14

**persons**
87:3

**perspective**
22:8 45:6 48:9 62:9 67:11 71:12 80:15 82:14 84:13

**pertain**
37:23 38:2

**pertaining**
32:14 38:9

**pertains**
38:22

**Petaluma**
8:6

**phone**
4:14 56:19,21, 25 58:2 91:24

**phonetic**
59:6

**phrase**
19:4

**phrased**
37:24

**physical**
36:19

**physicality**
73:13

**physically**
51:9

**picking**
91:20

**pickup**
9:24

**pictures**
32:8

**piece**
25:7 26:5 74:7 90:2

**pigeonhole**
82:5

**pigeonholed**
69:15 70:8

**places**
56:8

**plaintiffs**
4:12 61:22

**planning**
13:4

**play**
69:8

**plug**
43:8

**point**
5:25 13:19 20:7 34:23 47:9 54:6 63:16 67:12,14 68:3 70:5 71:16 72:4,11 73:6 87:7 94:4

**pointing**
51:10

**portion**
79:18

**portions**
21:11 37:13

**positively**
39:24

**possibility**
20:14

**possibly**
20:5 79:15

**posting**
56:16 76:18

**potential**
22:18 73:10

**practical**
24:18

**practice**
11:4 95:7

**preemptive**
19:16 64:19

**prefer**

Cemil Hope                                                                          April 12, 2017

71:21

**pregnant**
83:17

**prepared**
17:2 25:16

**preprinted**
6:19

**prerequisite**
44:8

**presence**
47:4

**present**
4:15

**preserve**
94:16,17,20,22

**president**
7:19

**press**
87:24,25

**pretty**
10:1 39:12,13
40:13 57:19
82:18 90:17
93:13 96:20

**prevent**
97:21

**price**
13:1

**printed**
32:23 33:23

**prior**
8:14,17 9:20
13:20 25:25
32:1 57:20 80:6

**Prius**
10:1

**privileged**
33:4,8,9

**problem**
22:2,5

**problems**
22:5,7

**proceedings**
37:15

**process**
38:4,11 51:5
66:20 84:7
85:17

**product**
27:5

**products**
27:8

**profession**
21:25

**professional**
96:24 97:2,11

**Professions**
33:7

**project**
79:1

**Proof**
31:2

**propensity**
22:21

**proper**
22:16,17

**properly**
22:15,16

**properties**
23:6

**proportion**
65:12

**proportionate**
26:8 67:13

**proportionately**
65:10

**proposed**
33:24 35:21
72:25

**protected**
22:15

**protection**
46:13 80:22

**provide**
18:22 33:10
43:12 44:5 98:3

**provided**
43:21 44:14
89:15 98:1

**providing**
23:24 24:2

**provision**
43:12

**psychology**
68:24 69:7

**pulled**
35:25 36:2,21

**pulling**
36:11

**pun**
46:11

**purchased**
10:24 15:8,10

**Purchasing**
14:25

**pursue**
96:17

**pushed**
81:19

**put**
24:22 45:13
46:15 72:12
73:23 82:6 95:1

**putting**
24:10

---

**Q**

**quality**
81:14

**question**
5:16,22 6:4,5
18:21 28:14
29:18 30:1 38:8
45:9,10 65:20

**questioning**
67:2

**questions**
5:9,14 17:1 30:3
61:9 77:20 78:4
84:5 95:4

**quick**
4:21 71:20

**quickly**
47:1 66:10
94:10

---

**R**

**Randall**
58:9

**randomly**
88:4

**range**
17:12

**reached**
85:2,19

**read**
18:5 29:19,20
37:8,11,21 61:3
84:1,2 90:18,19
98:8,11,20,21

**reading**
23:14 25:2
44:21 46:25
77:10

**ready**
16:6

**real**
4:21

**realms**
56:7

**reason**
5:3 12:3 14:9,13
16:3,14 18:17
39:3,8,10 42:19
48:20 55:5
70:25 85:5

**reasonable**
29:3,4,7,10,12
65:12 78:7
80:24

**reasons**
96:2

**recall**
11:19,20,25
18:6 36:3,7
49:12,13 63:9
80:8 82:8 87:6
93:11

**received**
58:15

**receiving**
36:8

**recent**
7:21 11:22

**recess**
15:2 34:11
75:14

**recognize**
60:13

**recollection**
57:15

**record**
4:11 6:10,15
15:1 29:20 37:5

**recourse**
19:20 20:2,3,9
28:3 81:4,6,15,
23 82:7 94:4,7

**refer**
88:22

**reference**
77:12

**referenced**
86:12

**referred**
89:6,8,9,10
97:12

**referring**
94:17

**refers**
32:16

**reimbursement**
64:3

Page 12

Cemil Hope                                                                April 12, 2017

reiterating
  75:10

related
  32:9

relates
  32:16

relating
  25:25 50:9

relation
  74:16

relationship
  40:14

relevance
  92:24 93:1

relevant
  65:17

relinquish
  39:9

relinquishing
  38:24 75:1

reluctant
  45:8 48:20

remember
  7:20 9:10 11:13
  17:20 34:23,24,
  25 36:10 44:20
  51:9 53:10 55:8
  57:1,2 75:23
  86:7 87:9,16
  88:2

remoras
  97:12,15

rent
  44:3

repair
  32:5

repairs
  32:6

reparations
  68:2

repeat
  29:17

repercussion
  16:24

replace
  24:5,9,21 25:8
  69:5 80:10,14

replaced
  16:21 25:3 43:3,
  14 68:23 69:1
  72:9 74:18

replacement
  16:16 18:6,7
  19:1 21:17 24:2,
  7,14,16 42:3,17,
  23

replacing
  24:24 44:10
  80:16

report
  43:8

reporter
  5:8 29:19,20
  98:24 99:7

represent
  4:11 78:3 84:6
  91:21

representation
  50:9 51:2

representative
  32:4

represented
  48:18 66:23
  67:1

representing
  38:12

represents
  67:9

request
  31:15,17 32:11,
  15,18

requested
  63:4

requests
  31:25

require
  61:22

requirements
  46:11

resale
  20:15,20 47:20
  73:11

researched
  90:18

resistance
  55:21 84:24

resistant
  44:13

resolve
  41:19

respect
  11:24 71:8

respected
  93:7

response
  28:13

responses
  32:9

responsibility
  27:7 29:6 39:16
  82:9

responsible
  26:2,17,22 27:5
  28:9,19 29:13
  62:20

responsive
  32:13,20,22

retainer
  32:24 33:3 57:6
  65:1

reviewed
  31:25 37:6
  49:23

rights
  38:14,19,23
  39:9 48:3 85:23
  90:4,7 92:3
  94:9,11,16,21,

22

ring
  59:24

road
  69:9

role
  13:12

route
  56:24

routine
  11:7,16

rug
  47:1

rules
  4:19

run
  41:3,10 47:17

rushed
  66:17

rust
  20:23 21:1,12
  25:10 26:18
  30:8,9,11 32:6

rusted
  24:24

─────────────
          S

S-U-M-E
  6:17

safety
  47:21 81:17
  82:1,8 91:8,15
  93:6 97:19,20,
  21

salary
  8:19

sale
  13:23 16:25
  19:13

Sales
  32:18

salt

89:22

Salter
  4:14 25:16
  28:12 29:17,21
  30:5 32:25 33:3,
  10,13,17 37:2
  45:2 50:9 52:16
  53:25 54:20
  55:5 56:18
  57:10,22 58:9
  60:18 65:16
  84:10 88:24
  89:6 95:5,11,24
  96:12,19 97:14,
  16 98:6 99:1,2,
  6,9

Salter's
  84:15

satisfy
  74:12 78:10
  79:5

savvy
  56:6

scale
  19:15

scales
  63:21

scheduled
  11:5,6,16,19

scientific
  73:3

Scion
  10:2

sec
  83:15

secure
  91:12

securing
  91:13

seeking
  84:6,12,14

seeks
  31:17

Cemil Hope                                                                                      April 12, 2017

seemingly
  26:6

self-employed
  7:9,20 47:16

selfish
  74:4

sell
  14:4,10,13,17,
  24 15:7 16:3,18
  17:5 19:10 20:7
  47:20 72:8 79:7
  80:1 81:25

selling
  13:19 16:10
  68:25 71:16
  74:16

send
  52:1,20 63:1

sending
  35:8 51:16

sense
  20:11 37:23
  61:8 62:12
  68:11 77:7
  85:22

sentence
  61:21

sentiment
  53:22

separately
  52:1

September
  14:20,21 15:6
  16:5

September/october
  14:20

Sequoia
  10:20,21 35:22

Sequoias
  77:10

serial
  97:5,6,8

served

31:5,10 40:15

service
  31:2 32:5,8 41:7
  44:2

services
  43:25

serving
  14:5

settle
  27:22 62:24

settled
  16:24 19:25
  48:2 66:9 71:2
  81:20 84:10

settlement
  13:14,16,17
  14:2 16:9,13
  17:23,25 18:3,
  10,22 19:14,16,
  19,21 21:5
  23:10 24:23
  25:4,13,18,20
  27:14,15 29:22
  33:23,24 34:2,
  18 35:3,21
  36:21 39:1,2,24
  40:8,25 42:10
  44:14 46:4
  48:17 49:7 51:8
  53:12 54:4
  58:12 61:22
  62:1,19 64:18
  67:5 69:18
  70:12,16 72:15
  75:3 78:8,11
  79:18 80:6 81:2
  85:22 88:15,16,
  21 90:5,22
  93:25

settlement's
  43:12

settlements
  67:4 89:20

settling
  63:5

sharing

35:9

shop
  16:1 32:5 71:19
  92:5

shopping
  92:6,13

short
  9:25

shorter
  36:8 41:18

side
  64:5

sign
  50:25 98:4,7

signature
  6:21 50:14,16,
  18 60:24

signed
  30:20 61:2,3,4
  65:8 94:9

significant
  58:24 93:10

similar
  20:8 59:21

similarly
  45:24

simple
  71:15

simplistic
  46:8

simply
  71:7

sit
  17:2 40:1 44:4

site
  71:20

situation
  38:22

situations
  21:16

sizable
  21:20

small
  14:6,9

smaller
  66:4

Smith
  60:6,8

smog
  43:7

sold
  15:19

sole
  7:17

solely
  42:18 45:13
  87:18

somebody's
  64:9 86:25 87:1

something's
  66:8

sort
  20:9 30:3 46:24
  48:7 69:14 94:3

sound
  31:6 60:9 96:10

sounds
  29:15 41:11,12,
  13 49:18

spacious
  15:11

speak
  66:18 75:6 78:2

speaking
  47:8 48:7 49:16
  62:23 78:6

specific
  18:8,9,11 19:1
  21:18 28:23
  29:1,10 36:14
  37:18 38:14
  43:10 52:2,7
  53:6 55:7,8
  65:20 69:12
  76:2 78:17

84:20,21 86:15

specifically
  6:9 20:17 25:15
  35:8,21 36:1,12,
  22 39:24 40:18
  46:4 52:21,24
  54:11,19 62:5
  78:14,17 87:9,
  13 90:3

specificity
  18:19

specifics
  23:13 41:23
  54:5 65:25

spell
  6:14

spite
  39:19 40:12
  71:6

splash
  36:23

spoke
  37:2

spoken
  57:22

spot
  63:23

spring
  11:20,25 93:11,
  12

Sprinter
  15:9,18,25 41:5,
  6

Sprinters
  15:14,17 30:7

stake
  93:17 97:18

standard
  43:11 73:3

start
  56:6 77:6,7

started
  14:19 76:15,16

Cemil Hope                                                      April 12, 2017

starting
17:21

state
6:14,20 43:9
85:11 95:7

stated
25:25 39:4,23
40:25 46:9
63:12 73:21
78:14

states
33:8

station
43:7

statute
27:8

stays
16:1

steel
22:16

step
86:10

stopped
59:20,23

Street
8:6 31:11

strike
10:17 11:23

strong
91:11,14

structurally
96:10

structured
13:17

styles
77:8

subject
21:12

subjects
78:19

submitted
58:20

subpoena
30:14,20 31:5,
10 33:20 34:3

substantive
98:18

substrate
91:14

sudden
98:17

sue
81:11,12 94:11,
17

sued
81:12 94:12

suggest
42:12

suggested
54:7

suggesting
42:16,23

suggestion
55:1,10 85:25

suggests
43:16

suit
34:17

Sume
6:16

sums
13:15

super
91:5

surely
80:4

sweep
47:1

sweet
63:23

sworn
4:5

**T**

Tacoma
8:24 9:6,11,14,
22,24 10:23
11:2,8 12:22
13:4 14:4,10,14,
18,24 15:7,14
16:4 17:5,9
19:8,10,13
20:23 21:2,4
25:9 28:5 35:22
47:13 75:16
77:6 82:21
86:15 87:19
90:16,19

Tacomas
9:23 10:4 53:3
76:24 77:11

takes
45:25 47:10

taking
24:9 68:21
71:17

talk
5:11,18 89:11,
12 90:4

talked
40:21 41:25
46:2 58:8 96:13

talking
20:13 49:6
54:23 66:5,7
76:16,17 85:20
86:15 87:14
98:10

tax
9:12 72:2

technically
7:19 10:2 15:18,
25

Ted
59:10

ten
15:10 27:4,6
29:3,4,8,10 34:9

41:7,13

term
97:2,8

terminology
27:24

terms
18:19 25:25
34:16 35:9
37:18 73:13
74:5 78:11,15
80:21

Test
43:8

testified
4:6 82:20 90:10

testify
4:25

testifying
83:7

testimony
4:22 5:4

text
51:13,18 52:1

theory
12:2 63:4

thing
6:18 16:13 20:4
23:25 24:1,3,5,
7,15 25:7 38:15
39:7 42:1,10
43:1,14 44:9
46:1,14 49:3,4,8
69:4 70:13 72:1
73:20 87:24
92:8,9 93:17
96:13 97:22,24

things
22:1,6 23:10
24:6 25:17,19,
21 27:25 45:18
46:9 48:16,18,
22 49:13 54:15
55:5 56:16
57:17 62:19
64:15 71:15

72:19 73:17
78:4,14,21
86:18,22

thinking
14:19 39:6
53:18 92:25

third-party
42:18

thought
14:24 21:23
53:4 60:4 79:20
85:17

thoughts
21:22 55:11
92:17

thread
51:17,25 52:7,9,
14 56:5

threads
54:16,23 84:21

three-year-old
83:17

threw
54:7

throw
76:1

time
11:8,21 27:11
28:18 34:8
41:17,18,20
46:15,16,20
52:10 69:14,16,
17,21 71:18,24
73:12,15 96:24
99:4,9,13

times
6:8 11:9 78:7
81:6 86:13

timing
70:20

title
9:2,4 31:18,21

to-dos
98:21

Cemil Hope                                                          April 12, 2017

**today**
4:14,23 11:2
17:14 31:21
33:22 35:16
90:10 93:2

**today's**
30:14,20

**told**
21:1

**Tommy**
4:11 29:22
33:13

**tone**
55:4

**tools**
42:9

**top**
23:18 65:3

**topic**
30:4 88:5

**tops**
41:1

**total**
40:6 44:22

**totally**
31:22 39:25
67:22

**Toyota**
4:13,16 8:21,23,
24,25 9:6,9,15
10:2,3,13,18,20
11:24 12:11,15,
18,21 13:11
15:14 16:10
20:10 21:12
26:2,9,17,22
28:9,19 29:13
31:18 32:4,7,9,
17 35:10 39:12,
14,16,19 40:14,
17,22 41:5 42:7,
10,11,16 43:22,
25 46:15,20
47:4,10,11,13
48:10 49:9

62:20 68:9,10
69:24 71:8
76:24 78:3,10
82:15,18,20,21
86:15,20 87:18
91:6 92:6 94:17
95:9

**Toyota's**
64:5 69:23

**Toyotas**
9:18 12:14,17
41:3,8 51:24
68:15 76:6
90:24

**track**
86:23 87:22

**trade**
79:10

**trade-in**
12:25

**trades**
47:12

**transcribing**
5:8,21

**transcript**
98:1,12,22,23
99:8

**transportation**
78:25

**treated**
46:19 91:1,2

**treatment**
44:13

**triggered**
14:23

**truck**
13:1,19,24 14:8
48:11 49:14
64:16 71:16
79:8

**trucks**
9:22 39:14,16
68:16 86:15

**True**
9:3

**trust**
42:20 46:15
62:4 72:23,24
73:1,5 92:8

**trusted**
12:2 45:14

**truthfully**
5:1

**Tundra**
10:18 35:22
47:13

**Tundras**
77:11

**turn**
31:13 50:12
60:21 61:17

**Twenty**
53:2

**Twenty-four**
10:14

**type**
50:20 94:22

**typically**
12:6 77:16

_____

**U**

**unclear**
13:21 16:9

**uncommon**
88:4

**undercarriage**
25:10

**underside**
30:8,9,11

**understand**
4:22,25 20:3
27:12 29:24
37:10,14,20
38:4,10,20,21
40:8 41:21,23
46:7

**understanding**
21:14 27:12
28:2 34:14
35:19 69:14

**understood**
78:9

**unfair**
53:16 66:8 86:9

**unfairly**
46:19

**unique**
33:6

_____

**V**

**V6**
75:20

**vague**
13:18 18:18
54:14 55:14
78:16,20 84:19
89:21

**valuable**
71:18

**varied**
17:10

**vehicle**
8:21,23 14:25
16:1,7 18:16
20:8 24:17
28:18 31:18
32:5 43:13 44:6,
10 46:19 64:4
72:22 73:2,14
74:6,12,16,19
80:18 96:3,6,9,
11

**Vehicle(s)**
32:7

**vehicles**
8:25 9:16 10:3
13:8 16:2 21:12
24:19 40:15
41:5 42:9 72:13

**version**
36:9 99:11

**versus**
32:17

**view**
47:9

**visual**
73:4 86:19

**voice**
71:3 84:25
93:24

_____

**W**

**wait**
61:16

**wanted**
14:17 16:4
38:23 85:21
89:24 90:7 92:3
93:23

**wanting**
90:3

**Warner**
32:17

**warrant**
22:9 23:1

**warrantied**
64:15

**warranty**
18:6 29:5 63:9
80:8

**water**
61:13

**ways**
5:10 25:12
62:18 71:21

**Wednesday**
4:1 31:8

**week**
43:19 56:11

**well-versed**
80:18

**whatsoever**
71:13

LITIVATE REPORTING + TRIAL SERVICES l 877.771.3312 l litivate.com

Cemil Hope                                                                    April 12, 2017

**wife**
  7:6 9:4 14:25
  15:14,24 83:16

**wife's**
  7:6

**window**
  82:10

**wise**
  91:8

**withdraw**
  44:24 48:14,21
  75:4 78:11

**withdrawing**
  78:15

**wondering**
  52:1

**word**
  7:13 13:13
  45:18 64:19,22
  78:18 87:17
  93:19 94:6
  97:14

**wording**
  53:18 62:4,11,
  16

**words**
  7:12 62:14
  88:10 95:1

**work**
  15:12 16:1
  63:14 85:20

**worked**
  23:5

**works**
  14:16 69:25

**world**
  68:15

**worth**
  26:11 75:10

**worthy**
  16:15

**written**
  32:16,17 33:21

  51:2

**wrongdoing**
  66:22

**wrongful**
  34:19

**wrote**
  60:17 62:4

———————————

Y

**year**
  10:6,10 14:20
  15:17,19 16:8
  17:5 73:10
  74:19

**years**
  8:18 15:10 27:4,
  6 28:5,6,9,11,18
  29:3,4,7,23
  30:12 39:13
  40:24 41:1,7,11
  71:7 77:8,10
  82:15 83:20
  91:6 95:19 96:4

———————————

Z

**ZIP**
  6:20

LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com